UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| ASSOCIATED GENERAL CONTRACTORS OF AMERICA; ASSOCIATED GENERAL CONTRACTORS OF TEXAS; LUBBOCK CHAMBER OF COMMERCE; and J. LEE MILLIGAN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR and JULIE SU, in her official capacity as Acting U.S. Secretary of Labor, <br><br> Defendants. | Case No. __5:23-cv-272__ |

## COMPLAINT

### INTRODUCTION

1.     This lawsuit asserts claims under the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., against the Department of Labor ("Department" or "DOL") regarding its "Updating the Davis-Bacon and Related Act Regulations" published August 23, 2023, 88 Fed. Reg. 57526 (Aug. 23, 2023) (to be codified at 29 C.F.R. pts. 1, 3, 5) (hereinafter "Final Rule").

2.     The Final Rule unconstitutionally attempts to amend by executive order an act of Congress, namely, the Davis-Bacon Act, and unlawfully imposes the requirements of the Davis-Bacon Act ("DBA" or "Act"), 40 U.S.C. § 3141 et seq., to federal agency and federally funded contracts by operation of law.  *See* 29 C.F.R. § 5.5(e); Final Rule, 88 Fed. Reg. at 57739. The Final Rule also unlawfully extends the DBA to apply to workers who are not "mechanics and laborers" under the Act and unlawfully extends the scope of the work covered by DBA to include work that

is not performed "directly on the site of the work." *See* 29 C.F.R. § 5.2; Final Rule, 88 Fed. Reg. at 57731–34.

3.     The Final Rule took effect on October 23, 2023. Final Rule, 88 Fed. Reg. at 57526.

4.     In promulgating these provisions in the Final Rule, the Final Rule violates the Constitution, oversteps the Department's statutory authority under the DBA, and is contrary to law. The challenged provisions of the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e), are also arbitrary and capricious in contravention of the Administrative Procedure Act ("APA").

5.     This action seeks a preliminary injunction.

6.     This action also seeks permanent relief in the form of a declaration that the challenged provisions of the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e), violate Article I, Section 1 and Article II, Section 3 of the Constitution, the APA and DBA and are arbitrary and capricious. The Court should hold unlawful and set aside the challenged Final Rule provisions, and DOL should be enjoined from implementing or enforcing the challenged Final Rule provisions in any manner.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 702, 706. As to Plaintiffs' constitutional claim, this Court has authority to issue "equitable relief . . . '[to] prevent[] entities from acting unconstitutionally.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)).

8.     The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1361, and to vacate unlawful agency action under 5 U.S.C. § 706.

9.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is also proper under 28 U.S.C. § 1391(e)(1)(B) because the defendants are officers, employees, and agencies of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this district. *See also* 5 U.S.C. § 703 (venue for actions under the APA generally proper in "a court of competent jurisdiction").

## PARTIES

10.     Plaintiff Associated General Contractors of America ("AGC of America") is a nationwide trade association of construction companies and related firms. It has served the construction industry since 1918, and over time, it has become the recognized leader of the industry in the United States.  Today, AGC of America has more than 27,000 members in 89 chapters stretching from Puerto Rico to Hawaii.  Among these members are more than 6,500 general contractors and over 9,000 specialty contractors.  AGC of America has at least one chapter serving each and every state, Puerto Rico, and Washington, D.C., including 11 chapters in the state of Texas.  AGC members construct both public and private buildings, including offices and apartment buildings, hospitals, laboratories, schools, shopping centers, factories, and warehouses. Across the United States, AGC of America contractor members regularly bid for and perform federal construction projects and federally funded construction projects which are subject to the DBA.  They construct highways, bridges, tunnels, dams, airports, industrial plants, pipelines, power plants, power lines, and both clean water and wastewater facilities.  AGC of America's mission is to advocate public policies that will expand and enhance the construction industry, to offer educational programs and materials on topics of interest to its members, and to encourage dialogue not only among construction companies but also between those companies and related

firms, including material suppliers, property owners, and design professionals.  The association also strives to maintain its members' longstanding commitment to skill, integrity and responsibility.

11.    Plaintiff AGC of Texas, Highway, Heavy, Utilities & Industrial Branch ("AGC of Texas") is a chartered chapter of AGC of America. It is incorporated in Texas and headquartered in Travis County, Texas. For nearly 100 years, it has represented the interests of the highway and transportation contractors among the members of AGC of America in the state of Texas. For nearly 40 years, it has also represented the industrial, municipal and utility contractors among those members. AGC of Texas has over 650 members. Among them are more than 200 contractors and more than 450 firms in closely allied industries. Collectively, their annual sales volume of construction exceeds $4 billion. Many of its members are engaged in public and private construction projects in this judicial district. The mission of the AGC of Texas is to advocate for professional and ethical standards that support cost-effective, quality construction. Its prime objective is to cultivate harmonious relations with supervising public authorities. To advance its mission and prime objective, AGC of Texas offers a broad range of specialized publications. It also hosts education and other events, and provides training, safety and other services. For the federal government, its members regularly construct infrastructure projects for the U.S. Army Corps of Engineers and the Federal Aviation Administration.

12.    Plaintiff Lubbock Chamber of Commerce ("Plaintiff Lubbock Chamber") is located in Lubbock, Texas.  It is the largest business federation on the South Plains of Texas, with over 2,000 members who employ over 79,000 workers.  Lubbock Chamber members include many small entities within the meaning of the Regulatory Flexibility Act ("RFA"). 5 U.S.C. § 601(6).

4

13.     Plaintiff J. Lee Milligan, Inc. ("JLM") is a heavy and highway construction contractor, located in Amarillo, Texas.  JLM performs construction work as a prime contractor and subcontractor on federally funded, state funded, and privately funded projects. JLM also operates several aggregate material quarries in Texas and sells aggregate materials to customers, including contractors performing work on federally funded projects subject to the DBA.  JLM also provides materials to federally funded projects subject to the DBA upon which JLM also works as a prime contractor and subcontractor.  JLM intends to bid on new federally funded projects subject to the Final Rule and also to sell and transport aggregate materials to contractors performing work on federal projects subject to the DBA.  JLM also intends to transport aggregate materials to and from federally funded projects subject to the DBA on which JLM will also bid and contract to perform on-site construction services.

14.     JLM expects to be bid against other contractors for these federally funded construction contractors.   In many cases, JLM will be bidding on federally funded projects on which it will also provide and transport aggregate materials from one of its existing JLM quarries. JLM wishes to be able to provide bids which are competitive with other contractors that do not have their own material operations and that will be purchasing aggregate materials from third party material suppliers.

15.     Defendant, the U.S. Department of Labor ("Department" or "DOL"), is an agency of the United States government, under the direction and control of the U.S. Secretary of Labor. The Department enforces the DBA through its Wage and Hour Division.

16.     Defendant Julie Su is the Acting U.S. Secretary of Labor. She is sued in her official capacity.

## ASSOCIATION STANDING

17.     Plaintiff AGC of America, Plaintiff AGC of Texas, and Plaintiff Lubbock Chamber each has standing to bring this litigation.

18.     Plaintiffs AGC of America, AGC of Texas, and the Lubbock Chamber have contractor members that perform work on projects which are subject to the DBA, and historically, such contractor members have relied and rely in whole or in part upon bid advertisements and contracts to determine whether the project is subject to the DBA.  Many of these contractor members provide construction services as a prime contractor or subcontractor and also maintain material supply services that sell and deliver construction materials to other third-party contractors.  Such contractor members also provide materials on those federal and federally funded projects on which the member contractor performs services as a prime contractor or subcontractor.  Many of these contractor members transport construction materials to and from federally funded projects subject to the DBA on which they will also bid and contract to perform on-site construction services.  Some of these contractor members purchase structures for specific use and installation on a DBA-covered project. Those structures may be manufactured at an off-site facility that is dedicated exclusively, or nearly so, to the performance of a DBA contract or project for a specific period of time lasting weeks, months or more.

19.     These contractor members are also subject to investigation by federal contracting agencies and the DOL regarding compliance with the Final Rule, and accordingly are subject to demand for the payment of back wages for the non-compliance with the DBA by themselves and lower-tiered subcontractors, withholding and cross-withholding, and debarment.  As a result, many of Plaintiff AGC of America, Plaintiff AGC of Texas, and Plaintiff Lubbock Chamber members have standing to bring this suit in their own right. Therefore, Plaintiff AGC of America,

Plaintiff AGC of Texas, and Plaintiff Lubbock Chamber may bring this action on behalf of those members.

20.     The Lubbock Chamber is the largest business federation on the South Plains of Texas, and its members include many small entities within the meaning of RFA. 5 U.S.C. § 601(6).  As a result, certain members of the Lubbock Chamber have standing to sue in their own right.   Therefore, the Lubbock Chamber has standing to bring this action on behalf of those members.

21.     None of the claims asserted through this lawsuit, or the relief requested, requires direct participation of the members of Plaintiff AGC of America, Plaintiff AGC of Texas, or Plaintiff Lubbock Chamber.

## GENERAL ALLEGATIONS

### *The Davis-Bacon Act and the Secretary's Improper Assumption of Legislative Power.*

22.     The DBA, as enacted in 1931 and subsequently amended, requires the payment of minimum prevailing wages determined by the Department to laborers and mechanics working on federal contracts in excess of $2,000 for the construction, alteration, or repair, including painting and decorating, of public buildings and public works. *See* 40 U.S.C. § 3142.

23.     Congress has also included the DBA prevailing wage requirements in numerous other statutes (referred to as "Related Acts") under which federal agencies assist construction projects through grants, loans, loan guarantees, insurance, and other methods. Related Acts include the National Housing Act of 1934, Pub. L. 73-479, 44 Stat. 1252; the Federal-Aid Highway Act of 1956, Pub. L. 84-627, 70 Stat. 374; and the Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58 (the Bipartisan Infrastructure Law). The Department maintains a list of Related Acts on its government contracts compliance assistance website at:

7

https://www.dol.gov/agencies/whd/government-contracts

24.     The Secretary of Labor has the responsibility to "prescribe reasonable regulations" for contractors and subcontractors on covered projects. *See* 40 U.S.C. § 3145. The Secretary, through Reorganization Plan No. 14 of 1950, also has the responsibility to "prescribe appropriate standards, regulations and procedures" to be observed by federal agencies responsible for the administration of the Davis-Bacon and Related Acts ("DBRA") "[i]n order to assure coordination of administration and consistency of enforcement of the labor standards provisions" of the DBRA. 15 FR 3173, 3176, effective May 24, 1950, reprinted as amended in 5 U.S.C. app. 1.

25.     When enacting the DBA, Congress used precise language, and deemed that the DBA applies only to "mechanics and laborers employed directly on the site of the work." 40 U.S.C. §§ 3141-3148; § 3142 (c)(1). This plain language is simple and unambiguous. Under its terms, DBA applies only to mechanics and laborers, and only if they are "employed directly on the site of the work." The DOL's Final Rule is an attempt to unconstitutionally amend the Act to extend the DBA to apply to workers who are not mechanics and laborers, and to extend the scope of the work covered by DBA to include work that is not performed "directly on the site of the work."

### The Final Rule Applies the DBA by Operation of Law

26.     The DBA expressly requires that public federal bid advertisement specification and contracts contain specified provisions concerning the minimum wages to be paid to the laborers and mechanics employed directly on the site of the work by contractors and subcontractors. The wages to be paid must be "computed at wage rates not less than those stated in the advertised specifications." Specifically, 40 U.S.C. § 3142(a) requires that the "the *advertised specifications* for every contract in excess of $2,000 to which the Federal Government or the District of Columbia is a party, for construction, alteration, or repair, including painting and decorating, of public buildings and public

works of the Government or the District of Columbia that are located in a State or the District of

Columbia and which requires or involves the employment of mechanics or laborers *shall contain a*

*provision stating the minimum wages to be paid various classes of laborers and mechanics*." (emphasis

added.).

27.     Further, 40 U.S.C. § 3142(c) provides that:

Every contract based upon the specifications referred to in subsection (a) must contain stipulations that: (1) the contractor or subcontractor shall pay all mechanics and laborers employed directly on the site of the work, unconditionally and at least once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and the laborers and mechanics; (2) the contractor will post the scale of wages to be paid in a prominent and easily accessible place at the site of the work; and (3) there may be withheld from the contractor so much of accrued payments as the contracting officer considers necessary to pay to laborers and mechanics employed by the contractor or any subcontractor on the work the difference between the rates of wages required by the contract to be paid laborers and mechanics on the work and the rates of wages received by the laborers and mechanics and not refunded to the contractor or subcontractors or their agents.

*See* 40 U.S.C. § 3142(c).

28.     40 U.S.C. § 3143 provides:

Every contract within the scope of this subchapter shall contain a provision that if the contracting officer finds that any laborer or mechanic employed by the contractor or any subcontractor directly on the site of the work covered by the contract has been or is being paid a rate of wages less than the rate of wages required by the contract to be paid, the Federal Government by written notice to the contractor may terminate the contractor's right to proceed with the work or the part of the work as to which there has been a failure to pay the required wages.

*See* 40 U.S.C. § 3143.

29.     The Final Rule provides that the labor standards contract clauses and appropriate wage

determinations are effective "by operation of law" and considered to be incorporated even when they

have been wrongly omitted from a covered contract. *See* 29 C.F.R. §§ 5.5(e) Final Rule, 88 Fed. Reg. at 57739.

30.     The DOL lacks authority under the DBA statute to impose this proposed rule, as the statute explicitly requires the contracting agency to include the DBA requirements.  Section 3142(a) requires that every contract "shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics." 40 U.S.C. § 3142(a). Further, Section 3142(c) mandates the inclusion of specific DBA stipulations. *Id.* § 3142(c). Given this statutory language, the DOL as a regulatory agency does not have the power to make any determination that the DBA requirements are applicable by operation of law, and that contractors are liable for violations, where not included by the contracting agency as requirements.

31.     The Final Rule does not require the DOL or any other federal administrative body to make a determination of the application of the DBA to the contract.

### The Final Rule Applies the DBA to Material Suppliers Operated by Contractors or Subcontractors

32.     The DBA applies to "all mechanics and laborers employed directly on the site of the work."  See 40 U.S.C. §§ 3142(a) and (c).

33.     The Final Rule purports to codify the DOL's long-standing subregulatory guidance that the DBA and the vast majority of Related Acts entirely exclude from coverage bona fide "material suppliers."  The Final Rule does so by defining the term "material supplier" and amending the regulatory definitions of contract and contractor to exclude material suppliers from their scope.  *See* Section 5.2. Final Rule, 88 Fed. Reg. at 57731-34.

34.     Significantly, the Final Rule further explains that if an entity engages in *any* construction, alteration, completion, or repair work that is not incidental to material supply at the site of the work, it is a contractor or subcontractor, not a material supplier.  *See* Section 5.2; 88 Fed.

Reg. at 57733 (emphasis added).  In such a case, the entity's workers' time at the site of the work would be covered by the DBA, subject to a *de minimis* exception.  This regulation eliminates a 20-percent threshold for material suppliers that had been set out previously in subregulatory guidance, including the Department of Labor's Wage and Hour Division ("WHD"). Field Operations Handbook ("FOH").

35.     Section 5.2 is invalid because the DBA does not cover material suppliers.

36.     The Final Rule's application of the DBA to materials suppliers that are operated by contractors or subcontractors ignores the statutory language and legislative history of the DBA, essentially determining that a bona fide material supplier will be considered covered by the DBA based simply upon its connection to a contractor or subcontractor. The Final Rule in this regard amounts to a fundamental amendment to the DBA, and one which would reclassify employees of material suppliers as "mechanics and laborers," in a manner clearly contrary to the plain language of the DBA.

### *The Final Rule Expands the DBA to Apply to All Time Spent by Drivers On-Site Where Such Time is Related to On-Hauling or Off-Transportation and is Not De Minimis*

37.     The Final Rule articulates the circumstances under which onsite activities essential or incidental to offsite transportation (e.g., pickup, dropoff, loading of materials and waiting time) by employees of contractors or subcontractors is covered.  Specifically, the Final Rule considers "covered transportation," to also include

> [o]nsite activities essential or incidental to offsite transportation, defined as activities conducted by a truck driver or truck driver's assistant on the site of the work that are essential or incidental to the transportation of materials or supplies to or from the site of the work, such as loading, unloading, or waiting for materials to be loaded or unloaded, *but only where the driver or driver's assistant's time spent on the site of the work is not de minimis*.

*See* 29 C.F.R. § 5.2; Final Rule, 88 Fed. Reg. at 57732 (emphasis added).

38.     The amendments in the Final Rule expanding the DBA to apply to trucking impermissibly conflict with the statute, which defines its coverage and is limited to "construction, alteration, or repair, including painting and decorating, of public buildings and public works… ." 40 U.S.C. § 3142.  Truck drivers are not "mechanics and laborers employed directly on the site of the work." *Id.* § 3142(c)(1).

39.     The amendment is neither a clarification nor an updating of the Act that a President or his agencies can lawfully undertake.  It is a fundamental change to the Act by adding "transportation" as a category of work covered by DBA, contrary to the congressional limitations of DBA to covering only mechanics and laborers employed directly on the site of work.  The expansion is also inconsistent with the substantial body of case law interpreting the application of DBA to transportation drivers. *See Bldg. and Constr. Trades Dep't AFL-CIO v. U.S. Dep't of Labor Wage Appeals Bd*., 932 F.2d 985, 992 (D.C. Cir. 1991); *H. B. Zachary Co. v. U.S*., 344 F.2d 352 (Ct. Cl. 1965); *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C. Cir. 1994); *L.P. Cavett Co. v. U.S. Dep't of Labor*, 101 F.3d 1111, 1112 (6th Cir. 1996); *Frank Bros. v. Wisconsin Dep't of Transp.*, 409 F.3d 880, 882–83 (7th Cir. 2005).

### The Final Rule Expands the DBA to Permanent Fabrication Facilities

40.     The Final Rule revises the definition of "site of the work" to define "secondary construction sites" that are covered under the DBA. Such sites include any site away from the primary worksite where *all* of the following requirements are met: (1) a "significant portion" of the building or work is constructed; (2) the "significant portion" is constructed for specific use in that building or work and is not just a product made available to the general public; and (3) the site is either established specifically for the performance of the contract or project, or is dedicated exclusively, or nearly so, to the performance of the contract or project for a specific period of time.  Final Rule, 88 Fed. Reg. at 57733.

12

41.     A "significant portion" is defined as

one or more entire portion(s) or module(s) of the building or work, such as a completed room or structure, with minimal construction work remaining other than the installation and/or final assembly of the portions or modules at the place where the building or work will remain.

*Id.*

42.     The Final Rule likewise defines a "specific period of time" to mean

a period of weeks, months, or more, and does not include circumstances where a site at which multiple projects are in progress is shifted exclusively or nearly so to a single project for a few hours or days in order to meet a deadline. DBA coverage exists only during the specific period of time in which the site is dedicated exclusively, or nearly so, to the performance of the contract or project.

*Id.*

43.     According to the DOL, this definition reflects an "incremental" expansion of coverage, noting that under the prior regulatory definition in effect since 2000, a secondary site at which "significant portions" of a public work are constructed was covered only if the site was established specifically for contract or project performance. *Id.* at 57618.  The Final Rule, however, impermissibly extends coverage beyond the 2000 rule to include permanent manufacturing facilities which were not established for contract performance solely upon the basis that they are dedicated, or nearly so, for a specified period of time spanning weeks or months to the manufacturing of structures or other elements that are to be installed at the site of the construction.

### The Department Exercised Unguided Discretion
### in Declining Requests to Lessen the Impact of the Final Rule

44.     Without guidelines or direction in statutory text, the Department rejected requests from various commentators that would have lessened the impact of the Final Rule for members of Plaintiffs.

45.     Of significance to Plaintiffs, without guidelines or direction from Congress, in promulgating the operation of law provisions at Section 5.5(e), the DOL declined numerous requests to provide contractors sufficient notice of the applicability of the DBA requirements. *See* Exhibit 1, Comment Letter of Americans for Prosperity and Institute for the American Worker (AFP–I4AW); Exhibit 2, Comment Letter of Contractor Compliance & Monitoring, Inc. (CC&M); Exhibit 3, Comment Letter of the Small Business Administration ("SBA") Office of Advocacy; Exhibit 4, Comment Letter of Independent Electrical Contractors (IEC); Exhibit 5, Comment Letter of Group of U.S. Senators; Exhibit 6, Comment Letter of Wiley Rein Partners.

46.     Additionally, without guidelines or direction in the statutory text, the DOL declined requests from commentators to minimize the impact of the Final Rule in other ways. For example, the DOL declined proposals to reduce the risk that contractors face for demands for back wages, withholdings, and/or debarment where the federal agency or contracting officer failed to include the DBA stipulations in the bid advertisement and contracts and the DBA was found to apply by operation of law, and to expand the application of the *de minimis* rule to all covered workers and activities at the site of work, not just truck drivers who are loading and unloading materials. Further, the DOL failed to adequately analyze the new small businesses covered by DBA, failed to adequately analyze the administrative burdens and compliance costs of the Final Rule, and failed to examine less burdensome alternatives. *See* Exhibit 6, Comment Letter of Wiley Rein Partners; Exhibit 7, Comment Letter of the AGC of America, Exhibit 3, Comment Letter of the SBA Office of Advocacy.

### *The Department's Final Rule Is Arbitrary, Capricious, And an Abuse of Discretion*

47.     The DBA does not confer upon the DOL the authority to impose the DBA upon a contract, from inception, by operation of law.  Significantly, the Final Rule does not require that either the contracting agency or the DOL first determine that the DBA does, in fact, apply before

the operation of law provision is effective.  This presents the risk that, where disputed, it will be left to arbitrators, district courts, state courts, and other tribunals to make the determination whether the DBA applies to the contract.  Moreover, this Final Rule provision adds undue uncertainty for all bidders as to what the contract terms are and whether the DBA requirements apply, which will invariably lead to discrepancies in bid submissions among contractors that may interpret a potential application of the DBA differently.  Further, this operation of law provision adds undue uncertainty whether a contractor will be compensated if those terms change at the Department's direction.  Further, this operation of law provision imposes real-world challenges on prime contractors that may have contracted with and paid lower-tier subcontractors for work performed before there is any determination that the contract is subject to the DBA.  Once such subcontractors have completed their contracts and are paid, the prime contractor may not be able to obtain evidence from the subcontractor of the wages paid to workers and whether such wages met the DBA requirements and if not, by how much.

48.     The DBA does not confer upon the DOL the authority to expand the DBA to apply to material suppliers by virtue of the sole fact that the materials suppliers are operated by a contractor or subcontractor.  The DOL concedes that the provision strictly limiting the material supplier exemption to companies whose only contractual responsibilities are material supply or activities incidental to material supply (thereby excluding from the exemption companies that also perform any other onsite construction) is "arguably" a change from current practice. The DOL nonetheless contends that such a change is consistent with existing DOL guidance. *See* Final Rule, 88 Fed. Reg. at 57623.  The DOL's proffered justification, however, is not supported by that purported guidance and its reference to the existing 20-percent threshold that applies to the on-site time spent by employees of material suppliers. Such a standard exists to ensure that if such

employees spend too much time on-site performing covered work, then the DBA applies to such time. This change in the Final Rule, however, turns the material supplier exclusion on its head by making such material suppliers subject to the DBA *solely because* they are operated or owned by contractors. The DOL cites no evidence or facts showing that the employees of such material suppliers are the same group of workers or workers who interact or are intertwined with the employees of the contractor. Instead, the DOL simply concludes the 20-percent threshold test has led to confusion and that "the need for clarity and predictability outweigh any reliance interests implicated by the final rule's change from the subregulatory 20-percent threshold." Final Rule, 88 Fed. Reg. at 57624.

49.     The DBA does not confer upon the DOL the authority to expand the DBA to include activities conducted by a truck driver or truck driver's assistant on the site of the work, such as loading, unloading, or waiting for materials to be loaded or unloaded, where the driver or driver's assistant's time spent on the site of the work is not *de minimis*. The DOL intends to aggregate a driver's total time on the worksite during the day or week to determine whether it is *de minimis*. Significantly, the Final Rule does not define "*de minimis*." The DOL states it "will consider whether to further elaborate on the definition of *de minimis* in subregulatory guidance" *Id.* at 57626.

50.     The DBA does not confer upon the DOL the authority to expand coverage beyond the 2000 rule to include permanent manufacturing facilities which were not established for contract performance solely upon the basis that they are dedicated, or nearly so, for a specified period of time spanning weeks or months to the manufacturing of structures, or other elements that are to be installed at the site of the construction.

### *Injury to the Plaintiffs*

51.     On October 23, 2023, the Department's Final Rule became effective.

52.     If not enjoined, the Final Rule will severely and irreparably harm prime contractors and contractors working on contracts subject to the Final Rule.

53.     Prime contractors and subcontractors are subject to significant consequences for failing to comply with the DBA.  Prime contractors are strictly liable for back wages owed to its employees or employees of any subcontractor on the project.  Further, the Final Rule provides that upper-tier subcontractors may be responsible for non-compliance with the DBA by lower-tier subcontractors and responsible for the payment of any back wages resulting from such violations. *See* 29 C.F.R. § 5.5(a)(6).

54.     Prime contractors are also subject to withholding from payment due from a contracting agency where the contracting agency determines there are amounts due and unpaid to workers because of DBA violations. The DOL may also direct federal agencies to withhold contract payments due to violations of DBA. If the funds remaining due to the contractor on the contract under which DBA violations occurred are insufficient, the federal agency can withhold funds from other contracts subject to DBA that are held by the same prime contractor.

55.     The Final Rule clarifies that cross-withholding can be from any contract held by the same prime contractor, even if the contract was awarded or assisted by a different agency than the agency that awarded or assisted the contract on which violations necessitating the withholding occurred. *See* 29 C.F.R. §§ 5.5(a)(2)(i), 5.5(b)(3)(i), 5.9(b).  Further, the Final Rule establishes the ability to cross-withhold from entities other than the entity that directly entered into the contract with the contracting agency. Accordingly, under the Final Rule, when a prime contractor uses a single-purpose entity, joint venture, or other similar vehicle to secure DBRA-covered contracts, the Department may pursue cross-withholding on any other contract held by one of the

related entities. *See* 29 C.F.R. §§ 5.2 (new definition of "prime contractor"), 5.5(a)(2)(i), 5.5(b)(3)(i), 5.9(b) and (c).

56.    Prime contractors and subcontractors are also subject to debarment proceedings where found by the DOL to be in "disregard of the contractor's "obligations to employees or subcontractors," and may be ineligible to participate in any DBA contracts for a period of up to three years. Final Rule, 88 Fed. Reg. at 57674. Debarment applies to the contractor or subcontractor and any firm, corporation, partnership, or association in which the contractor or subcontractor has a substantial interest. *Id.* at 57678; 29 C.F.R. § 5.12(a)(1). Debarment proceedings can be recommended by the contracting officer or may be initiated by DOL. Final Rule, 88 Fed. Reg. at 57742.

57.    The Final Rule provision imposing the DBA requirements by operation of law will have an irreparable and financially crippling impact on prime contractors and contractors that are determined to have performed contracts which are later determined to be subject to the DBA. Such contractors will be subject to the demands for back wages, withholdings, and debarment by the very federal agencies, erroneously, that the DBA did not apply to in the first place.

58.    The Final Rule provision expanding the DBA to apply to material suppliers by virtue of the sole fact that the materials suppliers are operated by a contractor or subcontractor will irreparably harm those contractors by placing such contractors at a competitive disadvantage with their material supply competitors that provide materials services only because those contractors must compensate the material supplier worker DBA-required wages for all on-site work.

59.    Prime contractors and contractors will be irreparably harmed by the Final Rule provision expanding the DBA to include activities conducted by a truck driver or truck driver's

18

assistant on the site of the work, where the driver or driver's assistant's time spent on the site of the work is not *de minimis*, because the provision imposes an unspecified standard and unreasonable recordkeeping requirements on such contractors.  Such contractors will be unjustly subject to the demands for back wages, withholdings, and debarment for non-compliance.

60.     Prime contractors and subcontractors will be irreparably harmed by the Final Rule provision that expands the DBA to cover permanent manufacturing facilities which were not established for contract performance, solely upon the basis that they are dedicated, or nearly so, for a specified period of time spanning weeks or months to the manufacturing of structures or other elements that are to be installed at the site of the construction.

## CLAIMS FOR RELIEF

## COUNT I

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202, 5 U.S.C. § 706(2)(B),
Article I, Section 1 and Article II, Section 3 of the United States Constitution that Sections
5.2 and 5.5(e) of the Final Rule are Contrary to Constitutional Right**

61.     Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

62.     Article I, Section 1 of the United States Constitution vests exclusive legislative authority in the Congress. Article II, Section 3 of the United States Constitution requires the Executive Branch to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

63.     In issuing the Final Rule provisions, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), Defendants, who are members of the Executive Branch, engaged in prohibited legislative activity. Defendants did not merely interpret or administer the statute that Congress enacted. Instead, they created substantive requirements wholly untethered to the statutory text. They accomplished this through and by the means of issuing ambiguous regulations, 29 C.F.R. §§ 5.2 and 5.5(e).

64.     By engaging in legislative activity from the Executive Branch, Defendants violated Article I, Section 1 and the separation of powers required therein.

65.     By engaging in legislative activity from the Executive Branch, Defendants violated Article II, Section 3 (the "Take Care Clause"), by failing to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

66.     In violating constitutional separation of powers, Defendants also violated the APA, 5 U.S.C. § 706(2)(B).

67.     Because of Defendants' actions, Plaintiffs and their members will suffer harm as set forth above, including exposure to legal claims for back wages, withholdings, and debarment for failure to comply with Defendants' guidance.

**68.**     Plaintiffs have no other adequate remedy in court or administratively for Defendants' unlawful action as described herein, and such action has caused Plaintiffs to suffer undue and actual hardship and irreparable injury.

## COUNT II

### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 706(2)(A) and 706(2)(C) that the Final Rule Exceeds Statutory Authority

69.     Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

70.     Defendants' Final Rule provisions, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), are not authorized by the DBA or any other law.

71.     Defendants' Final Rule provisions, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), exceed Defendants' statutory jurisdiction and authority.

72.     Accordingly, Defendants' Final Rule provisions, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), are in excess of Defendants' statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

73.     Because of Defendants' actions, Plaintiffs and their members will suffer harm as set forth above, including exposure to legal claims and debarment for failure to comply with Defendants' guidance.

74.     Plaintiffs have no other adequate remedy in court or administratively for Defendants' unlawful action as described herein, and such action has caused Plaintiffs to suffer undue and actual hardship and irreparable injury.

## COUNT III

### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §706(2) (A that the Sections 5.2 and 5.5(e) of the Final Rule Are Arbitrary and Capricious, an Abuse of Discretion, and Not in Accordance with the Law

75.     Plaintiffs restate and incorporate by reference the preceding paragraphs as if fully set forth herein.

76.     Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

77.     The pertinent text of the DBA is unambiguous, and it precludes the Defendants' challenged provisions in the Final Rule.

78.     In addition, the legislative history of the DBA demonstrates that Congress has spoken to this issue in a manner that is irreconcilable with the Defendants' approach.

79.    Therefore, the Defendants' provisions in the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), are arbitrary and capricious, are an abuse of discretion, and are contrary to the law.

80.    Because of Defendants' actions, Plaintiffs and their members will suffer harm as set forth above, including exposure to legal claims and debarment for failure to comply with Defendants' guidance.

81.    Plaintiffs have no other adequate remedy in court or administratively for Defendants' unlawful action as described herein, and such action has caused Plaintiffs to suffer undue and actual hardship and irreparable injury.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

82.    A declaratory judgment that the challenged provisions of the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), are "contrary to constitutional right, power, privilege, or immunity" under the APA;

83.    A declaratory judgment that the challenged provisions of the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), are unlawful under the Constitution's separation of powers;

84.    A declaratory judgment that the challenged provisions of the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under the APA;

85.    A declaratory judgment that the challenged provisions of the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA;

86.     A preliminary and permanent injunctive relief barring Defendants from enforcing, publicizing, or otherwise encouraging any person or court to follow or to defer to the challenged provisions of the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023);

87.     A preliminary and permanent injunctive relief ordering Defendants to rescind the challenged provisions of the Final Rule, 29 C.F.R. §§ 5.2 and 5.5(e) (effective October 23, 2023), forthwith;

88.     All other relief to which the Plaintiffs may show themselves to be entitled, including attorneys' fees and costs of suit.


DATED:        November 7, 2023.

Respectfully submitted,

*/s/ Robert R. Roginson*

Robert R. Roginson
CA Bar No. 51437
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
400 S. Hope Street, Suite 1200
Los Angeles, California 90071
213.457.5873 Direct
robert.roginson@ogletree.com
*Admission Pro Hac Vice Pending*
LEAD COUNSEL FOR PLAINTIFFS

Jeffrey C. Londa
State Bar No. 12512400
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
500 Dallas Street, Suite 3000
Houston, Texas 77002
Office:  (713) 655-5750
Fax: (713) 655-0020
jeff.londa@ogletree.com

And

Fernando M. Bustos
State Bar No. 24001819
fbustos@bustoslawfirm.com
Benjamin E. Casey
State Bar No. 24137943
bcasey@bustoslawfirm.com
BUSTOS LAW FIRM, P.C.
P.O. Box 1980
Lubbock, Texas 79408-1980
(806) 780-3976
(806) 780-3800 FAX

LOCAL COUNSEL FOR PLAINTIFFS

**AMERICANS FOR PROSPERITY** FOUNDATION

**INSTITUTE FOR THE AMERICAN WORKER**

May 17, 2022

**Submitted Via Regulations.gov**

Amy DeBisschop
Director
Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor,
Room S-3502
200 Constitution Avenue NW
Washington, DC  20210

> **Re:  Comments on Notice of Proposed Rulemaking, Updating the Davis-Bacon and
> Related Acts Regulations, 87 Fed. Reg. 15,698 (Mar. 18, 2022), RIN 1235-AA40.**

Dear Ms. DeBisschop:

We write on behalf of Americans for Prosperity Foundation and the Institute for the
American Worker.[1]  We appreciate this opportunity to comment on the Notice of Proposed
Rulemaking regarding Updating the Davis-Bacon and Related Acts Regulations (RIN 1235-
AA40), as published at 87 Fed. Reg. 15,698 (the "NPRM").

**I.      Introductory comments.**

The NPRM proposes "to amend regulations issued under the Davis-Bacon and Related
Acts that set forth rules for the administration and enforcement of the Davis-Bacon labor standards
that apply to Federal and federally assisted construction projects."  87 Fed. Reg. at 15,698.

We support efforts to bring greater clarity and transparency to the government contracting
process but have concerns over a number of the proposed amendments to the Department's Davis-
Bacon Act regulations.  *First*, as set forth below, the proposed amendment of the test to determine
the applicable prevailing wage rates for a given contract is arbitrary and will unjustifiably privilege
higher union wages in a given locality, leading to higher costs and a greater burden on the taxpayers
who ultimately fund government contracting.  *Second*, the NPRM's proposal to use wage
escalation data from the Bureau of Labor Statistics ("BLS") will improperly inflate Davis-Bacon
Act wage determinations because no changes to the Department's underlying wage survey process is
contemplated.  *Third*, the proposal to eliminate the distinction between urban and rural work
areas when making prevailing wage determinations is unjustified by the text of the Davis-Bacon
Act and will result in unnecessary inflation of construction costs.  *Fourth*, the proposal to treat

---

[1] *See* AMERICANS FOR PROSPERITY FOUNDATION, https://americansforprosperityfoundation.org/; INSTITUTE FOR THE
AMERICAN WORKER, https://i4aw.org.

┌─────────────────┐
│    **EXHIBIT**      │
│                 │
│       **1**         │
└─────────────────┘

Ms. DeBisschop
Page 2

certain different wage rates as functionally the same also will unjustifiably inflate construction costs by improperly privileging union wages. And *finally*, the Department's proposal to effect prevailing wage requirements by operation of law rather than through incorporation of appropriate clauses in covered contracts exceeds the Department's authority and violates the express provisions of the Davis-Bacon Act.

## II.     The proposed amendment to the "prevailing wages" test is arbitrary and unjustified and will only add to the current inflationary economic conditions.

The Davis-Bacon Act requires payment of locally prevailing wages and fringe benefits on specific Federal construction contracts, 40 U.S.C. § 3142,[2] and Congress has incorporated the "prevailing wages rate" requirement into a large number of additional related acts. The purpose of this provision, according to a 1981 Memorandum from the Office of Legal Counsel, which the Department itself relies on, is "to prevent the exploitation of imported labor and the concomitant depression of local wage rates."[3]

The 1981 OLC memorandum notes, however, the Act neither defines what it means by "prevailing" nor the procedure by which the Department is to determine the applicable prevailing wage rate.[4] The OLC therefore looked to "the common meaning of the word, and to the legislative history and purpose of the two Acts" to come to the conclusion that "prevailing" means the "most current" or "predominant" wage in the relevant locality.[5] Just as important, the OLC further concluded that "if no single wage can fairly be said to be 'prevailing,' and no single rate 'most current,' an average may represent the closest approximation of the statute's requirement."[6]

Building on this memorandum, the Department's current regulations, implemented during a 1981–82 rulemaking, define the prevailing wage rate as "the wage paid to the majority (more than 50 percent) of the laborers or mechanics in the classification on similar projects in the area during the period in question." 29 C.F.R. § 1.2. Where there is no majority, "the *prevailing wage* shall be the average of the wages paid, weighted by the total employed in the classification." *Id.*

This makes sense, is non-arbitrary, and gives full effect to the language of the Davis-Bacon Act. It has been in use for more than 40 years, almost half the entire life of the Act, and should be retained as the best and most accurate means of implementing the intent of Congress. As the Department itself concluded in the 1981–82 rulemaking, "the term 'prevailing wage' contemplates the most widely paid rate as a definition of first choice. The Department has accordingly

---

[2] 40 U.S.C.§ 3142(b): "The minimum wages shall be based on the wages the Secretary of Labor determines to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the civil subdivision of the State in which the work is to be performed, or in the District of Columbia if the work is to be performed there."

[3] Determination of Wage Rates Under the Davis-Bacon & Serv. Cont. Acts, 5 Op. O.L.C. 174, 176 (1981), https://www.justice.gov/sites/default/files/olc/opinions/1981/06/31/op-olc-v005-p0174_0.pdf.

[4] *Id.* at 175.

[5] *Id.* at 175-76.

[6] *Id.* at 177.

Ms. DeBisschop
Page 3

determined that the revision which defines prevailing wage as the majority, or weighted average where there is no majority, is the most proper interpretation of the statue." 47 Fed. Reg. 23,645.

The Department's current proposal is to return to the rule in place before the 1981–82 rulemaking, which would add to the current definition an additional test, the so-called 30 percent rule, whereby "in the absence of a wage rate paid to a majority of workers in a particular classification, a wage rate will be considered prevailing if it is paid to at least 30 percent of such workers." 87 Fed. Reg. 15,700.

This would be an arbitrary change. What is sacrosanct about the figure of 30 percent? Why not 32.5 percent or 43.1 percent or any of the infinite percentages that might be chosen between 0 and 50 percent? In other words, there is nothing in the Davis-Bacon Act to motivate or justify the choice of 30 percent. Moreover, in the 1981–82 rulemaking, the Department agreed with commentators who demonstrated "a rate based on 30 percent does not comport with the definition of 'prevailing', and that the 30 percent rule gives undue weight to collectively bargained rates." 47 Fed. Reg. 23644. Nothing in the NPRM contradicts that conclusion.

Indeed, contrary to any provision in the Davis-Bacon Act, the 30 percent rule appears motivated solely to give precedence to union wages since, under a collective bargaining agreement, wage earners in a particular classification generally earn uniform rates. In addition, union contractors historically have participated in the Department's wage surveys at a higher rate than non-union contractors.[7] As such, the 30 percent rule will cause the Department's wage determinations to reflect union rates, which in almost all instances are higher than the norm.

Implementation of the 30 percent rule also would unjustifiably ignore the rates applicable to 70 percent of workers. That is, where there is no majority, there is by definition no *actual* prevailing rate and a resort to the 30 percent rule would serve to inflate the wage determination by relying only on the highest wage earners in the locality. Where there is no majority, the only proper way to approximate the prevailing wage within the meaning of the Davis-Bacon Act is to include 100 percent of workers and take the weighted average of their wage rates. Any other approach would be arbitrary and serve purposes not contemplated by the Act.

One further observation. The proposed amendment to the prevailing wage definition would seriously impact the infrastructure spending contemplated under the Investment and Jobs Act enacted last November. That Act included approximately $550 billion in new spending, almost all of which will fall under Davis-Bacon Act requirements. Given the fixed amount of money available under that Act, the Department's current proposal, which necessarily with increase labor costs, will ultimately reduce the number of projects the Act will be able to fund.

To conclude, implementation of the 30 percent rule would result in an increase in the labor costs of federal construction projects by unjustifiably relying on only the highest wage earners in the Department's wage rate determinations. That this would be done in the current inflationary

---

[7] *See, e.g.,* James Sherk, Labor Department Can Create Jobs by Calculating Davis– Bacon Rates More Accurately (Jan. 21, 2017), at 4, https://www.heritage.org/sites/default/files/2017-01/BG3185_0.pdf (explaining that, whereas "[o]nly 14 percent of construction workers are covered by union contracts…, the GAO reports that 63 percent of Davis– Bacon rates are union rates.").

Ms. DeBisschop
Page 4

economic conditions makes no sense because there is no statutory reason to change the current regulations. The Department should reject the amendment and retain the current definition.

### III. The proposal to rely on BLS employment cost index data will unjustifiably inflate wage rate determinations.

The NPRM states "the Department proposes to add language to [29 C.F.R.] § 1.6(c)(1) to expressly permit adjustments to non-collectively bargained rates on general wage determinations based on U.S. Bureau of Labor Statistics (BLS) Employment Cost Index (ECI) data or its successor data." 87 Fed. Reg. 15,717

Although a greater use of BLS data for the Department's wage determinations would be welcome as providing more accurate data than currently in use,[8] this particular proposed amendment would unjustifiably inflate applicable Davis-Bacon wage rates because the NPRM makes no changes in the Department's voluntary wage survey process. That survey process is demonstrably unscientific and inaccurate, as it relies on unrepresentative, self-selected, and unreliably small sample sizes, among other problems.[9] BLS uses more accurate statistical sampling techniques to establish market wage rates and wage escalators, but the NPRM proposes only to use the Employment Cost Index (the escalator) without also adopting the underlying BLS wage determinations. This mixing of two different methodologies for determining the applicable prevailing wage will only entrench the Department's unreliable and inaccurate Davis-Bacon Act wage determinations while also unjustifiably inflating those rates with the unrelated BLS escalator.

A more accurate and proper methodology would be to completely scrap the current wage survey process and adopt the appropriate BLS data in its entirety, a change that some have estimated could result in more than 30,000 new construction jobs a year.[10]

### IV. The proposal to dissolve the distinction between urban and rural work areas is unjustified and will inflate construction costs.

Under current regulations, wage determinations are made at the county level where possible and, if insufficient data exists, the geographic area is expanded to surrounding counties. When expanding the geographic boundaries, however, urban and rural areas are kept separate since the wage rates in such areas typically differ. *See* 29 C.F.R. § 1.7(b). This distinction comparts with the Davis-Bacon Act requirement that wage determinations be made in respect of "the civil subdivision of the State in which the work is to be performed." 40 U.S.C. § 3142(b). In its 1981– 82 rulemaking, the Department agreed with this understanding, explaining that to combine urban and rural rates in such circumstances would be "inappropriate." 47 Fed. Reg. 23,647.

The current NPRM proposes to eliminate this practice by counting together both urban and rural wage rates in its wage rate surveys. Such a practice, however, will result in urban wages being overrepresented because such data is more forthcoming than its counterpart in rural area. The result again will be an unjustified inflation of labor costs that is not motivated or justified by

---

[8] *See generally id.*

[9] *Id.* at 2ff.

[10] *Id.* at 12-15.

either the text of the Davis-Bacon Act or the intent of Congress.  That increase will disproportionately impact rural areas, as they are typically less well positioned to pay higher wages.  The Department should retain the current form of 29 C.F.R. § 1.7(b).

### V.   The proposal to treat certain different wage rates as functionally the same is arbitrary and unjustified, will unfairly privilege union wages, and will improperly inflate construction costs.

Under the NPRM, "the Department proposes to amend [29 C.F.R.] § 1.3 to include a new paragraph at § 1.3(e) that would permit the Administrator to count wage rates together—for the purpose of determining the prevailing wage—if the rates are functionally equivalent and the variation can be explained by a CBA or the written policy of a contractor."  This change is designed to get around the 2006 decision of the Department's Administrative Review Board ("ARB") in *Mistick Construction,* ARB No. 04-051, which held the meaning of "same wage" for determining prevailing wage rates precluded the Department from treating different wage rates as functionally the same.  *See* 87 Fed. Reg. 15,699.

This proposed change is not justified.  The Department's rules for counting wages, whether for purposes of the majority 50 percent rule under the current regulations or for the proposed 30 percent rule, already favor the wage rates of union contractors because of their greater participation in wage surveys and the more uniform rates characteristic of collective bargaining agreements.  As already noted, 14 percent of construction workers who are covered by union contracts account for 63 percent of applicable Davis–Bacon Act wage rates.[11]   Abrogating the ARB's *Mistick Construction* decision and introducing additional agency discretion for which rates are sufficiently similar for the prevailing wage determination, especially where the agency is directed to look for justification in collective bargaining agreements, will only increase the likelihood of finding union rates to be the prevailing rates, leading to the unjustified inflation of labor costs.  The Department should reject this proposed change to its regulations.

### VI.   The proposal to enforce applicable prevailing wage rates by operation of law rather than by contract is not supported by the Davis-Bacon Act.

Currently, contractors are not held responsible for compliance with the Davis-Bacon Act unless the required clauses have been included in the project's governing contracts.  *See* 4 U.S.C. § 3142(c) (requiring stipulations on prevailing wage rates to be included in contracts).  This rule comports not only with the governing statute but also with general contract law principles, which puts the onus for compliance in this respect on the government as the party in the best position to know if the Davis-Bacon Act requirements apply to the particular contract in question.

The NPRM seeks to undermine this rule by declaring the imposition of Davis-Bacon Act requirements "by operation of law."  *See* 87 Fed. Reg. 15,724 ("[T]he Department proposes to add language to [29 C.F.R.] § 3.11 explaining that the requirements set forth in part 3 are considered to be effective as a matter of law, whether or not these requirements are physically incorporated into a covered contract.").  Invariably, this change will lead to greater litigation, and the consequent

---

[11] *See supra* note 7.

Ms. DeBisschop
Page 6

waste of government and private resources, because, without direct contractual notice to contractors, the risk of unknowing violations will abound.

The vast extent of government contracting in the American economy, together with the potential applicability of Davis-Bacon Act requirements to contracts that are silent on the matter, heightens the risk of inadvertent and completely avoidable noncompliance.  The consequences to contractors could be severe, which will only raise the government's cost of construction over the long term—representing yet another way the newly proposed regulations will greatly increase the costs of public infrastructure projects.  The statue requires the government to include the proper clauses in covered contracts, and so do principles of contracting in good faith.  As such, there is no legal or policy justification for this proposed change to the applicable regulations.

<div align="center">*       *       *</div>

Thank you for your time and attention.  If we can provide any additional information or otherwise be of further assistance, please do not hesitate to contact us.

<div style="margin-left: 40%;">

Respectfully submitted,

Lee A. Steven
Austen Bannan
AMERICANS FOR PROSPERITY FOUNDATION
1310 North Courthouse Road, 7th Floor
Arlington, VA 22201
571-329-1716
571-215-7573
lsteven@afphq.org
abannon@afphq.org

Vincent Vernuccio
President
INSTITUTE FOR THE AMERICAN WORKER
PO Box 458
Hamilton, VA 20159
607-437-0482
vinnie@i4aw.org

</div>



# CONTRACTOR COMPLIANCE & MONITORING, INC.

www.ccmilcp.com

635 MARINERS ISLAND BLVD, SUITE 200, SAN MATEO CA  94404 – P 650-522-4403

May 16, 2022

The undersigned is an attorney who has practiced in the field of prevailing wage for over 40 years. I am also the president and major stockholder of Contractor Compliance and Monitoring Inc., a prevailing wage consulting company that assists public agencies and contractors with state and federal prevailing wage requirements. I have worked with over hundred agencies and over a thousand contractors in my career. I have worked with both union and open shop contractors, have testified as an expert in the field of prevailing wage and am the author of three books on prevailing wage compliance, including AGC of America's Davis-Bacon Compliance Manual. I provide this background in hopes that you will provide sufficient weight to my comments as one who has spent a professional lifetime in this field.

**Wage Surveys and Determinations**:  The calculation of prevailing wages should not be based on a common wage rate paid by 30% of the workforce. A prevailing practice is one which occurs more than 50% of the time. If this wage rate cannot be determined by 50% of the population surveyed, then the proper classification and wage rate must be based on a weighted average taking into account all wage rates submitted and applying a weighted average formula. The U.S. Department of Labor has been reluctant to use the Bureau of Labor Statistics information in the past in determining prevailing wage rates. Yet, in this proposed rulemaking, the U.S. Department of Labor suggests that perhaps metropolitan statistical areas as determined by the Bureau of Labor Statistics might be an appropriate standard to use. If the U.S. Department of Labor (hereinafter U.S. DOL)is willing to accept the calculations and authority of the Bureau of Labor Statistics for part of the Davis-Bacon regulations, why would the U.S. DOL not accept the Bureau of Labor and Statistics data relating to wages.

Under the 30% rule it seems patently clear that almost all rates will then migrate to union collective bargained rates, even when those rates are not truly prevailing in the area. The last time I checked, union rates controlled in less than 40% of the wage determinations, primarily in large metropolitan areas. Establishing a union collectively bargained rate in Humboldt County, California, which is the same as in the San Francisco Bay Area (hundreds of miles away) does a disservice to the worker, the contractor, the awarding agency and the community. Prevailing wages are to ensure that workers are not unfairly exploited on prevailing wage projects. The purpose of the Davis-Bacon Act is not to provide the worker with an inflated wage rate for the area in which they are working. The original purpose of the Davis-Bacon Act was to preserve use of local workforces and create a level playing field between local contractors and contractors from out of the area. Creating an artificially high prevailing wage rate based on the 30% rule does not meet that purpose.

My recommendation is that instead of attempting to conduct wage surveys for each county throughout the country and including the four separate project types, the Department of Labor would be better served by using the data that the Bureau of Labor Statistics already has. A few years ago, I had an opportunity work on a residential project in South Carolina. Those wage rates had not been updated in 18 years. Even when I made a call to the wage hour division to confirm and clarify, I was told there was just too much work to be done and they just could not get to every wage determination. That is a travesty to the workers who the U.S. DOL is supposed to be the protecting.

**EXHIBIT**

**2**

1

Certainly, tying ALL of the wage rates to the Bureau of Labor Statistics would be an easy way to keep all prevailing wages current. It would also not skew the wage rates by adopting an artificial 30% rule and would allow for regular and consistent updates. I am in agreement with using state or local prevailing wage rate for wage rates, but only where there is otherwise insufficient information from the Bureau of Labor Statistics.

**Single Rates in "Area"**:  Prevailing wages are to be paid based on the tasks that the worker performs and not based on a particular title the worker is given. If a worker spends two hours unloading materials in the morning, that is Laborers work; if they hang drywall for five hours in the afternoon, they must be paid the applicable Drywall rate, and if they performed painting for one hour, the applicable prevailing wage for Painters must be paid. Over the years, many of the trades have created subclassifications which have become almost specialties themselves. Low voltage wiring is almost always performed by a Communication and Tech Installer while other electrical work is performed by Inside Wireman. Those who are engaged in cable splicing or high utility lines, are paid in a different classification. What is needed is more detail and multiple wage classifications within a trade not less.  Let us use the Bureau of Labor Statistics information already available. If some minor changes need to be made to that process, then make those changes, but let us not create a new process when that information is already being collected within the DOL.

**Periodic Adjustments:**  I am opposed to annual adjustments to prevailing wage requirements. This will create more confusion in the entire construction process, including local agencies and contracting officers who are already overburdened. I do understand extremely long projects which should have some adjustment for wage increases, but then the contractor should automatically be allowed a 150% increase change order to cover the cost of the wage increase and related payroll burden. Perhaps for any project not completed within 3 years, then an update to the current wage rate upon the 3rd anniversary of contract award or start of work.

**Conformances:** Every time I complete a conformance request, I include much more than the one page form itself. I enclose a specific scope of work for the trades requested and I also provide the backup documentation for the wage and fringe benefits. That might be wage rates found in a collective bargaining agreement, or wage rates found in a state prevailing wage determination, or it could be a wage rate from some local survey. I think you could make the conformance process easier for your staff if you required those submitting the conformance requests to include the scope of work and any backup documentation relating to the wages and fringe benefits proposed.

If there are multiple wage determinations on a particular project, a contractor should be allowed to use a wage classification and rate from one determination on another type of work without submitting a conformance.  For Example:  A transit center would have Heavy, Highway and Building determinations. A contractor should be allowed to use a classification and wage rate from the Highway determination for the Building portion of the work, if there is no classification for that work listed in the Building determination.

Another solution would be to allow a contractor to adopt a conforming wage rate from the same County but in a different determination. For example, if I have commercial rates for Communication and Tech Installers, I could adopt that rate for residential work in the same County. The other option is to allow a contractor to use a rate without going through the conformance process which is listed in an adjacent County within the same time window.

2

Finally, once a conformance is granted, it could be included in the next update for the prevailing wage determination in that particular jurisdictional area.  That would eliminate the need for repeated requests for conformances in a particular County.

**Multiple Wage Determinations:**  I agree with the $2.5 million or 20% rule for requiring multiple wage determinations.

**Contract Clauses and Wage Determinations:** One of the only ways that a contractor is alerted that federal Davis-Bacon applies to a specific project is when there is specific contract language provided and the wage determinations are attached. Under no circumstances should those requirements be diluted. If an agency has mistakenly omitted either of those items, it is not the unsuspecting contractor who should bear that burden.

   A few years ago, I had a contractor working at a veterans hospital. There were no contract provisions in the documents and no prevailing wage determination attached. Yet, this contractor believed that federal Davis-Bacon rates would apply and so he did his best to try and determine what those rates would be. At the end of the project, when his work was audited, the Department of Labor found that he had not used the proper wage determination and so additional wages were due. Had the agency provided the proper wage determination, this never would have happened. It is grossly unfair to the contracting community to allow an awarding agency to transfer liability to a contractor when the agency has failed to meet its obligation in informing the contractor of the appropriate wage rates applicable to the project.

I do NOT agree that "incorporating by reference" contracting terms is just as effective as inserting the full Davis Bacon contract section. Nor do I support the provisions your proposal under "operation of law". If the Agency missed including the information, and the U.S. DOL wants to hold the contractor liable for prevailing wages then the Agency MUST automatically be liable for 150% of the delta between wages paid and the amount the needs to be paid to meet prevailing wage.

This is even more important when you have a DBRA project. Many times, the local agency does not provide any information to the contractor that federal funds are being used on the project. The contractor may proceed with the project, complying with state prevailing wage laws, but then are caught at the end of the project for failing to pay a higher federal rate. Again, the agency must provide this information to a contractor, how else is the contractor to know.  Also relating to 1.6(f)(3)(v) applying to Related Acts, it is not the withholding or cross withholding that the Agency should be obligated to engage, but a mandate that the Agency pay the contractor 150% of the delta between what the contractor paid and the amount that should have been paid. That final 150% can be withheld until the contractor pays the full amount due to workers, but additional withholding or cross withholding because of the Agency's error is just flat wrong.

**Better Definition between Davis Bacon and Service Contract Act:** Construction is the only industry which can be found under both the Davis-Bacon Act and the Service Contract Act. The federal agency letting a contract relating to improvements and rehabilitations to building and facilities, will frequently misclassify construction work under the Service Contract Act. This is extremely confusing to contractors who are used to a particular standard of operations and prevailing wage coverage. Particular regulations need to be established which will trigger Davis-Bacon when the dollar value of the work to be performed reaches a particular level.  Rewiring an entire building with fiber optics is Dais Bacon work and not SCA work.

3

**Clarifying Material Supplier, Trucking and De Minimis:** The current rule relating to Trucking companies delivering sand, rock, asphalt and other such products remains confusing to contractors. Because they are indeed "Material Suppliers" the issue is whether or not the amount of time they spend on the project site is truly de minimis so as to discount any prevailing wages, or if the 20% rule must apply to these drivers. If a driver spends 20% of their week actually on the jobsite, should prevailing wage then apply to all hours they are on the project. That  20% equates to eight hours within a week or basically two hours per day. Does that rule apply only for the look back at the entire week or can/should it apply to onsite work which equates to 2 hours per day?

**Secondary Construction Sites**: Prevailing wages have traditionally applied to on-site construction services. Prevailing wages should only be extended to secondary sites when that secondary site is established for the particular purpose of servicing the original jobsite. This should exclude any work performed in a contractor's permanent facility, which is established prior to the advertisement for bid and will continue to operate after the project is complete.

**Flaggers:** I agree that flaggers are subject to prevailing wage because the work they are performing is adjacent or nearly adjacent to the construction site and are for the purpose of providing safety to those in and around the jobsite.

**Apprentices**:  I support your clarification of the language relating to the employment and use of Apprentices with the following comment: Apprentices which are employed on the project outside of their immediate jurisdictional area, must receive either the wage rate and be employed according to the local ratio which apprentices are subject to based on the  location of the project or apply the wage rates and ratio of the actual program in which the apprentice is enrolled, whichever is higher and more restrictive. This will create both a level playing field with other contractors and apprentices who would seek to perform work on the project site, but would not penalize the apprentice for working outside the immediate jurisdictional area of the program in which they are enrolled.

**Unfunded Plans:** Requiring DOL approval of unfunded plans, especially in the area of vacation and holiday, is unduly burdensome to the contractor and would create massive amounts of work for the Department of Labor.  It also creates an uneven playing field between union and open shop contractors, requiring the open shop contractor to essentially pay more than the prevailing wage rate by discounting legitimate holiday and vacation benefits paid by the contractor. Rather, clear regulations relating to the standards under which these unfunded plans would be allowed to receive Davis-Bacon credit is the better approach.

*Unfunded vacation and holiday benefits, which an employer keeps on their books, are allowed to count toward meeting Davis-Bacon fringe benefits if all of the following occur:*
  *a)  the benefit is in writing and has been provided to the worker;*
  *b)  the benefit is vested and will not be forfeited if the worker leaves their employment; and,*
  *c)  the benefit is amortized using the employee's regular rate of pay for the calculation of the benefit.*
*Example: 40 holiday hours + 80 Vacation Hours X RRP (Employee's regular rate or pay) ÷ 2080 = Amount of hourly fringe benefit that can be claimed.*

**Fringe Benefits and Annualization:  The Proposed "Annualization" Exception in § 5.25(c) Should Include a Safe Harbor Provision that Meet the Exception Requirements.**

In the Proposed Regulations, the Department proposes adding a new paragraph (c) to the existing §5.25 to codify the principle of "annualization" (*i.e.*, the long-standing method of calculating the amount of Davis-Bacon credit that a contractor receives for contributions to a fringe benefit plan when the contractor's workers also work in private projects). The Proposed Regulations also observes that historically, the Wage and Hour Division ("WHD") has not applied the annualization requirement to defined contribution pension plans ("DCPPs") that provide for immediate participation and accelerated vesting (*i.e.*, vesting after a worker works no more than 500 hours).   This should not change. The employee is receiving 100% of the contribution and the employer should receive 100% of the credit for that contribution.

Alternatively, I  recommend that DOL revise the Proposed § 5.25(c) to formally adopt a safe harbor provision to automatically qualify defined contribution retirement plans for the annualization exception when they meet the required standards. This could be achieved by adding a new subparagraph (4) to read as follows:
*§ 5.25(c)(4) Safe harbor. Fringe benefits provided by a contractor through a defined contribution pension plan shall be considered to be excepted from the annualization requirement, and are not subject to the exception request requirement described in 5.25(c)(2), above, if the defined contribution pension plan meets the following three criteria:*
*(A) the benefit provided is not continuous in nature;*
*(B) the benefit does not provide compensation for both public and private work; and*
*(C) the plan provides for immediate participation and essentially immediate vesting. A plan will generally be considered to have essentially immediate vesting if the benefits vest under the plan after a worker works 500 or fewer hours.*

**Recommendations on Item Omitted from the Rulemaking**

**Publication of Scope of Work:** The federal government should not be allowed to play "gotcha" with the contracting community. Clear Scopes of Work need to be available to the contracting community to understand how to classify workers. And, a contractor should not be penalized when they comply with the actual wording in the Davis-Bacon wage determination.

> For example, I had a contractor working in Hawaii on a military base. The prevailing wage determination stated that Laborers could lay pipe. This contractor paid its Laborers to lay pipe. The plumbers filed a complaint stating that they claimed the work. The US DOL said they had absolutely no information to make a ruling in this regard. They suggested that I contact the Hawaii Department of Labor, which I did. The Hawaii Department of Labor directed me to contact the plumbers union and ask for a copy of their collective bargaining agreement. The union refused to give me a copy and then the local US DOL office  when I told them I had no information stated that the Plumber/Pipefitter rate had to be paid for the laying of the pipe because that is what the plumbers claimed. The laborers were not making any connections, they were merely laying the pipe. The contractor had complied with the literal language in the wage determination and it seemed that nobody really knew the "prevailing practice". Instead, the prevailing practice was determined at some point after the project had started, near its completion. The contractor's only option was to go back to the military base and asked for change order, which was denied. I ask, how is a contractor to know the proper wage rate to pay if there is no Scope of Work provided and the wage determination itself says Laborers can lay pipe?

5

I do not believe that a Scope of Work for every classification in every wage determination is necessary; but, I do believe there should be a place where contractors could go on the www.sam.gov website to search out jurisdictional scopes of work.  And, if more than one trade claims the work, the contractor should be allowed to pay in either of those classifications and be considered compliant with Davis-Bacon requirements.

**1099 Employees:** Something I see repeatedly on projects, especially in less industrial states and areas, is the use of 1099 employees. We all know there is no such thing as a 1099 employee. There are employees and they are independent contractors. Yet, the contracting community from time to time hires temporary workers which they call 1099 employees and for which no taxes or payroll deductions are made.

I have been repeatedly told by the US Department of Labor that this is wage theft. It is wage theft because the individual worker will have to pay not less than 13% as self-employment tax, and has no unemployment insurance; when in reality they are a temporary employee and should only have to pay their half of Social Security and Medicare. Those workers are also entitled to unemployment benefits and other state and federal benefits due to employees. Yet, every time I reported these instances to the Wage Hour Division, I am told that so long as the worker receives the total amount of the prevailing wage rate on the check, there is nothing that can be done. The U.S. Department of Labor needs to stop talking out of both sides of its mouth. If this is in indeed wage theft, which I believe it is, then the U.S. Department of Labor needs to have a protocol for seeing that these workers receive restitution and the proper classification as an employee on the particular job site.

**Contracting Officer Authority**: I have been repeatedly told that the comments and decisions of a contracting officer is not final and binding upon the U.S. DOL and that it is only the Regional Office that has the authority to bind the U.S. DOL. This is extremely confusing to local contractors who seek the advice of the Contracting Officer on classifications of work, area practices etc.  So either, the DOL needs to grant Contracting Officers with authority to bind the US DOL or the Contracting Officer must affirmatively inform the contractor that the opinion issued by the Contracting Officer is not binding and how to get a binding opinion.

I object to the short period of time provided by the US DOL in response to this rulemaking.  US DOL is making over 50 different changes to the Davis Bacon regulations. These are massive changes and should be given sufficient time for discussion and comment. I would have liked  to have spent more time to detail comments on every aspect of the rule making, but was not able to do so.

Sincerely,

Deborah E.G. Wilder
President



May 17, 2022

VIA ELECTRONIC SUBMISSION

The Honorable Martin J. Walsh
Secretary
U.S. Department of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

Jessica Looman
Acting Administrator
U.S. Department of Labor
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210


Re: Updating the Davis-Bacon and Related Acts Regulations, 87 Fed. Reg. 15698 (March 18, 2022).

Dear Secretary Walsh and Acting Administrator Looman:

On March 18, 2022, the Department of Labor's (DOL) Wage and Hour Division published a proposed rule titled Updating the Davis-Bacon and Related Acts Regulations (DBRA).[1] This letter constitutes the Office of Advocacy's (Advocacy) public comments on the proposed rule.

Advocacy is concerned that the added costs and complexities in this proposed rule will make it more difficult for small contractors and subcontractors to comply with the DBRA. This may have the unintended consequence of discouraging small businesses from participating in federal construction contracts. Advocacy is concerned that DOL's Initial Regulatory Flexibility Analysis is deficient. DOL needs to publish a more accurate analysis of the expanded number of new

---

[1] Updating the Davis-Bacon and Related Act Regulations, 87 Fed. Reg. 15698 (Mar. 18, 2022). (hereinafter "2022 Proposed Rule").

EXHIBIT
3



small businesses that may now be covered and subject to compliance costs under the DBRA. DOL severely underestimates these compliance costs at under $100 per small business annually. Due to the problems with this IRFA, DOL cannot meaningfully consider significant and less burdensome alternatives to the proposed rule that would meet the agency's objectives. Advocacy recommends that DOL reassess the number of small businesses covered and the compliance costs from this regulation in a new Initial Regulatory Flexibility Analysis. Additionally, DOL should consider significant alternatives that would accomplish the objectives of the statute while minimizing the economic impacts to small entities.

## I.  Background

### A.  The Office of Advocacy

Congress established the Office of Advocacy under Pub. L. 94-305 to represent the views of small entities before Federal agencies and Congress. Advocacy is an independent office within the U.S. Small Business Administration (SBA). As such, the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration.

The Regulatory Flexibility Act (RFA),[2] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[3] gives small entities a voice in the rulemaking process. For all rules that are expected to have a significant economic impact on a substantial number of small entities, the RFA requires federal agencies to assess the impact of the proposed rule on small entities and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.[4] The agency must include a response to these written comments in any explanation or discussion accompanying the final rule's publication in the *Federal Register*, unless the agency certifies that the public interest is not served by doing so.[5]

Advocacy's comments are consistent with Congressional intent underlying the RFA, that "[w]hen adopting regulations to protect the health, safety, and economic welfare of the nation, federal agencies should seek to achieve statutory goals as effectively and efficiently as possible without imposing unnecessary burdens on the public."[6]

### B.  The Proposed Rule

The Davis-Bacon Act and the 71 Related Acts (collectively "DBRA") apply to contracts entered into by Federal agencies and the District of Columbia that are in excess of $2,000 for the construction, alteration, or repair of public buildings or public works. Under the DBRA, DOL determines wage rates that are "prevailing" for each classification of covered laborers and mechanics, as determined by voluntary wage surveys of contractors. Covered contractors and

---

[2] 5 U.S.C. §601 et seq.
[3] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. §601 et seq.).
[4] Small Business Jobs Act of 2010 (PL. 111-240) §1601.
[5] *Id*.
[6] *Id.*

subcontractors are required to provide weekly certified payrolls to the contracting agency to demonstrate their compliance with the incorporated wage. Prime contractors have the responsibility for the compliance of all subcontractors on a covered prime contract.[7]

On March 18, 2022, DOL published a proposed rule modifying the DBRA implementing regulations. This is DOL's first comprehensive review of federal construction regulations in over 40 years.

The proposed rule provides definitions that may add small businesses to DBRA coverage including:
1) Prefabrication businesses where a "significant portion" of the building or work is constructed.[8]
2) Material suppliers, truck drivers, demolition companies, and flaggers.[9]
3) Surveyors who perform physical and manual work.[10]
4) Businesses completing work with green technology such as solar panels, wind turbines, broadband installation, or electric car charger installation.[11]

The proposed rule incorporates many changes in the calculation of prevailing wages under the DBRA, including:
1) Adopting the "30 percent rule," a three-step process where the wage rate paid to 30 percent of the workforce could qualify as a prevailing wage.[12]
2) Updating outdated non- collectively bargaining prevailing wage every three years using U.S. Bureau of Labor Statistics (BLS) Employment Cost Index (ECI) data.[13]
3) Allowing additional data into calculation of the wage rate in various circumstances including variable rates, multiple county rates, state transportation divisions, federal project data, state prevailing wages, rural and urban rates considered together, and surrounding county information.[14]

The proposed rule also makes changes to other requirements to contractor liabilities and enforcement, including:
1) Incorporating Davis-Bacon Act requirements by operation of law, whether they are included or incorporated by reference into such contract.[15]
2) Increasing the liability of subcontractors.[16]

---

[7] 2022 Proposed Rule, page 15699.

[8] *See* 2022 Proposed Rule, page 15731 and 15793, Proposed 29 CFR Part 5.2, Definitions, Site of Work (1)(i)-(iii).

[9] *See* 2022 Proposed Rule, page 15726-15734, Proposed 29 CFR Part 5.2, Definitions, Construction, Prosecution, Completion, or Repair (Truck Drivers, Demolition), Material Supplier, Site of Work (Flaggers).

[10] *See* 2022 Proposed Rule, page 15729 (Footnote 80), and 15792-Proposed 5.2, Definitions, Labor or Mechanic.

[11] *See* 2022 Proposed Rule, page 15724 and 15789, Proposed 29 CFR Part 5.2, Definitions, Building or Work.

[12] *See* 2022 Proposed Rule, page 15703, and 15783, Proposed 29 CFR Part 1.2 Definitions, Prevailing wage.

[13] *See* 2022 Proposed Rule, page 15716, and 15786, Proposed 29 CFR Part 1.6(c)(1) Periodic Adjustments.

[14] *See* 2022 Proposed Rule, page 15703-15720.

[15] *See* 2022 Proposed Rule, page 15793, Proposed 29 CFR Part 5.5(e) Incorporation by operation of law.

[16]*See* 2022 Proposed Rule, page 15793, Proposed 29 CFR Part 5.5(a)(6) and (b)(4).

3) Expanding powers for DOL to withhold and cross-hold funds from other contracts.[17]

Advocacy has reached out to small business stakeholders to discuss concerns with this proposed rule. On April 25, 2022, Advocacy held a Small Business Roundtable with the officials from the Department of Labor and over 100 small businesses and their representatives on this proposed rule. The provisions of most interest to the small businesses in attendance included the provisions expanding industry coverage, changes to the calculation of the prevailing wage, and updated enforcement provisions.

## II. The Rule's IRFA Does Not Meet the Requirements of Section 603(b) Because It Undercounts the Number of Small Businesses, Underestimates the Compliance Costs of the Proposed Rule and Does Not Examine Less Burdensome Alternatives.

Under the Regulatory Flexibility Act (RFA), an Initial Regulatory Flexibility Analysis (IRFA) must contain:

1) A description of the reasons why the regulatory action is being taken;
2) The objectives and legal basis for the proposed regulation;
3) A description and estimated number of regulated small entities (by affected industry based on the North American Industry Classification System (NAICS));
4) A description and estimate of compliance requirements, including any differential for different categories of small entities;
5) Identification of duplication, overlap, and conflict with other rules and regulations; and
6) A description of significant alternatives to the rule.[18]

DOL's Initial Regulatory Flexibility Analysis is deficient and does not properly inform the public about the impact of this rule on small entities. This proposed rule inadequately quantifies newly affected industries. DOL has also underestimated the administrative burdens and compliance costs of this complicated regulation, with the very unlikely low average cost of $78 per small business in first year costs. DOL should have estimated the compliance costs of expanding DBRA coverage to new industries, the increase in the prevailing wage costs, and changes in the enforcement requirements on small businesses.

Without the information required by Section 603(b), DOL cannot fully consider significant and less burdensome alternatives to the proposed rule that would meet the agency's objectives. DOL must produce a new Initial Regulatory Flexibility Analysis that estimates the numbers of small businesses and compliance costs of this rule, especially including the administrative burdens and compliance costs of this rulemaking on small businesses. Finally, DOL must consider significant alternatives that would accomplish the objectives of the statute while minimizing the economic impacts to small entities.

---

[17] *Id.*
[18] 5 U.S.C. § 603.

## A. DOL Has Not Adequately Analyzed the New Small Businesses Covered under the DBRA

DOL does not properly analyze the number of small businesses and the industries affected by this proposed rule as required by the Regulatory Flexibility Act. The construction industry is composed primarily of small businesses, with 99.8 percent of businesses with less than 500 employees, and 91.6 percent of businesses with less than 20 employees.[19] DOL's analysis estimates that there are 103,600 to 135,200 potentially affected small businesses that are prime contractors and subcontractors through USA Spending and System for Award Management data (SAM).[20] DOL has expanded coverage to new industries such as prefabrication companies, material suppliers, truck drivers, survey crews and green infrastructure. However, the agency has not analyzed the numbers of small businesses affected and the economic impact of this rule on these entities.

*Proposed Rule Expands Coverage to Prefabrication Companies*

Advocacy is concerned that DOL is expanding the scope of the Davis-Bacon Act from construction work performed at the "site of the work" to prefabrication work completed at remote off-site locations.[21] Under this proposed rule, off-site coverage can include any secondary construction site, defined as a site "where a *significant portion* of the building or work is constructed."[22] Small businesses at Advocacy's roundtable pointed out that the DBRA by its own terms applies to wages "at the site of the work"[23] at a specific building worksite in the contract, and has limited application at nearby sites created solely for purposes of the project.[24] As proposed, this rule creates an additional area of coverage by applying it to any remote location that manufactures or builds "significant" components for a contract, regardless of whether that site is in proximity to the site of the work or whether it was established specifically for the project. Such businesses are not now covered by DBRA. In order to comply with Section 603(b) of the RFA, DOL must identify which types of manufacturers will now be potentially covered by the DBRA by NAICS code and clarify what types of building components would trigger this coverage.

---

[19] U.S. Small Business Administration, Table of Size Standards Matched to North American Industry Classification System Codes (NAICS), 13 CFR § 121.201 (May 2022), https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf.

[20] *See* 2022 Proposed Rule, Regulatory Flexibility Analysis, page 15779.

[21] *See* 2022 Proposed Rule, page 15731 and 15793, Site of the Work.

[22] *Id.* "A "significant portion" of a building or work means "one or more portion(s) or module(s) of a building or work, as opposed to smaller prefabricated components, with minimal construction work remaining other than the installation and/or assembly of the portions or modules at the place where the building will remain."

[23] 29 CFR 5.2(l)(1) Site of the work. The site of the work is the physical place or places where the building or work called for in the contract will remain; and any other site where a significant portion of the building or work is constructed, provided that such site is established specifically for the performance of the contract or project.

[24] Courts have found that off-site plants are not subject to the DBRA when the facilities were located three miles from site, batch pits two miles from construction site, or transportation of materials from a dedicated borrow pit. *See Building & Construction Trades Dep't. AFL-CIO v. U.S. Dep't of Labor Wage Appeals Bd.*, 932 F.2d 985 (D.C. Cir. 1991); *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C. Cir. 1994): *L.P. Cavett Co. v. U.S. Dep't of Labor*, 101 F.3d 1111 (6th Cir. 1996); *Les Calkins Trucking*, 1990-DBA-65 (ALJ July 13, 1995).

It is not clear from the regulation what constitutes a "significant portion" of work that would trigger DBRA coverage. For example, at the roundtable a representative from the Modular Building Institute (MBI) pointed out that MBI members produce modular components for buildings such as dorms, administrative buildings, and multi-family housing. These items may now be covered under the DBRA. A representative from the National Association of Home Builders (NAHB), most of whose members are small businesses, stated that modular construction has become a cost-effective way to address rising housing costs in the industry because costs are predictable when houses are produced in a controlled environment. Small builders described many building components of all sizes manufactured off-site that may fit this new definition for DBRA coverage including pre-cast concrete, tilt-up concrete, roofs, roof trusses, floor trusses, carpentry, wall panels, air conditioners, elevators, generators, and windows. It would be impractical, if not impossible, to isolate specific orders on off-site assembly lines to ensure wages compliance with DBRA rates.

Small businesses that produce prefabricated work are concerned that DBRA coverage would result in a steep increase in wages and administrative and end-product costs, making this option less affordable and desirable. For example, a small business making modular elevators commented that the skill set of the factory workers assembling a product has a fraction of the skillset of a craftsman at the worksite that installs, programs, and troubleshoots an installation. A small business owner commented that the logistics of paying different labor rates at an assembly line is a management and employee relations nightmare, as it would affect scheduling, payroll structure, and employee morale if some employees with the same position receive higher wages depending upon who the customer is.

A home builder making multi-family rental housing noted that their business has identical projects half an hour apart, one subject to Davis-Bacon requirements and the other not. The cost of the project subject to the DBRA was 30 percent higher than the cost of the other project. This builder noted that the current DBRA wage costs and regulatory burdens already dissuade many subcontractors from bidding on federal projects, and this rule may also make producers of prefabricated and modular components reject participation in these projects. Another roundtable participant was very concerned that this provision would undermine the affordable housing goals of the Administration, which touts the use of modular off-site construction in the development of this housing supply.[25]

*Proposed Rule May Expand Coverage to Some Material Suppliers and Truck Drivers*

Small businesses at Advocacy's roundtable commented that material suppliers and the trucks that deliver material to construction sites traditionally have been exempt from the requirements of the Davis-Bacon Act. The proposed extension of DBRA to these businesses will increase their costs and create confusion for the construction industry. Advocacy is also concerned that these small

---

[25] The White House, Fact Sheet:  President Biden Announces Actions to Ease the Burden of Housing Costs (May 16, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/05/16/president-biden-announces-new-actions-to-ease-the-burden-of-housing-costs/.

businesses are not counted in the assessment of the rule's impact. DOL must identify the potential industries newly covered by the DBRA and quantify the numbers of small businesses in a new IRFA.

Under the proposed rule, the exemption will require that the material supplier also provide items to the public. Currently some suppliers may only produce items for the federal government. The exemption would also require that the facility manufacturing the goods be neither established specifically for the project nor located at the site of the work. However, there is caselaw that allows some off-site plants to be exempt from the DBRA. Under this rule, any business that "also engages in other construction, prosecution, completion, or repair work is not a material supplier."[26]

A representative from the National Stone, Sand and Gravel Association stated that some of its members who are currently labeled as material suppliers may be considered subcontractors and subject to the DBRA because of this rulemaking. For example, some suppliers recycle concrete using a portable crusher onsite because on-site recycling is cheaper and more ecologically friendly than trucking used concrete offsite.

Application of the DBRA to material delivery truck drivers would be a significant change in practice for the construction industry.[27] The proposed rule may expand coverage to truck drivers delivering materials to a job site, "such as loading, unloading, or waiting for materials to be loaded or unloaded—where the driver or driver assistant's time spent on the site of the work is not so insubstantial or insignificant that it cannot be as a practical matter be precisely recorded."[28] Participants at Advocacy's roundtable expressed concern that it would be burdensome and unrealistic to require truck drivers dropping off materials to track their time under the DBRA.[29]

The delivery of materials at a jobsite is unpredictable and requires safety measures. It can take more than a few minutes to drop off items like wall panels at a curb. It may take a more significant amount of time to safely unload heavy roofing materials utilizing a crane. A small retailer or supplier may drop off construction materials at many different sites and jurisdictions, with both federal and private jobsites. Small businesses were also concerned that this rule would

---

[26] *See* 2022 Proposed Rule, page 15793, Proposed 29 CFR 5.2 Definitions, Material Supplier. " (1) A material supplier is an entity meeting all of the following criteria: (i) Its only obligations for work on the contract or project are the delivery of materials, articles, supplies, or equipment, which may include pickup of the same in addition to, but not exclusive of, delivery; (ii) It also supplies materials, articles, supplies, or equipment to the general public; and (iii) Its facility manufacturing the materials, articles, supplies, or equipment, if any, is neither established specifically for the contract or project nor located at the site of the work. (2) If an entity, in addition to being engaged in the activities specified in paragraph (1)(i) of this definition, also engages in other construction, prosecution, completion, or repair work at the site of the work, it is not a material supplier."

[27] *Building & Constr. Trades Dept., etc. v. United States Dep't of Labor Wage Appeals Bd*., 932 F.2d 985 (1991). (Material delivery truck drivers who come onto the site of the work merely to drop off construction materials are not covered by the Act's coverage even if they are employed by the government contractor.)

[28] *See* 2022 Proposed Rule, page 15793, Proposed 29 CFR 5.2 Definitions, Covered Transportation.

[29] *See* 2022 Proposed Rule, page 15733.

discourage small business material suppliers and their truck drivers from providing construction products to worksites, exacerbating current supply chain issues for the construction industry.

*Proposed Rule May Expand Coverage to Professional Surveyors*

While surveyors are generally not subject to DBRA requirements, DOL's proposed rule provides guidance that "survey crew members who spend most of their time on a covered project taking or assisting in taking measurements would likely be deemed laborers or mechanics."[30] Professional surveyors and their representatives in attendance at Advocacy's roundtable were concerned that this is a broad expansion of the DBRA.

*Proposed Rule May Expand Coverage to Additional Small Businesses*

DOL's Proposed Rule also contains multiple provisions clarifying definitions which may extend DBRA coverage to additional small businesses. The proposed rule adds installation of green infrastructure to coverage under a covered "building or work," which includes "solar panels, wind turbines, broadband installation and installation of electric car chargers."[31] The proposed rule also clarifies situations where demolition crews and flaggers could be subject to DBRA coverage. [32] Advocacy recommends that DOL quantify the numbers of small businesses and identify these potentially affected industries in a new IRFA.

**B. DOL Has Not Adequately Analyzed the Administrative Burdens and Compliance Costs of Proposed Rule**

DOL has also severely underestimated the administrative burdens and compliance costs of this rule for small businesses. In the IRFA, the agency only estimates one hour of time of human resources time or $52 for regulatory familiarization, or "to review the regulations to understand how the prevailing wage methodology will change." DOL also estimates 0.5 hours of staff time or $26 to implement this regulation, to update non-collectively bargained rates every three years.[33] However, this proposed rule is DOL's first comprehensive regulatory review of the DBRA in over 40 years, and it is over 400 pages long with 50 regulatory provisions. Small businesses attending an Advocacy's roundtable on this rulemaking disagreed with DOL's low estimate.

---

[30] *See* 2022 Proposed Rule, page 15729, Footnote 80. U.S. Dep't of Labor, Office of the Solicitor, Memorandum on the Application of the Davis-Bacon and related Acts, https://cdn.ymaws.com/www.nsps.us.com/resource/resmgr/Davis-Bacon/Goldberg_letter.pdf. (A representative from the National Society of Professional Surveyors cites to this DOL letter for the proposition that survey crews are exempt except for rare instances when they are performing duties that are physical in nature).

[31] *See* 2022 Proposed Rule, Page 15789, Proposed 29 CFR 5.2 Definitions, Building or Work.

[32] *See* 2022 Proposed Rule, Page 15791, Proposed 29 CFR 5.2 Definitions, Construction, Prosecution, Completion or Repair.

[33] *See* 2022 Proposed Rule, Page 15780.

*Proposed Rule Adds Administrative Burdens*

Small businesses newly covered by the DBRA may have the highest compliance costs under this proposed rule, as they have no experience working in this bureaucratic regulatory regime. Many small businesses spend a disproportionately higher amount of time and money on regulatory compliance because they have more limited human resources and legal staff and often must hire experts to perform compliance work or train internal staff. The DBRA requires covered contractors and subcontractors to complete human resources tasks, such as submitting weekly certified payrolls, evaluating prevailing wage and work rules, and paying and providing fringe benefits. Small businesses must update their payroll systems. Small businesses also commented that they will incur management costs to manage DBRA contracts, and assign covered and uncovered work. A small construction contractor commented that working on a DBRA-covered contract involves a lot of risk and uncertainty, as incorrect certified payroll or other paperwork could result in hundreds of thousands of dollars in penalties and back wages. Small businesses have told Advocacy that they do not have the workforce to administer the DBRA and would be less able to compete with larger, better-staffed companies for contracts.

*Proposed Rule's Prevailing Wage Changes Adds Increased Costs and Burdens*

At Advocacy's roundtable, some small business representatives expressed disappointment that the proposed rule did not reform the problems with the current prevailing wage system under Davis-Bacon, which they said discourages small business participation in federal construction projects. Others commented that DOL's current prevailing wage system does not reflect the wages in the local area, and the proposed revisions would mean that the prevailing wages under DBRA reflect the wages of fewer businesses. The proposed rule changes the prevailing wage methodology from a two-step process to a three-step process, which would re-establish as prevailing wages paid to 30 percent of the workers in a particular classification.[34] The Department determines prevailing wages from survey information that responding contractors and other interested parties voluntarily provide. However, a 2019 DOL OIG report found that 48 percent of all Davis-Bacon rates are union rates, even though less than 12.6 percent of the construction workforce was unionized during the time the study was conducted.[35] A recent survey of Associated Builders and Contractors members found that more than 70 percent of its members had not participated in federal government surveys used to determine Davis-Bacon Act rates, and that most of these members were not aware of these wage surveys.[36]

Small businesses at Advocacy's roundtable commented that prevailing wages under the DBRA can be significantly higher than similar private sector jobs, adding costs and burdens on covered

---

[34] *See* 2022 Proposed Rule, Page 15783, Proposed 29 CFR 1.2 Definitions, Prevailing Wage.

[35] U.S. Dep't of Labor, Office of Inspector General-Office of Audit, Report to the Wage and Hour Division, Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates (Mar. 29, 2019); U.S. Bureau of Labor Statistics, Current Population Survey Data, Construction Union Membership 2019 (Modified Jan. 20, 2022). In this study, union rates prevailed for 48 percent of the 134,738 rates in the Wage and Hour Division's system.

[36] Associated Builders and Contractors (ABC), News Release, available at: https://www.abc.org/News-Media/Newsline/entryid/19424 (last accessed May 17, 2022).

contractors and subcontractors and increasing the price for federal construction projects.[37] DOL has proposed many new changes to the calculation of prevailing wages under the DBRA that may also increase the wages for covered federal contractors, but the agency has not estimated any compliance costs from these changes. The proposed rule also updates the non-collectively bargaining prevailing wage survey every three years using the U.S. Bureau of Labor Statistics (BLS) Employment Cost Index (ECI) data. DOL is also allowing the use of previously prohibited wage data into the calculation of the wage rate under various circumstances, including variable rates, multiple county rates, state transportation divisions, federal project data, state prevailing wages, rural and urban rates considered together, and surrounding county information.[38]

DOL's Executive Order 12866 cost-benefit analysis does calculate potential increased wage costs from the 30 percent rule and 3-year updates, but none of these increases are counted as costs in the RFA section.[39] DOL also notes that firms could incur costs due to the updated rates, from adjusting payrolls, adjusting contracts, and communicating this information to employees. DOL also acknowledges that there could be increases in payroll costs for small firms in its IRFA but does not calculate these costs due to data limitations and uncertainty.[40] Advocacy recommends that DOL complete more analysis on the potential compliance costs of these prevailing wage changes.

Although small prime contractors should be reimbursed by the government for increased wages, Advocacy is concerned that financial risks may still remain for subcontractors when complying with DBRA such as delay in reimbursement, increased compliance costs, increased paperwork, and other risks. This risk should be reflected in the economic analysis through an increased estimate of the cost to comply with the rule. Small businesses told Advocacy that increased wages adversely impact small businesses with fewer administrative and financial resources, especially when the small business performs other work not subject to DBRA requirements. Small businesses will be required to spend hours of administrative work to adjust pay scales, record hours worked, and adjust fringe benefits.

Small businesses commented that these increased wages will likely result in many costly mistakes for contractors and subcontractors. Wage determinations have been known to be out of date or inaccurate for other reasons, yet the contractor and subcontractor remain subject to penalties if they are found to be paying an incorrect wage, even if the mistake is made by the contracting agency. Small businesses also mentioned that exact job classifications are often not

---

[37] Sarah Glassman, MSEP, Michael Head, MSEP, David Tuerck, PhD, and Paul Bachman, MSIE, The Federal Davis-Bacon Act: The Prevailing Mismeasure of Wages, Beacon Hill Institute at Suffolk University (Feb. 2008), http: https://www.beaconhill.org/BHIStudies/PrevWage08/DavisBaconPrevWage080207Final.pdf.

[38] *See* 2022 Proposed Rule, page 15703-15720.

[39] *See* 2022 Proposed Rule, page 15774-15775, Executive Order 12866 Section, Table 7, Changes in Rates Attributable to Change in Definition of Prevailing and Table 8- Distribution of Potential Per-Hour Transfers Due to Updated Rates. For example, Table 7 shows the differences in wages due to the 30 percent rule; rates for laborers could be increased by $7.80 per hour or decreased by $3.93 per hour depending on location. For example, Table 8 shows that the updates to non-competitively bargained contracts may result in 60,434 wage rate updates.

[40] *See* 2022 Proposed Rule, page 15780.

available, and they may bid at a lower price that is later found to be incorrect. Small businesses are less likely to be able to absorb such losses and are less well-equipped to defend against citations that lead to penalties and even debarment. Small contractors report that failure to pay the correct wage, failure to report certified payroll, paperwork mistakes, or even typographical errors in recordkeeping can result in penalties or withholding of payment under the contract.

Advocacy believes that if these costs are imposed on previously uncovered small businesses, these companies will decline to provide materials or services to DBRA projects, reducing the availability of those materials and services. This list of costs for contractors is not exhaustive, and Advocacy encourages DOL to review the experience of contractors who have encountered these and other issues in the performance of DBRA work.

*Proposed Rule's Other Provisions Add Liability Costs*

Participants at Advocacy's roundtable raised multiple provisions that create extra risk and liability for small businesses who participate in DBRA contracts, increase contractor costs, and discourage small businesses from taking part in federal construction projects.

The proposed rule allows incorporation of Davis-Bacon Act regulations by operation of law and allows contract clauses to be required even if they are not included or incorporated by reference into the contract.[41] For prime contractors, this provision increases the risk of violation without any notice that they were required to pay the DBRA wage. Another provision allows DOL to withhold funds from contractors who may hold multiple contracts during a wage investigation.[42] These provisions could result in significant harm to small subcontractors, who, as noted above, are less equipped to absorb the withholding of payments under the contract. The proposed rule also creates liability for subcontractors whose lower tier subcontractors are cited for violations. Small businesses commented it would be especially difficult under the proposed rule for subcontractors to keep track of their lower tiered subcontractors and material suppliers because of the lack of clarity and vague definitions in this rulemaking.[43] This liability risk needs to be reflected in the cost estimate of the RFA section.

## C.  DOL Does Not Examine Less Burdensome Alternatives in its IRFA

Under 603(c) of the RFA, an agency must provide a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes, and which minimize any significant economic impact of the proposed rule on small entities.[44] In DOL's IRFA, the proposed alternatives provided do not minimize the significant impacts of this rule.[45] DOL should review the public comments from the small business community to develop and

---

[41] *See* 2022 Proposed Rule, page 15798- Proposed 29 CFR Part 5.5(e) Incorporation by operation of law.
[42] *See* 2022 Proposed Rule, page 15793- Proposed 29 CFR Part 5.5(a)(6) and (b)(4).
[43] *Id.*
[44] 5 U.S.C. § 603.
[45] *See* 2022 Proposed Rule, Page 15780. In the IRFA, DOL suggests all contracting agencies submit reports, these entities are not small businesses. DOL also suggests using another index for updating non-collectively bargained wage rates, but that index would not accomplish the agency's goals because it does not track changes in wages or benefits.

adopt alternatives that will provide regulatory relief to small entities.

## Recommendations

1. **DOL Should Complete New IRFA**

DOL must produce a new Initial Regulatory Flexibility Analysis that estimates the numbers of small businesses and compliance costs of this rule, especially including the administrative burdens and compliance costs of this rulemaking on newly covered small businesses. Without the information required by Section 603(b), DOL cannot meaningfully consider significant and less burdensome alternatives to the proposed rule that would meet the agency's objectives.

2. **DOL Should Reconsider or Clarify Coverage of Newly Covered Small Businesses**

DOL should reexamine whether to expand DBRA coverage to the new small businesses listed in this comment letter based on the estimated economic impacts in a new analysis. In the alternative, DOL should also clarify vague definitions like "significant portion" of work in this proposed rule that, left unclarified, will create confusion and uncertainty for the covered small entities. Requirements imposed on small businesses must be measurable and enforceable.

3. **DOL Should Reconsider Changes to Prevailing Wage Methodology**

DOL has proposed changes to the prevailing wage methodology such as a change from the 50 percent rule to the 30 percent rule, regular updates to non-collectively bargained rates, and the adoption of other alternate data. DOL should measure the potential compliance costs and burdens of these proposals before adopting them in a final rule.

4. **DOL Must Publish a Small Business Compliance Guide**

For each rule requiring a final regulatory flexibility analysis, section 212 of SBREFA requires the agency to publish one or more small entity compliance guides.[46] Agencies are required to publish the guides with publication of the final rule, post them to websites, distribute them to industry contacts, and report annually to Congress.[47] Advocacy is available to help DOL in the writing and dissemination of this guide.

## Conclusion

Advocacy is concerned that the added costs and complexities in this proposed rule will make it more difficult for small contractors and subcontractors to comply with the DBRA and may have the unintended consequence of discouraging small businesses from participating in federal construction contracts. Advocacy recommends that DOL reassess the numbers of small businesses that will be covered and the compliance costs from this regulation in a new Initial Regulatory Flexibility Analysis. Additionally, DOL should consider significant alternatives that would accomplish the objectives of the statute while minimizing the economic impacts to small entities.

---

[46] Small Business Regulatory Enforcement Fairness Act, Pub. Law 104-121 § 212.
[47] The Small Business and Work Opportunity Act of 2007 added these additional requirements for agency compliance to SBREFA.

If you have any questions or require additional information, please contact me or Assistant Chief Counsel Janis Reyes at (202) 798-5798 or by email at Janis.Reyes@sba.gov.

Sincerely,

/s/
Major L. Clark, III
Deputy Chief Counsel
Office of Advocacy
U.S. Small Business Administration

/s/
Janis C. Reyes
Assistant Chief Counsel
Office of Advocacy
U.S. Small Business Administration

Copy to:      Dominic Mancini, Deputy Administrator
              Office of Information and Regulatory Affairs
              Office of Management and Budget



**Independent Electrical Contractors**
**2900 South Quincy Street, Suite 720**
**Arlington, VA 22206**
**Ph  703.549.7351 • 800.456.4324 • Fx  703.549.7448**
**www.ieci.org**

May 17, 2022

Division of Regulations, Legislation, and Interpretation, Wage and Hour Division
U.S. Department of Labor
Room S-3502
200 Constitution Avenue NW
Washington, DC 20210

Re: The Department of Labor's Proposed Updates to Davis-Bacon and Related Acts Regulations

This letter provides the response of Independent Electrical Contractors ("IEC") to the Department of Labor's ("DOL" or "Agency") proposed amendment of regulations issued under the Davis-Bacon and Related Acts, 29 C.F.R. Part 1 *et seq* (collectively referred to herein as the "DBA"), the first major regulatory review of the DBA implementing regulations in almost forty years.  As set forth fully in the comments below, based upon its experience representing thousands of electrical contractors across the United States, all with unique interests and operating in diverse environments, IEC believes that DOL should provide more time for thoughtful review and comment of these proposed rules, rescind them entirely given the tremendous expense and burden they will impose, or in the alternative, reconsider several of these proposed changes.

In summary, while IEC, likely many others attempting to fully-grasp (in a matter of weeks) the impact these proposed rules might have on 40+ years of practice, is concerned about the possible inflationary effect of several proposed changes that could result from the sudden increase in wages for certain non-union workers and workers in rural areas.  There are many parallels between America's current economic circumstances and those we faced in 1982 when inflation topped 6.16%.  At that time, the DOL made several changes to DBA regulations that commentators noted would help reduce inflation.  Today, the inflation rate is at 8.3%,[1] and that trend is expected to continue without government intervention.  Despite this concerning inflation, the DOL is now considering reversing the changes made in 1982 that were designed to mitigate inflation.

While inflation should be the concern of all Americans, IEC is also concerned with the legal basis of several proposed changes.  In many circumstances, DOL appears to disregard the language and intent of the DBA, resulting in expanded definitions of terms such as "construction" and "building or public work."  IEC's comments reflect its concern that DOL's regulations are broader than its mandate under the plain language of the DBA.  For example, DOL's changes reflecting a broader conception of "site of the work" violates the plain language of the DBA as well as related case law. For this, among other reasons, IEC urges the DOL to rescind these proposed changes and issue regulations consistent with the DBA's plain language and subsequent and well-settled case law.

---

[1] https://www.nytimes.com/2022/05/11/business/economy/april-2022-cpi.html

**EXHIBIT**
**4**

To facilitate a complete understanding of IEC's concerns, we have organized our comments under headings, intending to address some of the topics upon which DOL has requested comment specific to the pending regulations as well as IEC's larger concerns.

## I.     BACKGROUND

Now one of the largest non-profit trade associations representing electrical contractors across America, IEC was founded in 1957 and has grown into a 52-chapter association representing more than 3,600 company members and almost 80,000 electrical workers. IEC has now expanded its operations to include approximately 14,000 apprentices and provides world-class training programs to increase the knowledge base of its members. Together, IEC contractor members generate over $8.5 billion in gross revenue annually.

IEC strives to advocate for the independent electrical industry in the U.S., and the following comments represent feedback following outreach to our members. In any case where the Agency has questions for IEC, we may be contacted at (703) 549-7351.

## II.     THE AGENCY HAS NOT PROVIDED SUFFICIENT TIME TO PROVIDE COMMENTS ON THE PROPOSED RULE

The Agency is undergoing its first complete overhaul of DBA regulations since 1981, more than forty years ago. The proposed rules reflect significant regulatory changes that will severely burden industry and likely result in challenges under the Administrative Procedure Act ("APA") when they are imposed. IEC requests an additional 120 days for members and other contractors to examine and thoughtfully consider these proposed changes, and provide in-depth responses based on impact analyses. A 60-day comment period is simply inadequate for the public to analyze the potential impact these changes may have on a complicated regulatory regime that is been in place for over four decades. Accordingly, more time is necessary to afford interested parties the time necessary to assess and consider how industry, the economy, and the federal taxpayer could be effected by these changes.

## III.     THE AGENCY SHOULD WITHDRAW THE CHANGES IN LIGHT OF LEGAL SHORTCOMINGS AND ITS PROBABLE ECONOMIC EFFECTS

IEC's review of the proposed rule reveals several legal and policy shortcomings that would increase inflation, require extensive regulatory review for provisions that appear to be merely clarificatory, and increase costs for contractors that would likely be passed on to the government and taxpayer. At a minimum, the proposed changes will artificially increase wages in the localities where federal construction projects occur, which in turn will cause inflationary effects in these same localities, thereby harming the American economy more generally. And at worst, as discussed herein, in many instances, these proposed changes exceed the plain reading of the DBA and is therefore unsupported and illegal. For these reasons and the fact that the DBA has been operating for more than four decades, as is, with decades of interpretive and supporting case law, IEC believes the proposed rule should be rescinded in total and DOL continue with the status quo.

Alternatively, if the Agency will not rescind the proposed rule, then IEC proposes that the more specific comments and recommendations explained throughout the remainder of this submission be made prior to finalization.

**IV.** **CHANGE TO 29 C.F.R. § 1.2, DEFINITION OF "PREVAILING WAGE"—RETURN TO THE 30 PERCENT RULE.**

In its commentary on the proposed 30-percent rule, the Agency states that it has begun to overly-rely on the use of weighted averages when determining the "prevailing wage" under the definition applicable to 29 C.F.R. § 1.2. The effect, per the Agency, has been the over-use of weighted averages, now accounting for approximately 64 percent of classification determinations.[2]  To remedy this perceived overreliance on weighted averages for these determinations, the Agency proposes to reintroduce the 30-percent rule. This proposal, however, would have several negative effects on our members and would also have larger negative effects on the impacted workforce and American consumers.

First, as the Agency notes in its commentary of the 30-percent rule, the rule previously existed in regulations in effect between 1935 and 1982. As commentators noted on the proposed changes in 1981-82, the elimination of the 30-percent rule occurred as a result of record-high rates of inflation at the tail-end of "The Great Inflation," a period that saw rates reach as high as 13.5% in 1980.[3]  The inflation rate for March 2022 was 8.5%, up from .1% in May 2020.[4]  The same inflationary conditions exist today that justified the elimination of the 30-percent rule forty years ago; accordingly the Agency should delay the implementation of the 30-percent rule that might artificially increase the rate of pay by applying a more expansive definition of "prevailing wage." At minimum, the Agency should remain cautious to accept any change that would exacerbate inflation. As it stands, IEC opposes the change to the definition of "prevailing wage" in the proposed changes.

**V.** **CHANGES TO 29 CFR 1.6(C)(1)—PERIODIC ADJUSTMENTS**

The Agency is also proposing to amend 29 C.F.R. § 1.6(C)(1) to require regular increases of non-collectively bargained prevailing wage rates. The Agency invited comments on possible alternative sources of data for prevailing wage rates. As the Wage and Hour Division ("WHD") is an enforcement agency that is not responsible for data collection, IEC welcomes the untainted use of statistical data from the Bureau of Labor Statistics ("BLS"). At least one study has also shown that measurements conducted by WHD regularly exceed those of the BLS, costing taxpayers millions of dollars.[5]  IEC would like to ensure that the adoption of any alternate sources of data would reflect sound, scientific data collection methods, such as those used by BLS.

**VI.** **CHANGES TO 29 C.F.R. § 1.7(B)—ELIMINATION OF SEPARATION BETWEEN RURAL AND URBAN WAGE RATES**

---

[2] https://www.federalregister.gov/d/2022-05346/p-83
[3] Bryan, Michael. "The Great Inflation." Federal Reserve Bank of Atlanta, available at: https://www.federalreservehistory.org/essays/great-inflation
[4] "Consumer Prices up 8.5% for Year Ended March 2022." U.S. Bureau of Labor Statistics. Available at: https://www.bls.gov/opub/ted/2022/consumer-prices-up-8-5-percent-for-year-ended-march-2022.htm#:~:text=The%20Consumer%20Price%20Index%20increased,February%202021%20to%20February%202022.
[5] The Wage and Hour Division's calculations inflate wages on average by 20.21%. Repealing the DBA entirely would save taxpayers approximately $17.1 billion between 2021 and 2030. Burke and Tuerck. The Federal Davis-Bacon Act: Mismeasuring the Prevailing Wage. The Beacon Hill Institute for Public Policy Research. Available at, https://www.beaconhill.org/BHIStudies/2022/FINAL-BHI-DBA-2022-05-16.pdf.

The Agency is also proposing to amend 29 C.F.R. § 1.7(b) to eliminate the prohibition on using surrounding metropolitan counties in wage determinations for rural counties. IEC opposes the use of wage data from metropolitan counties to determine wages in adjacent, rural counties. First, the Agency's finding that construction workers commute further distances is derived from two research papers by the same author, an economist in the Utah.[6] Based on these two papers, which study the causes for an increased tolerance for construction workers commute time, the Agency supports its argument that the geographical area that includes a metropolitan county and its adjacent, rural counties, will constitute a single labor market.[7] The Agency concludes that it may be permissible to use a metropolitan county's wage rates in a determination of an adjacent, rural county, since commuting patterns support the finding of a shared labor market. While this reasoning may adequately address objections based on disruptions in labor patterns, it ignores other consequences of importing labor rates from metropolitan areas. Namely, the increased cost of construction in metropolitan areas—and increased wages that support this construction—is the result of numerous factors that do not apply to rural construction projects, such as building density, heavier traffic, stricter code enforcement, etc. To allow cross-consideration of metropolitan and rural wage rates apply dissimilar circumstances and would artificially inflate the construction wages in rural counties.

Second, the Agency should retain the bar on cross-consideration of metropolitan and rural wage data due to the inflationary effect it would have on rural economies. In a largely rural state, such as New Mexico, using a metropolitan county's wage rate would inflate rural wage rates above what the local economy can support and would undermine existing methods of incentivizing rural construction, such as subsistence pay to offset food and lodging.

Third, by equating rates between metropolitan and rural areas, the rule would disincentivize workers from taking on higher-paying jobs in metropolitan areas, which have numerous additional out-of-pocket expenses for such workers, including but not limited to commuting, parking, subsistence, and other related costs. As a result, equating labor across these areas would likely create a shortage of workers being willing to incur these expenses for work in metropolitan areas when they can earn an equivalent wage in rural areas devoid of these out-of-pocket expenses. This would in-turn drive up wages further in metropolitan areas to re-create the incentive to take on these metropolitan jobs, thereby further increasing inflation.

Lastly, in States without right-to-work protections, construction unions are more heavily concentrated in large- and especially mid-sized metropolitan areas than in rural areas.[8] Using a metropolitan county's wage rate in a rural county would unfairly apply union wages to many counties where workers have not chosen to unionize.

---

[6] Sun, Philips, & Zhao. "Hierarchy Divisions of the Ability to Endure Commute Costs: An Analysis based on a Set of Data about Construction Workers," Journal of Economics and Development Studies, Available at http://jedsnet.com/journals/jeds/Vol_8_No_4_December_2020/1.pdf; Sun, Karen. "Analysis of the Factors Affecting the Commute Distance/Time of Construction Workers," International Journal of the Arts and Humanities, Available at http://ijah.cgrd.org/images/Vol6No1/3.pdf
[7] https://www.federalregister.gov/d/2022-05346/p-243
[8] https://constructioncoverage.com/research/most-unionized-cities-in-america

For these reasons, we ask that the Agency retain the ban on cross-consideration of metropolitan and rural wage data and consider county groupings that would not artificially increase the wages of rural construction workers.

## VII.   CHANGES TO 29 C.F.R. § 1.3(D)—USING DBA-COVERED FEDERAL PROJECT DATA TO DETERMINE PREVAILING WAGES ON BUIDLING AND RESIDENTIAL CONSTRUCTION WAGE DETERMINATIONS

The Agency proposes changes to 29 C.F.R. § 1.3(D) that would allow the use of federal or federally assisted projects subject to the DBA when determining prevailing wages on building and residential wage determinations.  Currently, this is only possible when "it is determined that there is insufficient wage data to determine the prevailing wages in the absence of such data" or when compiling wage rate data for heavy and highway wage determinations.[9]  The Agency proposes the change, since the 1982 changes that disallowed the use of federal project wage data was based on the minimal financing used on such projects.

First, as litigation by labor unions following the 1982 changes makes clear,[10] Senate and House reports to the DBA clarify that the measure of "projects of a character similar" should be *private*, not federal projects:

The purpose of this measure is to require contractors and subcontractors engaged in constructing, altering, or repairing any public building of the United States . . . to pay their employees the prevailing wage rates when such wage rates have been established by *private industry*.[11]

(Emphasis added). The DBA was passed with this intention in mind, and any change in the prevalence of federally funded building and residential projects does not alter the statutory limitation made clear by the legislative history of the DBA.  Accordingly, to suddenly allow the use of federally funded building and residential projects would violate the Act's purpose as well as established case law.

Secondly, to suddenly use wage data from federally funded projects would increase wages at a time when inflation has been spiking over the past three years.  Based on the clear statutory authority and case law precedence, DOL must maintain the current practice of establishing a prevailing wage by surveying for the wages paid on private work in the local area, *NOT* public projects.

## VIII.   CHANGES TO ADD 29 C.F.R. § 1.3(E)—PERMITTING THE USE OF WAGE DATA FROM COLLECTIVE BARGAINING AGREEMENTS ("CBAS") DEEMED TO BE "FUNCTIONALLY EQUIVALENT" TO NON-CBA WAGES

IEC strongly opposes the use of CBA wage data deemed "functionally equivalent" to non-CBA wages in a labor classification.[12]  Although IEC appreciates DOL's intention of obtaining additional data points for the purpose of determining a single, predominant wage, based on the Agency's discussion, it is not sufficiently clear what principle will guide the Agency's finding that varied rates are nonetheless functionally equivalent.  Additionally, if the intent is to broaden the set of wages that

---

[9] 29 C.F.R. § 1.3(D)
[10] *AFL-CIO* v. *Donovan,* 712 F.2d 611, 616 (D.C. Cir. 1983).
[11] S.REP. No. 1445, 71st Cong., 3d Sess. 1-2 (1931)
[12] https://www.federalregister.gov/d/2022-05346/p-108

can fall under a single wage, then there is no reason the Agency could not also find non-CBA wages "functionally equivalent" so long as they fall within the same acceptable variation proposed for CBA wages deemed functionally equivalent. The Agency's example of CBA "zone rates" employed to compensate union employees for travel or lodging away from home is not unique to work performed by unionized labor.[13] Such stipends and pay inducements exist in certain non-CBA contexts, and there is no reason to think that they could also be treated as functionally equivalent. IEC opposes the inclusion of CBA wage rates, but if they are to be used, then the Agency should at least allow the use of non-CBA rates that are functionally equivalent as well. This would have the benefit of further broadening the sample size of available wage rates.

## IX.   ADDITIONS OF PARAGRAPHS (G), (H), (I), AND (J) TO 29 C.F.R. § 1.3, ADOPTING STATE PREVAILING WAGE RATES.

One upshot of the Agency's proposed adoption of wage increases every three years is that the increase is based on the BLS's scientific statistical sampling methods. Contrast this to the proposal to allow the DOL Administrator to adopt—rather than merely consider, as is currently the case—the prevailing wage rates set by State and local governments.[14] IEC opposes this proposal for several reasons.

First, DOL should only consider wage rates in states that open wage surveys to all companies, both union and non-union, participating in the classification for which a wage determination is sought. New Mexico, for example, does not allow non-union shops to participate in state wage surveys. Adopting that wage rate would result in the exclusion of approximately 92% of the state construction workforce from wage determinations, resulting in a skewed perspective on wages with grave consequences for inflation and the price of commodities in the state.[15]

Second, the Agency makes the adoption of state and local rates conditional on criteria outlined in proposed paragraphs 29 C.F.R. § 1.3(h)(1)-(4). Among these conditions is the determination, required by the Administrator, that the State or local government "[use] a survey or other process that is open to full participation by all interested parties,"[16] which would then set a wage rate that "reflects both a basic hourly rate of pay as well as any prevailing fringe benefits . . . calculated separately,"[17] employ similar labor classifications[18], and employ "substantially similar" criteria used by the Administrator when making wage determinations.[19] While the last criterion suggests some fealty to DOL regulations, the ability to merely adopt—rather than consider—state and local wage determinations converts key provisions of the regulations governing wage determinations into mere suggestions. The state procedures must be found *fully compliant* with DOL regulations prior to adoption. For these reasons, IEC opposes the proposed revision as being contrary to regulatory requirements.

## X.   CHANGES TO 29 C.F.R. § 5.2 AND § 5.2(I), EXPANDING SITE OF THE WORK AND

[13] https://www.federalregister.gov/d/2022-05346/p-109
[14] https://www.federalregister.gov/d/2022-05346/p-156
[15] https://www.abqjournal.com/455064/thank-nms-nonunion-construction-workers-today.html
[16] https://www.federalregister.gov/d/2022-05346/p-933
[17] https://www.federalregister.gov/d/2022-05346/p-934
[18] https://www.federalregister.gov/d/2022-05346/p-935
[19] https://www.federalregister.gov/d/2022-05346/p-936

## CHANGING THE DEFINITION OF "MATERIAL SUPPLIER."

### A.    Site of Work Changes

IEC strongly opposes the proposed changes to 29 C.F.R. § 5.2(I) expanding the activities considered to take place at the "site of work" despite occurring at secondary work-sites.  This change would affect thousands of electrical contractors who engage in prefabrication off site and would substantially increase costs for contractors that would be passed on to the taxpayer.  Under the proposed changes, off-site work will not simply encompass facilities established specifically for the performance of a project but will also include long-established facilities where "significant portions" of elements for designated buildings or works are constructed.

First, the DBA expressly states that its coverage is limited to construction performed at the "site of the work."  The statutory language is clear:

> The contractor or subcontractor shall pay all mechanics and laborers employed directly on ***the site of the work***, unconditionally and at least once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and the laborers and mechanics.[20]

Numerous court decisions during the 1990's rejected DOL efforts to expand the scope of DBA coverage to pre-fabrication activities away from the construction site or transportation to and from the site.  In *Ball, Ball & Brosamer, Inc. v. Reich*, the D.C. Circuit held that including "workers at off-site facilities is inconsistent with the plain language of [§3142] of the Davis-Bacon Act, which requires the payment of prevailing wages only to 'mechanics and laborers employed directly upon the site of the work."[21]  While that court allowed a possible exception for work sites "located in actual or virtual adjacency to the construction site," off-site facilities that were miles away from the actual site were specifically found not to fall under DBA language.[22]  To support its plain language argument, *Ball* cites *Building & Construction Trades Department v. United States Department of Labor Wage Appeals Board* ("*Midway*").[23]  In *Midway*, the court likewise endorsed a plain language reading of the DBA:

> [W]e find, not surprisingly, that Congress intended the ordinary meaning of its words; the phrase "mechanics and laborers employed directly upon the site of the work" restricts coverage of the Act to employees who are working directly on the physical site of the public building or public work being constructed.[24]

Just like in *Ball* and *Midway*, *L.P. Cavett Company v. U.S. Dep't of Labor* found the DBA's plain language required coverage only for work completed directly at the physical site:

---

[20] 40 U.S.C. §3142(c)(1)
[21] *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1451 (D.C. Cir. 1994)
[22] *Id.* at 1452.
[23] *Building & Construction Trades Department v. United States Department of Labor Wage Appeals Board*, 932 F.2d 985 (D.C. Cir. 1991)
[24] *Midway*, 932 F.2d at 992.

> Where the language of the regulation is clear and plain, not only is there no reason to let the Director offer an interpretation of it, and no reason to consult the legislative history, but there is every reason not to do so.

> The statutory phrase "employed directly upon the site of the work" means that only employees working directly on the physical site of the public work under construction have to be paid prevailing wage rates.[25]

Despite noting these cases in passing without providing substantive analysis of how the proposed regulations are permissible under these interpretations of the DBA,[26] DOL now proposes to reopen this previously settled issue by expanding the definition of the construction "site." While this is not the sole basis, the fact that this change does not comport with law alone supports IEC's opposition to this expansion of the definition of the "site of work".

In addition to being contrary to law, the changes would increase the wages paid to off-site workers and contribute towards inflation near the areas where the off-site facilities are located. The change also carries significant administrative costs and would increase management and reporting costs significantly, costs that would ultimately be borne by the taxpayer. The administrative difficulties are clear. Under the proposed changes, contractors would be required to account for different wage rates for numerous projects at numerous different sites despite assembly occurring at a centralized site staffed by workers operating in close proximity. Many of these workers would be compensated in accordance with different wage decisions despite engaging in the exact same work. For example, if a contractor is prefabricating hangers that will be used in four different sites, they will now be expected to track and break out different pay rates for the same work; this will be an administrative challenge and even cause well-intentioned contractors compliance issues, added costs, and potentially penalties.

The change will also hamper pay transparency at off-site facilities. In addition to Federal protections mandated by the Office of Federal Contract Compliance Programs that require pay transparency,[27] the emerging consensus among many states is that contractors should publish pay ranges.[28] Multiple wage determinations at the same off-site facility would increase pressure on management to level wages. While this pressure may be good in some contexts, namely, where different pay is explained by discriminatory factors, those factors will not account for variation in pay for the same work under different projects, and this would be an unfair consequence of the change. This could also lead to worker unrest as employees jockey for the higher paying projects.

## B.   Changes to the Definition of "Material Supplier"

The Agency proposes to revise the "material supplier exception" to require such suppliers to meet three criteria. To summarize, in order to qualify as a material supplier, the work must be the delivery of materials, articles, supplies, or equipment; the supplier must supply those to the general public, and its facility cannot be established specifically for the contract or project nor located at the

---

[25] *L.P. Cavett Company v. U.S. Dep't of Labor*, 101 F.3d 1111, 1115 (6th Cir. 1996)
[26] https://www.federalregister.gov/d/2022-05346/p-342
[27] https://www.dol.gov/agencies/ofccp/faqs/pay-transparency
[28] https://www.natlawreview.com/article/emerging-trend-state-pay-transparency-laws

site of the work.[29]  IEC opposes changes to the definition of "material supplier," that includes the requirement that a material supplier supply its products to "the general public."

First, contractors cannot be expected to know what other customers the supplier might support. Second, what would constitute the "general public." For instance, if a supplier has a limited set of contract relationships with four different suppliers, would that count as servicing the "general public"? The ability of a supplier to only service a limited number of customers should not *ipso facto* create a subcontract relationship with that supplier.  Rather than seek to draw arbitrary boundaries between material suppliers and subcontractors based on a vague reference to the "general public", the proposed requirement should be omitted entirely.

## XI.  CHANGES TO 29 C.F.R. § 5.5(A)(3)(I) AND § 5.5(A)(3) AND (C)—INCREASED RECORDKEEPING REQUIREMENTS.

IEC further opposes any additional recordkeeping requirements.  The Agency proposes to change 29 C.F.R. § 5.5(a)(3)(i), *Basic record requirements*, to require contractors to maintain records for three years.  Simply put, IEC understands this to already be a requirement under 29 C.F.R. but also the Federal Acquisition Regulation, namely, 48 C.F.R. § 4.7.  Changing the language of the regulation introduces confusion and is unnecessarily duplicative of other regulatory requirements.

The Agency also proposes to add § 5.5(a)(3)(i)(B), which would require contractors to maintain a list of telephone numbers and email addresses for its employees.  Current requirements are that the record include the name, address, and social security numbers, in addition to the classification and hourly rates of wages paid.[30]  In its discussion of the telephone and email requirements, the Agency states the following:

> The new or additional recordkeeping requirements in the proposed revisions to § 5.5(a)(3) likely do not impose an undue burden on contractors or subcontractors, as they likely already maintain worker telephone numbers and email addresses and may already be required by contracting agencies to keep contracts and related documents.[31]

However, it is one thing to maintain this contact information so that a contractor can contact its employees, and yet quite another to make this a regulatory requirement, the breach of which could result in suspension of payment, advance, guarantee of funds, or even a debarment action.  First, employees may not wish to provide a telephone number or email address or may simply not have either.  Second, maintaining an accurate and up-to-date contact list for employees should not be a general regulatory mandate, since under the Privacy Act of 1974, that information is not "relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President."[32]  The Privacy Act applies to government contractors as well:

---

[29] https://www.federalregister.gov/d/2022-05346/p-1093
[30] 29 C.F.R. § 5.5(a)(3)(i)
[31] https://www.federalregister.gov/d/2022-05346/p-404
[32] 5 U.S.C. § 552a(e)(1)

When an agency provides by a contract for the operation by or on behalf of the agency of a system of records to accomplish an agency function, the agency shall, consistent with its authority, cause the requirements of this section to be applied to such system.[33]

The Agency has not explained how the collection of telephone numbers and email addresses is necessary to accomplish the purposes of the DBA, and they should not require contractors to collect and maintain this information, which will only impose additional burdens and potential liability onto such contractors.

## XII.   CHANGES TO 29 C.F.R. § 5.2—EXPANDING TYPES OF ACTIVITIES CONSTITUTING "CONSTRUCTION" TO INCLUDE SOLAR PANELS, WIND TURBINES, BROADBAND INSTALLATION, AND THE INSTALLATION OF ELECTRIC CAR CHARGERS

The Agency is proposing to add "solar panels, wind turbines, broadband installation, and the installation of electric car chargers" to the list of characteristics of a "building or work" at 29 C.F.R. § 5.2(i). IEC opposes this change.

First, the list is deemed to be illustrative, and includes "such as…" to indicate that there are several improvements that would be covered by DBA regulations that are not included on the list. If the Agency believes these are already covered by the list, then there is no need to further expand an illustrative list. Second, the use of "such as" is vague and ambiguous and fails to provide contractors with explicit notice of the items being added to the list of characteristics of a "building or work." Third, solar panels, wind turbines, and electric car chargers should not be covered by DBA. There are several energy related federal financial assistance programs created to encourage the use of green energy in residential and commercial buildings.[34] Adding a requirement to pay DBA wages on construction projects—particularly design-build projects—will disincentivize their use, as contractors will search for methods of cutting costs. This will affect the country's ongoing effort to achieve energy independence and of cutting emissions.

For that reason, IEC opposes the expansion of the list of characteristics that might constitute "building or work."

## XIII.   ADDITIONS TO 29 C.F.R. § 5.2—ADDING TO THE DEFINITION OF "CONSTRUCTION, PROSECUTION, COMPETION OR REPAIR" TO INCLUDE "HAZARDOUS WASTE REMOVAL, LAND RECYCLING, OR RECLAMATION THAT INVOLVE SUBSTANTIAL EARTH MOVING, REMOVAL OF CONTAMINATED SOIL, RE-CONTOURING SURFACES, AND/OR HABITAT RESTORATION" TO THE DEFINITION OF CONSTRUCTION

IEC opposes the creeping expansion of the definition of construction contemplated by the inclusion of certain work that bears no relation to the construction of a building or public work. The plain language of the DBA applies the wage standards to "every contract . . . for *construction, alteration, or repair*, including painting and decorating, of *public buildings and public works* of the

---

[33] 5 U.S.C. § 552a(m)(2)
[34] https://www.energy.gov/eere/solar/energy-related-federal-financial-assistance-programs

10

Government." (Emphasis added).[35]  The expanded list that the Agency argues falls under the definition of "construction, prosecution, completion or repair," including but not limited to "hazardous waste removal, land recycling, or reclamation that involve substantial earth moving, removal of contaminated soil, recontouring surfaces, and/or habitat restoration," falls outside of the statutory scope that the DBA was enacted to cover.  Indeed, these are not construction activities and expanding the DBA to cover such activities represents a slippery slope to all manner of work that is not related to the construction, alteration, or repair of a building or public work.

Accordingly, IEC respectfully requests this proposed change be rescinded.

## XIV.   CHANGES TO 29 C.F.R. § 5.12(A)(1)—EXPANDING DOL'S DEBARMENT REGULATIONS PERTAINING TO "RELATED ACTS" TO ALSO COVER NON-DBA FEDERAL AWARDS

IEC objects to broadening the debarment provision of the DBA to apply to the "Related Acts" as this likely exceeds the statutory authority of several if not all of the "Related Acts."

The scope of DBA debarment authority is plainly stated in the statute:

RESTRICTION ON AWARDING CONTRACTS.— ***No contract shall be awarded to persons appearing on the list*** or to any firm, corporation, partnership, or association in which the persons have an interest until three years have elapsed from the date of publication of the list.[36]

(Emphasis added).

The Agency's proposal to simply bring 71 separate statutes[37] under the same scope as DBA may likely exceed the statutory authority under those 71 "Related Acts."  Based on the proposed rule, DOL appears to be using the authority under the DBA's statutory debarment provision and applying such to covered activities of "Related Acts."  While it is clear that some of the "Related Acts" give the Secretary of Labor enforcement authority under the DBA,[38] the Agency's explanation of the expansion of debarment to "Related Acts" on a *carte blanche* basis where no such authority exists is contrary to law and generally accepted cannons and axioms of statutory interpretation.  Accordingly, IEC requests that DOL adhere to the debarment requirements plainly stated in the "Related Acts," if any, rather than expanding their scope beyond what these statutes provide for.

## XV.   CHANGES TO 29 C.F.R. § 5.6(A)(II)(E)—REQUIRING CROSS-WITHHOLDING OF AMOUNTS DUE TO A CONTRACTOR ALLEGED TO HAVE VIOLATED WAGE

---

[35] 40 U.S.C. §3142(a)(emphasis added)
[36] 40 U.S.C. §3144(b)(2)(emphasis added)
[37] A full list of the acts can be found here: https://casetext.com/regulation/code-of-federal-regulations/title-29-labor/subtitle-a-office-of-the-secretary-of-labor/part-5-labor-standards-provisions-applicable-to-contracts-covering-federally-financed-and-assisted-construction-also-labor-standards-provisions-applicable-to-nonconstruction-contracts-subject-to-the-contract-work-hours-and-safety-standards-act/subpart-a-davis-bacon-and-related-acts-provisions-and-procedures/section-51-purpose-and-scope
[38] For example, Part II, Article 15.1(b)(i) of the Delaware River Basin Compact (sec. 15.1, 75 Stat. 714, Pub. L. 87-328) gives the Secretary of Labor such authority, available at  https://www.govinfo.gov/content/pkg/STATUTE-75/pdf/STATUTE-75-Pg688.pdf.

### REQUIREMENTS

IEC opposes the introduction of cross-withholding as exceeding the authority provided by the plain language of the DBA.  The proposed rule would require the agency to:

> …withhold or cross-withhold sufficient funds to remedy any back wage liability resulting from the failure to incorporate the correct wage determination or otherwise identify and obligate sufficient funds through a termination settlement agreement, bond, or other satisfactory mechanism.[39]

Under the DBA, contracting officers may make certain withholdings to compensate workers for wages required by the contract but not paid by a contractor:

> [T]here may be withheld from the contractor so much of accrued payments as the contracting officer considers necessary to pay to laborers and mechanics employed by the contractor or any subcontractor on *the work* the difference between the rates of wages required by the contract to be paid laborers and mechanics on the work and the rates of wages received by the laborers and mechanics and not refunded to the contractor or subcontractors or their agents.[40]

Under this statute, the withholding authority relates to accrued payments for "the work" on which laborers and mechanics are employed.  It does not authorize a withholding of funds related to *other* works or other DBA-covered or non-DBA-covered contracts.  Additionally, the Agency's explanation of its authority acknowledges that, unlike amounts that might be due by a contractor to the federal government and that could therefore be subject to an offset on a future payment, there is no "mutuality of debts" between a contractor and the government when a contractor owes a worker wages that would justify a cross-withholding.  Despite recognizing this, as well as the need for specific contractual assent for cross-withholding by contractors, the Agency seeks to *require* cross-withholding by regulation.  The Agency does not have this authority under either the DBA or under the Bureau of Fiscal Service's Treasury Offset Program, as funds owed to workers are *not* owed to the Government.  Accordingly, IEC opposes the addition of a mandatory cross-withholding in the proposed regulations.

Second, the Agency should revisit its cross-withholding program to strengthen contractors' rights to due process before taking the extraordinary action of making a withholding.  The government's ability to withhold payment prior to a formal finding of wrongdoing violates the spirit of due process and subjects the contractor to potential harm far in excess of the withholding as the contractor may be unable to meet payroll, loan, bond or other obligations that could irreparably harm the contractor.  The Agency should allow review by Administrative Review Boards *prior* to withholding any amounts owed and then pursue contractors for amounts due to employees in case of a violation.  As the proposal stands, a company would likely face bankruptcy in light of cross-withholdings and could put workers out of jobs entirely.  Moreover, it is not as though the government does not have other, potentially more onerous and effective enforcement mechanism already provided under the law, such as civil and criminal penalties, and/or administrative remedies such as suspension or debarment for contractors knowingly violating requirements under the DBA.

---

[39] https://www.federalregister.gov/d/2022-05346/p-1198
[40] 40 U.S.C. §3142(c)(3)

## XVI.   ADDING 29 C.F.R. § 5.5(A)(11) AND (B)(5)—"ANTI-RETALIATION" PROVISIONS

DOL is proposing to add new provisions penalizing contractors that retaliate against workers who complain of prevailing wage violations. IEC opposes the additions as duplicative and could unnecessarily expand the number of claims against contractors.  Under current law, contractor employees are already entitled to whistleblower protections:

> An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant . . . or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.[41]

In addition to this statute, the Federal Acquisition Regulatory Counsel has already published regulations prohibiting retaliation related to the disclosure of compensation information.[42]  These anti-retaliation provisions are in addition to those found in a host of other statutes, including, but not limited to the Fair Labor Standards Act (FLSA); the Family and Medical Leave Act (FMLA); the Migrant and Seasonal Agricultural Worker Protection Act (MSPA); the H-1B,  H-1B1, E-3, H-2A, and H-2B provisions of the Immigration and Nationality Act (INA); the United States-Mexico-Canada Agreement (USMCA); Executive Order (EO) 13706, Establishing Paid Sick Leave for Federal Contractors; EO 13658, Establishing a Minimum Wage for Contractors; EO 14026, Increasing the Minimum Wage for Federal Contractors; the Consumer Credit Protection Act (CCPA); and the Employee Polygraph Protection Act (EPPA).[43]

## XVII.   ADDITION OF 29 C.F.R. § 5.5(E)—HOLDING CONTRACTORS RESPONSIBLE WITHOUT NOTICE OF DBA REQUIREMENTS.

IEC opposes the Agency's introduction of the proposed provision at § 5.5(e), stating that certain provisions omitted from the contract are nonetheless included "by operation of law."  First, this cannot apply to all DBA provisions, for example, cross-withholding, which requires the assent of the contractor.  Second, this addition violates notice requirements integral to basic contract and due process principals.  Omitting entire requirements and then demanding compliance with a complicated and costly regulatory regime would create significant confusion and uncertainty among contractors when reviewing bidding opportunities and entering into a contract. Indeed, the uncertainty that this may create, especially when these proposed rules seek to include less than clear language as to the applicability of the DBA (*see* Comment at Section X) may result in:  a) many contractors to opt out of DBA (or potentially DBA) covered work thereby leaving the government with less competition, which in turn would result in higher prices; and/or b) contractors hedging whether a project is DBA covered and therefore submitting a bid that may account for the DBA, when it is in fact not covered, but still

---

[41] 41 U.S.C. §4712, available at http://uscode.house.gov/view.xhtml?req=(title:41%20section:4712%20edition:prelim)
[42] See DoD, GSA, and NASA adopted as final, without change, an interim rule amending the Federal Acquisition Regulation (FAR) to implement Executive Order (E.O.), Non-Retaliation for Disclosure of Compensation Information. The interim rule also implemented a final rule issued by the Department of Labor, 83 FR 42570, available at https://www.federalregister.gov/documents/2018/08/22/2018-17826/federal-acquisition-regulation-non-retaliation-for-disclosure-of-compensation-information
[43] https://www.dol.gov/sites/dolgov/files/WHD/fab/fab-2022-2.pdf

placing these added costs onto the taxpayer.  Either way, a no notice approach will lead to higher prices merely to absolve the oversight of professional contracting officials.

Finally, any allusion to the *Christian* doctrine is misplaced.  That doctrine requires the incorporation of mandatory provisions required by statute or regulation.  It does not govern clauses that are merely included because the contractor agrees to enter a contract with the government, such as agreeing to be subject to cross-withholding.  Without requiring notice in the form of contract provisions, contractors would have to track all the different regulatory changes (wage rates) from location.  This would substantially increase the cost of compliance for contractors.  IEC emphasizes that the responsibility of ensuring clear requirements are published and accessible must fall on the agency and its professional contracting official implementing the rules, not on contractors subject to the rules.

## XVIII. PROPOSED REVISIONS TO §§ 1.3 AND 5.5—ALLOWING PRE-APPROVAL OF CONFORMED CLASSIFICATIONS AND WAGE RATES WITHOUT CONTRACTOR INPUT

IEC opposes the Agency's introduction of a procedure to identify wage and fringe benefit rates on classifications for which there is insufficient data without contractor input.  The Agency proposes a process whereby the Administrator "would be authorized to list the classification on the wage determination along with wage and fringe benefit rates that bear a 'reasonable relationship' to the prevailing wage and fringe benefit rates contained in the wage determination."[44]  While this preapproval process might increase predictability and would inform contractors' bids, it also removes them from the process of determining the appropriate rate.  This change eliminates contractors' rights to dispute a proposed classification and wage rate, currently found at 29 C.F.R. § 5.5(a)(1)(ii)(C).  IEC insists on providing a mechanism whereby contractors can challenge the Administrator's proposed classifications and provide reasonable alternatives.

## XIX. ADDING FRINGE BENEFIT ANNUALIZATION REQUIREMENTS TO THE REGULATIONS AND CODIFYING ADMINISTRATIVE COSTS RESTRICTIONS.

IEC opposes the requirement that contractors obtain DOL review and approval of existing fringe benefits plans within 18 months after the published rule.  These plans have met DOL's longstanding criteria, and the approval process will dramatically increase regulatory burdens on contractors and DOL itself.  Additionally, IEC opposes the annualization of non-DBA work in an hourly rate, as this will strip benefits from thousands of employees at no fault to themselves.  While IEC understands the Agency's intent of ensuring that DBA wages are paid directly to employees, the current regulations allow contractors to develop other alternative methods of complying beyond the straightforward payment of wages, such as a fringe 401k accounts.  The requirement that plans allow "immediate participation and immediate vesting" eliminates fringe 401k plans from DBA creditability.  IEC therefore opposes this change.

## XX. CHANGES TO 29 C.F.R. § 5.5(A)(4)(I)—APPRENTICESHIP WAGE PORTABILITY

IEC shares concern over changes to how apprenticeship rates and ratios are to be determined under the proposed regulations, namely, based on the locality of the project.  One critical feature of

---

[44] https://www.federalregister.gov/d/2022-05346/p-280

apprenticeships is that they are not required to receive full DBA wages but rather a percentage specified by the approved apprenticeship program.  This will constitute a huge burden on apprenticeship programs across the country, who will be required to register programs in additional localities in order for apprenticeship to journeyman ratios to be reliable.  It also places a burden on apprenticeship programs from DBA regulations that is not meant to exist—namely, the locality-specific rules.  Apprenticeships exist to provide valuable experience and training at a rate of pay determined by the apprenticeship program.  So long as there is a reasonable ratio of apprentices to journeymen, the rate of pay set by the program should be honored in any locality.  The Agency provides no guidance for situations where localities have no apprenticeship program.  What does the Agency propose in those circumstances?  IEC requests additional clarity surrounding these changes.

## XXI.   CHANGES   ADDING   29   C.F.R.   § 5.5(6)—STATING   THAT   UPPER   TIER SUBCONTRACTORS CAN BE HELD RESPONSIBLE FOR VIOLATIONS OF LOWER TIER SUBCONTRACTORS.

The Agency proposes to codify certain Administrative Review Board ("ARB") decisions regarding the liability of upper-tier contractors for offenses committed by lower-tier subcontractors against employees.[45]  IEC opposes this expansion of the regulatory language.

First, the cases cited by the Agency do not support a blanket liability provision.  In *Ray Wilson Co.,* the vice president of a prime, Aztec, had prepared the lower-tier subcontract of a DBA-violating firm.  Aztec also did not include DBA provisions in its own agreement.  These specific issues govern the case and the Board's finding that Aztec had violated its requirement "to ensure that its lower-tier subcontractor R&F properly complied with the wage payment and record keeping requirements on the project."[46]  The Board also did not cite any provision of DBA or regulations to support its finding.  Indeed, in this instance it may have been appropriate for Aztec to be held responsibility for its subcontractor's violations of the DBA due to its failure to include the DBA in the lower-tier subcontract. Second, nothing in *Norsaire Sys., Inc.,* also cited by the Agency, suggests the need for a broad rule holding that a prime contractor should be responsible, as the proposed language indicates, "for the compliance by any subcontractor or lower tier subcontractor with all the [DBA-required] contract clauses."[47]

Rather, as these cases cite no DBA or regulatory provisions in support of the holdings, IEC would strongly recommend that the Agency follow the approach of many regulatory scheme's applicable to government contractors that explicitly allow upper-tier contractors to rely on the certifications of lower-tier subcontractors with respect to certain compliance obligations. For example, the small business program administered by the Small Business Administration has long allowed upper-tiered contractors to rely upon the size certifications of small businesses and have not imposed a duty to inquire unless there was a reason to believe the certification was inaccurate. Here, the proposed language is overly harsh, relies on Board decisions where the upper-tiered contractor was involved in or had direct culpability for the noncompliance, and would greatly increase the compliance costs of

---

[45] See https://www.federalregister.gov/d/2022-05346/p-434, *discussing Ray Wilson Co.,* ARB No. 02-086, 2004 WL 384729, at *6 (Feb. 27, 2004); *Norsaire Sys., Inc.,* WAB No. 94-06, 1995 WL 90009, at *1 (Feb. 28, 1995)
[46] *Ray Wilson Co.,* ARB No. 02-086, at *10
[47] https://www.federalregister.gov/d/2022-05346/p-1164

upper-tier contractors, who would have to expend significant costs to audit subcontractors.  For these reasons, IEC firmly opposes the proposed language.

## XXII. DOL ASKS FOR COMMENT ON HOW TO TREAT THIRD-PARTY FRINGE BENEFIT ENTITIES WHICH BOTH PERFORM ADMINISTRATIVE FUNCTIONS AND ACTUALLY DELIVER BENEFITS. NO CHANGE IS CURRENTLY PROPOSED.

The Agency invited comments on regulations governing whether third-party entities who perform certain administrative functions or administer benefits should be changed.  IEC endorses the status quo regulations, as they are clear and IEC member entities would experience an increase in compliance costs to account for additional changes.

## XXIII. CONCLUSION

For the reasons presented above, the proposed DOL changes should be rescinded in full, more time should be provided for the public to carefully consider these changes, and/or, at a minimum, many of the proposed changes should be abandoned or revised as they are contrary to the plain reading of the DBA and/or may further exacerbate inflation and costs onto federal taxpayers.

IEC appreciates your time and attention to these comments and concerns, and welcomes any questions that you may have.

Sincerely,

Jason E. Todd
Vice President, Government Affairs

# United States Senate

## WASHINGTON, DC 20510

May 17, 2022

The Honorable Martin J. Walsh
Secretary
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, D.C. 20001

Re: Updating the Davis-Bacon Act and Related Regulations, [RIN 1235-AA40]

Dear Secretary Walsh,

We write in opposition to the Department of Labor's (DOL or "the Department") March 18, 2022 Notice of Proposed Rulemaking (NPRM) to amend regulations issued under the Davis-Bacon and Related Acts (Davis-Bacon or DBRA). By rescinding reforms of the 1981-1982 rulemaking, the proposal is misguided. The 1983 Final Rule revised the prevailing wage definition to allow open-shop contractors to bid on DBRA covered contracts on an equal footing with their unionized counterparts. The 1982 Final Rule also eliminated a number of regulatory impediments that discriminated against the ability of many small firms, including a number of minority-owned construction firms, to bid on federally subsidized construction projects. The current proposal, by reverting to regulations and policies last employed in the Carter Administration, represents a massive step backward. Further, it fails to adopt necessary reforms recommended by government watchdogs, only exacerbating deficiencies in wage survey and data collection, further inflating construction costs at great detriment to the taxpayer.

The Department claims the proposal addresses a number of enforcement challenges Davis-Bacon poses "while also providing greater clarity in the modern economy."[1] In reality, the proposal, by seeking to implement via regulatory fiat over 50 changes in a single rulemaking, will aggravate a deeply dysfunctional process for determining prevailing wages in civil subdivisions.  Far from modernizing the DBRA, the proposal deliberately degenerates federal prevailing wage regulations back to the same dysfunctional state they were in prior to the Reagan Administration, when a wide array of stakeholders and government watchdogs were urging reform, resulting in the 1982 Rulemaking.  By repealing the Reagan-era reforms and ignoring the urgent recommendations of government watchdogs to truly modernize the DBRA, the Administration is willfully promulgating fundamentally misguided policy that for decades has resulted in grossly inflated wages, contravening the original intent of Davis-Bacon.

> **EXHIBIT**
>
> **5**

---

[1] "Updating the Davis-Bacon Act and Related Acts Regulations", 87 Fed. Reg. 15, 698 (March 18, 2022).

Secretary Marty Walsh
May 17, 2022
Page 2 of 19

The defects in the Davis-Bacon NPRM are numerous. In its present proposal, DOL ignores no less than four[2] General Accounting Office (GAO) reports identifying fundamental flaws in the Wage and Hour Division's (WHD) voluntary survey process and excoriating DOL for its reliance on small, random sample sizes for calculating prevailing wages.  The Department fails to recognize the concluding recommendation of a 2019 audit by DOL's Office of the Inspector General (OIG)[3] urging the WHD to adopt data from the Bureau of Labor Statistics' Occupational Employment and Wage Survey.  By ignoring these recommendations, DOL's pervasive failure to properly calculate and determine prevailing wages will continue unabated.

Moreover, returning to an antiquated and obsolete definition of a prevailing wage only scratches the surface of the NPRM's misguided regulatory policies. By rescinding a key element of the 1982 reform that prohibited cross-consideration of metropolitan and rural wages, the Department ensures that any wage calculation will over-count inflated urban wages as prevailing in smaller rural areas. By increasing recordkeeping requirements, expanding DOL's debarment and withholding powers and imposing Davis-Bacon prevailing wage obligations through "operation of law" regardless of whether prevailing wage language is contained within the contract, the Department places onerous paperwork burdens on contractors while violating basic tenets of procedural due process. Taken together, these regulatory burdens will only further deter many minority-owned, smaller construction firms with limited resources from bidding on federal projects. By attempting to broadly redefine civil subdivisions to include state highway districts and expand the term "site of work" to include material supply drivers and off-site construction, DOL contradicts not only the plain language of Davis-Bacon but also D.C. Circuit precedent. Additionally, by attempting to impose, via executive rulemaking, remedial make-whole relief for whistleblowers despite lacking express statutory authority to do so, DOL far exceeds its remit and violates separation of powers principles.

These criticisms of the NPRM are by no means exhaustive, but taken together, reflect serious concerns with the Department's misguided objectives and fundamental lack of transparency. That most of these "reforms" unilaterally benefit labor unions and their interests, despite unionized firms constituting scarcely thirteen percent of market share[4] in the modern construction workforce, is not lost upon us. This rulemaking, far from reforming Depression-era federal prevailing wage regulations to adapt to a modern age, represents a significant step

---

[2] See, e.g., "Davis-Bacon Act Should Be Repealed", April 27, 1979; "Davis-Bacon Act: Process Changes Could Raise Confidence that Wage Rates Are Based on Accurate Data", May 31, 1996 [hereinafter 1996 GAO Report]; "Davis-Bacon Act: Labor Now Verifies Wage Data, but Verification Process Needs Improvement", January 11, 1999;  "Davis-Bacon Act: Methodological Changes Needed to Improve Wage Survey",  March 22, 2011[hereinafter 2011 report].
[3] Report to the Wage and Hour Division: Better Strategies Are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Prevailing Wage Rates. Office of the Inspector General. March 29, 2019. [hereinafter 2019 IG Report]
[4] Bureau of Labor Statistics Economic News Release, "Union Members Summary." January 22, 2022. The report found that just 13.4 percent of wage and salary workers were members of unions in the U.S. private construction industry in 2020.

Secretary Marty Walsh
May 17, 2022
Page 3 of 19

backward, and will only compound the waste, inefficiency, and dysfunction that has plagued the Department's oversight and implementation of federal prevailing wage mandates.

I.    *The NPRM fails to adequately justify regulatory revisions to the definition of "prevailing wage" or explain DOL's restoration of the thirty percent rule.*

DOL's proposal is fatally flawed because it fails to justify restoration of the thirty percent rule, a measure of calculating the prevailing wage that has long been a source of controversy by nonpartisan government watchdogs for its ability to inflate construction costs. The Department also fails to support its contention that the Department's current use of weighted averages violates the DBRA's legislative intent with reasoned explanation, much less substantial evidence. From 1935 until the Reagan era-reforms in 1982, the Department used a three-step process to determine the prevailing wage. A wage was first deemed to be prevailing if it is paid to a majority of workers in that class, and if there was no single wage paid to a majority of workers, any wage paid to at least thirty percent of workers was deemed to be the prevailing wage.[5] Only if no single wage was paid to a thirty-percent plurality were the use of weighted averages permitted.

However, the NPRM neglects to note that, by the early 1960s, the use of the thirty percent rule as a predominant means of calculation was beginning to generate concern.  In June 1962, J.E. Welch, the Deputy General Counsel of the Government Accountability Office (GAO), testified before a labor subcommittee that "the methods and procedures" adopted by DOL for administration of the DBRA "have not kept pace" with the requirements of the period.[6] Welch supplemented his testimony with extended documentation questioning DOL's administration of DBRA, and lamented the lack of "a precise delineation of elements to be ascertained and evaluated in wage determinations by the Secretary of Labor."[7] Between June 1962 and July 1971, GAO issued a series of eight reports to the Congress with a general theme that, in large part due to the thirty percent rule: (a) prevailing rates prescribed by the Department were significantly higher than wage rates prevailing in the local areas and (b) "the higher rates that resulted from the inappropriate wage determinations not only increased the costs borne by the Federal Government but also had an adverse and inflationary effect on the economic and labor conditions in the area of the project and in the country as a whole."[8]

Nearly two decades documenting the inefficiency and waste characterizing DOL's implementation of Davis-Bacon culminated in GAO's formal recommendation to repeal the DBRA in an April 1979 report to Congress.[9] The report was issued under the leadership of the then-Comptroller General of the GAO, Elmer Staats, a veteran, non-partisan public servant whose career began in 1939 as a staff member within the Executive Office of the President under

---

[5] 29 C.F.R. § 1.2(a); Labor Department Regulation No. 503 § 2 (1935).
[6] Special Labor Subcommittee, *Administration of the Davis-Bacon Act*, 1962, p. 283.
[7] Id. at 288.
[8] "The Davis Bacon Act Should Be Repealed." Statement of Elmer B. Staats, Comptroller General of the United States, Before the Subcommittee on Labor Standards, House Committee on Education and Labor. June 14, 1979, pp. 1-2. [hereinafter Staats Testimony].
[9] Ibid.

Secretary Marty Walsh
May 17, 2022
Page 4 of 19

Franklin D. Roosevelt and continued under Democratic and Republican Administrations.[10] The report identified the thirty percent rule as responsible for the calculation of "unrealistic wage rates."[11] The thirty percent rule's inflationary impact was detailed throughout, with the report concluding that "[i]n areas where unions have organized at least 30 percent of the construction workers, [the union's] wage scales have an excellent chance of becoming the prevailing rate, even though 70 percent of the rates paid to other workers may vary by small amounts."[12] The GAO report also observed that, as union pay scales set forth in collective bargaining agreements are uniform, whereas open-shop contractors generally recognize different skill categories and productivity when establishing compensation, the union's wage scales have a far greater prospect of becoming the prevailing rate.[13] As an illustration, the GAO report highlighted the wage rate of $12.40 an hour determined to be prevailing for painters in Carson City, NV on the basis of a wage survey of 11 projects in the area. However, the survey showed that only three of the eight painters were paid that rate, whereas the other five were paid hourly rates that differed in gradation. In issuing the $12.40 hour rate paid to only 37.5 percent of the painters as prevailing, the thirty percent rule gives no consideration to the lower rates paid to the other 62.5 percent of the painters.

In formal testimony before Congress shortly following the report's issuance, Staats also identified a number of flaws within the DBRA, namely that "the policies, practices and procedures developed by Labor for establishing wage rates under the act have only rarely implemented the legislative intent."[14] Comptroller General Staats also identified the thirty percent rule as inflationary, with its use resulting in significantly higher rates than what the majority of workers were receiving.[15] The predominance of higher fringe benefits in union agreements only exacerbated the disparity, with the level of fringe benefits higher for union employees than their nonunion counterparts.[16] When one considers that fringe benefits are paid along with the basic wage rate, no less an authority than the Council on Wage Price and Stability conceded in 1979 that fringe benefits are likely to be larger for union than for nonunion workers.[17] The NPRM's proposal to annualize fringe benefits will only exacerbate[18] this phenomenon and result in inflated wages.

---

[10] Elmer B. Staats, born June 6, 1914. Fellow, Brookings Institution, 1938-1939. Staff Member, Executive Office of the President, Division of Administrative Management, Bureau of the Budget 1939-1943; War Agencies Section 1943-47; Chief, 1945-47. Assistant to the Director, U.S. Bureau of the Budget, 1947-1950; 1958-1959. Deputy Director, U.S. Bureau of the Budget, 1950-1953, 1959-1966. Executive Officer of the Operations Coordinating Board, U.S. National Security Council, 1954-1958. 5th Comptroller General of the United States, 1966-1981.
[11] Report to the Congress by the Comptroller General of the United States, "The Davis Bacon Act Should Be Repealed." April 27, 1979, 51-52. (hereinafter Staats Report).
[12] Staats Report, at 52.
[13] Ibid.
[14] Staats Testimony, at 6-7.
[15] Ibid. at 32.
[16] Ibid. (noting a study by the Massachusetts Institute of Technology that, on average both the level of benefits and the proportion of nonunion employees receiving fringe benefits "are much lower than those in the union sector.").
[17] Ibid.
[18] 87 Fed. Reg. at 15,703.

Secretary Marty Walsh
May 17, 2022
Page 5 of 19

The rescission of the thirty percent rule in the 1982 rulemaking was thus the result of decades of
nonpartisan GAO reports and independent civil servants asserting, with substantial evidence, that
application of the thirty percent rule resulted in inflated wages. Inflated wages by definition are
not prevailing, and run counter to Davis-Bacon's statutory command. The report and
recommendations of Elmer Staats, a distinguished veteran of the civil service, is not mentioned
at all within the text of the NPRM. Nor is Comptroller General Staats's 290-page report
documenting DOL's chronic failure in administering the DBRA worthy of a mention, a report
which served as a leading impetus of the 1982 reforms. Yet inexplicably, the text of the NPRM
asserts that the thirty percent rule's rescission, and the Department's subsequent reliance on
weighted averages "is inconsistent with the text and purpose of the [Davis-Bacon] Act."[19] Such a
pronouncement ignores D.C. Circuit precedent upholding the rescission of the thirty percent rule
and granting the Secretary of Labor wide discretion in calculating the prevailing wage.[20] The
D.C. Circuit, in its opinion upholding most of the 1982 Rule's reforms, noted that the DBRA
delegates to the Secretary the authority to determine which wages are prevailing "in the broadest
terms imaginable."[21] Moreover, the court held that the DBRA's legislative history documents
that the Secretary could establish the most practical method of determining the prevailing wage.[22]
A bipartisan D.C. Circuit panel also held that the definition of prevailing as first a majority and
then a weighted average "is within a common and reasonable reading of the term."[23]

The NPRM fails to justify why Comptroller Staats's assertion concerning the causal relationship
between the thirty percent rule and its inflationary impact on wages is no longer applicable.
DOL's assertion that a reliance on weighted averages is contrary to the text of the DBRA directly
contradicts D.C. Circuit precedent stating precisely the opposite.

II.   *The proposal ignores multiple GAO reports and an IG study documenting
      fundamental flaws within the WHD's voluntary survey process that has for decades
      tilted the playing field in favor of collectively bargained rates.*

The NPRM fails to acknowledge the endemic dysfunction of WHD's voluntary wage survey
process documented over decades by numerous GAO reports and a recent Inspector General
report. The NPRM's proposals that aim to remedy the WHD's chronic inability to update
nonunion wages in a timely fashion, or even to conduct up-to-date surveys with proper
verification, only compound the waste and inefficiency that has characterized DOL's
administration of DBRA.

For nearly fifty years, numerous GAO reports have documented a variation of the same
deficiency: a complete inability, nearly a century after the DBRA's implementation, "to develop

---

[19] 87 Fed. Reg. at 15,704.
[20] See Building and Const. Trades' Dept., AFL-CIO v. Donovan, 712 F.2d 611, 616-617 (1983).
[21] Building and Const. Trades Dept., 712 F.2d at 616.Wh
[22] Ibid. (citing 74 CONG. REC. 6516 (remarks of Rep. Kopp) ("A method for determining the prevailing wage rate
might have been incorporated in the bill, but the Secretary of Labor can establish the method and make it known to
the bidders.")).
[23] Ibid. at 616-617 (citing 75 CONG. REC. 12,365 (1932)(remarks of Rep. Connery, floor manager of the 1932
amendments)(endorsing an averaging method for determining the prevailing wage)).

Secretary Marty Walsh
May 17, 2022
Page 6 of 19

an effective program to issue and maintain accurate wage determinations".[24] Comptroller
General Staats's 1979 report reviewed a random sample of 73 prevailing wage determinations
and found that surveys had not been made for 22 of the 50 projects and 13 of the 23 area
determinations-nearly 50 percent of the 73 projects reviewed. In those 35 determinations where
surveys were not made, DOL issued rates obtained from union-negotiated collective bargaining
agreements.  For wage determinations in effect in October 1976, no surveys were made for 57
percent of the determinations. In all areas covered by the wage determinations, union rates from
collective bargaining agreements prevailed. DOL failed to determine in those wage
determinations how many workers were paid the rates in the locality or the extent of nonunion
wages paid to workers engaged in similar work in the area. The 1979 GAO report also uncovered
chronic deficiencies in DOL's ability to obtain up-to-date wage data through the voluntary
survey program. In several surveys in each of the then five regions, contractors could not be
contacted or refused to provide data. Voluntary wage data that DOL did manage to obtain was
limited at best, with DOL receiving completed surveys on only about 30 percent of construction
projects nationwide.[25] DOL also failed to properly verify the vast majority of wage and
classification data, with payrolls rarely obtained or reviewed.

Further, a May 1996 GAO report found DOL's voluntary wage survey process to "contain
internal control weaknesses that contribute to [a] lack of confidence in the resulting wage
determinations."[26] Those weaknesses included limitations in DOL's verification of wage and
fringe benefit data, with surveys in Oklahoma and Tulsa City rife with inaccuracies,
necessitating new wage determinations.[27] A March 2011 GAO report found chronically small
sample sizes, with over 25 percent of wage determinations based on six or fewer workers.[28]  The
2011 report documented the WHD's inability to conduct up-to-date surveys, resulting in aged
nonunion rates that do not accurately reflect prevailing rates. The 2011 report found that union-
negotiated rates prevailed in almost two-thirds of the published building, heavy and highway
rates, despite unions' steadily declining market share in the construction industry.[29] Union rates
were also automatically updated when new collective bargaining agreements were negotiated,
with 75 percent of union rates 3 years old or less and only 36 percent of nonunion rates 3 years
old or less due to the latter not being updated until DOL conducted a new survey.[30]  Forty-six
percent of nonunion prevailing wage rates were 10 or more years old, with one regional office
having to update nonunion prevailing rates with a new survey because they no longer complied
with the federal minimum wage. The report also found an inability on the part of DOL to
calculate response rates or conduct non-response analyses.

Most recently, a 2019 Department of Labor Office of Inspector General (OIG) report illustrated
the defects in the WHD's survey process persist to a disturbing degree. The OIG analyzed wage

---

[24] Staats Report at 2.
[25] Ibid. at 46.
[26] 1996 GAO Report at 2.
[27] Ibid. at 5.
[28] 2011 Report at 1.
[29] 1996 GAO Report at 18.
[30] Ibid.

Secretary Marty Walsh
May 17, 2022
Page 7 of 19

rate age data within the WHD's Wage Determinations Generation System and found that, of the 4,385 wage rates that were between 21 and 40 years old, 4,353 were nonunion, while only 32 were union.[31] A federal agency's solicitation for a $140 million dollar contract in Texas included a wage determination with nonunion wage rates last updated in 1988.[32]  Union wages prevailed for 48 percent of the 134,738 rates in WHD's Wage Determination Generation System, despite accounting for less than fourteen percent of the construction workforce. In seven sampled surveys within the states of Arkansas, Kansas and Nevada, the WHD was not able to collect wage data for a single construction worker in any of the 31 counties the published rates represented.[33] Of the more than 8,000 private sector contractors eligible to provide wage data, 53 percent did not respond to WHD's voluntary surveys.[34]  Private sector contractors have proffered a number of reasons for not responding to voluntary surveys, from lacking administrative support staff to complete the complicated, incomprehensible forms to a fear of furnishing propriety data that could later be subject to audit.[35] When the OIG conducted an onsite verification for 49 selected contractors, a number of inaccuracies were found, including variances in reported and verified numbers of workers that "could not be explained."  Twenty contractors were completely non-responsive, declining to participate in onsite reviews.[36]

To remedy these institutional defects, the 2019 OIG report urged the Department to use BLS Occupational Employment Survey (OES) Data to develop prevailing wage determinations.[37] OES Data is uniquely suited to remedy the institutional defects that define the WHD's voluntary survey process, as BLS first strives to make their surveys easy as possible to understand and complete, testing them with employers before they are placed in the field.[38] BLS also follows up with employers who do not initially respond to surveys, supplementing telephone calls with on-site visits. OES surveys have higher response rates of at least 78.4 percent, and adjust to correct for the absence of non-responsive employers, including weighting and imputation.[39]  The use of weighting and imputation is essential to correcting small survey sizes and unrepresentative samples if one hopes to calculate prevailing wages that are even remotely accurate.  Given that the Department has restored a regulatory barrier to the use of weighted averages, as discussed previously, DOL ensures that prevailing wages will not reflect reality.

Instead, the Department proposes methods, such as the utilization of the BLS Employment Cost Index, that only serves to perpetuate the *status quo*. Whereas OES program data collects data on wage and salaried workers for about 830 separate occupations[40], the Employment Cost Index

---

[31] 2019 IG Report at 3, 5.
[32] Ibid.
[33] Ibid. at 11.
[34] Ibid. at 15.
[35] 2011 Report at 24-25.
[36] Ibid.
[37] Ibid. at 8.
[38] Polly A. Phipps and Carrie K. Jones, "Factors Affecting Response to the Occupational Employment Statistics," U.S. Department of Labor, Bureau of Labor Statistics, Office of Survey Methods Research, November 2007.
[39] U.S. Department of Labor, Bureau of Labor Statistics, BLS Handbook of Methods, Chapter 3.
[40] U.S. Department of Labor, Bureau of Labor Statistics, "Occupational Employment and Wage Survey Data". Overview.

Secretary Marty Walsh
May 17, 2022
Page 8 of 19

merely accounts for the net increase or decrease in the cost of labor,[41] but does, not, as the DBRA commands, account for prevailing wages paid to "corresponding classes of laborers and mechanics".[42] The use of OES data would in all likelihood eliminate an impediment preventing small firms from bidding on projects.  Numerous stakeholders have identified job classification rates missing from wage determinations as a deterrent to bidding on a project, as contractors do not know what to pay workers and federal contracting agencies cannot accurately estimate costs if job classification rates are missing. Many small contractors cannot afford the expense of requesting missing wages from DOL through a conformance process after the protracted difficulty of bidding on a project. The adoption of more comprehensive OES data would have ameliorated if not eliminated this impediment, but, as with all matters concerning this NPRM, the Department has chosen not to follow independent recommendations.

For similar reasons, permitting the WHD to adopt state and local prevailing wages as Davis-Bacon wages will only further perpetuate dysfunction, as state prevailing wage rates are often adopted from voluntary surveys containing the same flaws and statistical sampling errors as their federal counterparts, or are based on a collective bargaining agreement negotiated between an employer and a union. For example, New York's prevailing wage inflates state and local construction costs by 13 to 25 percent, depending on the region, with employer contributions required to backfill union pension and welfare fund liability shortfalls accounting for more than 10 percent of the total hourly compensation required by the prevailing wage law.[43] New York's state prevailing wage law has resulted in cost differentials for the taxpayer based on employee compensation alone. Many state prevailing wage laws, such as New York's, base their definition of prevailing rate of wage directly on compensation levels set in CBA, rather than voluntary surveys, allowing contract administrative costs and union work rules to further inflate wages, at great detriment to the taxpayer.[44]

III.   *By permitting the cross-consideration of metropolitan and rural data, the Department undermines local wage structures and ensures rural wages will be inflated by metropolitan rates of compensation, further undermining the legislative purpose of the Davis-Bacon Act.*

In rescinding current language barring the cross-consideration of metropolitan and rural data, the rulemaking ensures wages will be inflated by union negotiated urban rates lacking both commonality and contiguousness with the rural locality. The importation of locality-distinct metropolitan wages will further upset the local wage structure. Both measures blatantly undermine the statutory purpose of the DBRA.

The importation of metropolitan wage data was identified by the Comptroller General in the 1979 report as one which directly contradicts Davis-Bacon's requirement that prevailing wages

---

[41] U.S. Department of Labor, Bureau of Labor Statistics. Economic News Release: Employment Cost Index Summary." April 29, 2022.
[42] 40 U.S.C. § 3142(b).
[43] Empire Center, "Prevailing Waste: New York's Costly Public Works Pay Mandate." April 24, 2017.
[44] NY Labor Law § 220.

Secretary Marty Walsh
May 17, 2022
Page 9 of 19

be determined in the city, town, village, or other civil subdivision of the State in which the work is to be performed.[45] Previous decisions of the DOL's Wage Appeals Board (now the Administrative Review Board) have warned that the importation of wage rates from non-contiguous counties, cities, and municipalities violates the plain language of the DBRA by establishing new payment practices rather than reflecting local wages.[46] The 1979 GAO Report noted that "the application of rates from noncontiguous counties and the use of union rates in predominantly nonunion areas" was "not in accord with the act's intent, which was to maintain the local wage structure and not raise or lower wages on the basis of rates prevailing in other areas."[47] In that spirit, the 1979 GAO report warned that "metropolitan data generally should not be used to produce data for a rural county or vice versa."[48] In subsequent congressional testimony, Comptroller General Staats noted that, when inflated metropolitan wages negotiated by unions are imported into open-shop rural communities, local contractors would prefer not to bid on Government projects whose rates were higher than those in the locality rather than disturb existing wage structures. The importation of metropolitan wage data thus had the most adverse effect on local contractors-those the DBRA was originally intended to protect-by promoting the use of nonlocal contractors on Federal projects.[49]

The Department ignores the compelling reasons the 1982 Final Rule excluded urban counties from rural wage determinations, and in permitting the importation of metropolitan wage data, ensures that once again, small local contractors will be excluded from bidding on Federal projects. In upholding the 1982 Final Rule's rural-urban wage distinction, the D.C. Circuit noted that the exclusion of urban wage data "has not been shown to undermine the central purpose of the statute, which is to ensure that federal contractors pay the wages prevailing in the locality of the project."[50] The explanation offered by the Secretary for the 1982 regulation, that the "importation of higher urban wages to rural areas has disrupted relations in rural areas because employees have been unwilling to return to their usual pay scales after a Davis-Bacon project has been completed" was held by the D.C. Circuit to "make sense".[51] The D.C. Circuit also dismissed the union's argument that "higher urban wages were justified in rural areas because it is the urban workers who do the work", as, were that precept true, "the wage scales for the surrounding rural counties would reflect" a corresponding market increase in wages.[52] Unsurprisingly, the D.C. Circuit's opinion is omitted from the text of the NPRM.  Instead, we are treated to the argument that cross-consideration of rural and metropolitan wage data is a justified good because rural and metropolitan subdivisions share "heterogeneity of commuting patterns" and "local labor markets".[53] This argument is one of many that was promoted by unions in the 1983 litigation, dismissed by the D.C. Circuit, and has now resurfaced within the text of the

---

[45] Staats Report at 50.
[46] Ibid. at 55 (citing Texas Paving & Utilities Rates, 77-WAB-19 at *2-*3 (Dec. 30, 1977)).
[47] Ibid. at 50.
[48] Ibid.
[49] Ibid. at 13.
[50] Building and Const. Trades Dept., 712 F.2d  at 619.
[51] Ibid. at 618-19.
[52] Ibid.
[53] 87 Fed. Reg. at 15, 719.

Secretary Marty Walsh
May 17, 2022
Page 10 of 19

NPRM. Moreover, were it a fact that rural and metropolitan subdivisions share common labor markets, wage scales would, as the D.C. Circuit quite aptly held, reflect a corresponding increase in wages.[54]

The NPRM's text also extols the use of Metropolitan Statistical Area (MSA) data that contains both urban and rural territories and population. The NPRM expresses a belief that the purposes of the DBRA would be best served by "[c]ombining rural and urban data at the State level" as a means of "geographic expansion".[55]  The Department also believes that "the purposes of the Act are better served by using such combined statewide data to determine the prevailing wage, when the alternative could be to fail to publish a wage rate at all."[56] The WHD already combines data from counties in different labor markets, with the GAO reporting that 20 percent of key DBRA rates occur at the "super-group" level, and 40 percent of DBRA rates are based on statewide data.[57] In many cases, these counties have little economic connection to the county in which the work is performed. Not surprisingly, the groupings of these MSAs have resulted in vast wage differentials. In a Long Island MSA, for instance, the Davis-Bacon prevailing wage for electricians is $51.00 an hour-a 74 percent increase of $19.27 an hour, the actual prevailing wage BLS determined.[58] In a Washington, D.C. MSA, the Davis-Bacon prevailing wage for electricians on a construction project was determined to be $43.70 an hour-a 45 percent increase from $30.11 an hour, the actual prevailing wage BLS calculated.[59] The purpose of the DBRA is most certainly not served by such inflated wages.

In support of their argument of importing urban wages, the NPRM cites House debate from Congressman William Connery of Massachusetts, the Chairman of the House Labor Committee, purporting to bind the Secretary to adopting the prevailing wages of the nearest city for rural areas.[60] However the NPRM fails to acknowledge that when the same debate was cited by unions during the litigation, the D.C. Circuit found no indication "that Congress intended to bind the Secretary to the method suggested by Representative Connery" with the thrust of the debate indicating "the entire question was left for the Secretary" and Congressman Connery's suggestion "merely intend[ing] to show that some method for determining a wage could be found."[61] Also omitted from the NPRM's text was the finding that excluding urban data from rural data was a consistent practice dating from before the 1982 Rulemaking, with the Secretary's Operations Manual for Issuance of the Wage Determinations Under the DBRA instructing that "a metropolitan county should not be used to obtain data for a rural county (or vice [sic] versa)" as early as 1977.[62] President Carter's DOL also sought to formalize such a

---

[54] Building and Const. Trades Dept., 712 F.2d  at 618-19
[55] 87 Fed. Reg. at 15, 719.
[56] Ibid.
[57] 2011 Report, Figure 5.
[58] U.S. Dep't of Labor, Bureau of Labor Statistics. "Economic News Release." Table 6, September 2016.
[59] Ibid.
[60] 87 Fed. Reg. at 15, 719
[61] Building and Const. Trade's Dept., 712 F.2d at 618.
[62] Ibid. at 619.

Secretary Marty Walsh
May 17, 2022
Page 11 of 19

prohibition in new regulations.[63] That the Department is now citing the same arguments proffered by unions and since rejected by a federal court as justification for upending local wage structures reveals the likely motive behind this regulatory change. The Department's characterization of the wage prohibition as existing only since the 1982 rulemaking is similarly disingenuous, with non-partisan experts having long since concluded that cross-consideration of metropolitan and urban wage data undermines the DBRA's legislative purpose.

IV.     *By increasing already onerous recordkeeping requirements, expanding DOL's debarment and withholding powers, and rendering Davis-Bacon contract clauses and wage obligations effective "by operation of law," the Department violates basic standards of procedural due process and places an impermissible administrative burden on small to mid-size contractors, many of whom lack the administrative resources to keep up with paperwork burdens.*

The Department's proposal to increase a contractor's recordkeeping duties, expand DOL's debarment and withholding powers, and provide that Davis-Bacon prevailing wage obligations are effective by "operation of law" places an impermissible burden on the private sector, while relieving contracting agencies of any obligation to bargain in good faith.

The Department's proposal to discard the requirement that a violation of prevailing wage obligations be "aggravated or willful" in order to merit disbarment and instead lowering the burden of persuasion to a "disregard of obligations" will ensnare many small contractors into debarment proceedings.[64] Given the non-transparent and wasteful manner in which prevailing wages are calculated, as detailed previously in this comment, small to mid-size contractors who lack administrative resources to keep abreast of DOL's nightmarishly bureaucratic administration of DBRA will render themselves vulnerable to an ocean of legal liability as a result of the new debarment standard. This standard is akin to posting a "Do Not Apply" sign to small and mid-level contractors who are at greater vulnerability of unintentionally violating incomprehensible prevailing wage requirements. As an initial matter, this comment has established that DOL is frequently incapable of accurately calculating a prevailing wage, with survey methods that are, to put it generously, less than consistent. That a contractor could stand to be debarred from federal contracts covered by the DBRA-in essence nearly the entirety of federal procurement-due to a "disregard of obligations" that a nearly 50-page NPRM fails to explain will only serve as a greater obstacle to small firms bidding on DBRA covered contracts. The NPRM's observation that the "aggravated or willful" Related Acts standard has been "interpreted inconsistently"[65] over the decades is dubious, given the volatile manner in which DOL calculates prevailing wage rates. The NPRM merely defines a "disregard of obligations" as "purposeful inattention and gross negligence"[66] which, given the incompetent manner in which

---

[63] See 46 Fed. Reg. 4305, 4314 (1981)(final rule)(providing for exclusion of metropolitan counties except in "extraordinary circumstances"), stayed, 46 Fed. Reg. 11,253 (1981), and replaced 47 Fed. Reg. 23, 643 (1982).
[64] 87 Fed. Reg. at 15,755.
[65] Ibid. at 15,756.
[66] Ibid.

Secretary Marty Walsh
May 17, 2022
Page 12 of 19

DOL has calculated prevailing wages, would render private construction firms subject to a wide panoply of liability. DOL also laments the inconsistent manner in which the "aggravated or willful" standard has been applied, but later concedes the ambiguous "disregard of obligations" burden would be considered in light "of all the facts involved".[67] Such a fact-specific, contextual analysis will lead to the same supposed "inconsistencies" the Department laments the previous standard as yielding. In truth, the Department wishes to more easily debar those private contractors who refuse to pay union wages grossly inflated above market value.

The Department's proposal to provide that labor standards contract clauses are effective "by operation of law" in circumstances where they have been "wrongly omitted from a covered contract" is no less insulting to private contractors. The proposed language would ensure that Davis-Bacon's burdensome regulations would be imposed on workers "notwithstanding any mistake by an executive branch official in an initial coverage decision or in an accidental omission of the labor standards contract clauses."[68] The proposal thus shamelessly attempts to shift the legal burdens of enforcement and compliance from the contracting agency to the contractor, limiting the pool of bidders to those who could afford to shoulder such inordinate administrative costs. When one considers the ambiguous and inchoate nature with which DOL defines a "prevailing wage", and that such obligations are applicable to federally subsidized as well as federal contracts under the DBRA, the administrative burdens on private sector contractors to determine which elements of the procurement contract are covered by prevailing wage obligations, calculate such wages, and be certain that the contract is DBRA covered would prove nightmarish in its sheer bureaucracy. Though the NPRM notes that contracting agencies would be required to compensate the contractor for any additional wages paid as a result of the calculation, in reality, procurement agencies often use the threat of refusing to award contract bids in the future as insurance against paying any additional wage fees in the present, leaving contractors shouldering the expense. That terms are to be adhered to regardless of the due diligence the procurement agency demonstrated, particularly in giving the contractor the courtesy of notice of the terms by which a bill of lading is to be adhered, robs the contractor of basic notice and procedural due process, and places boundless administrative and regulatory burdens on the contractor that, by statute, were meant to be placed on the procuring agencies.

To add insult to injury, the NPRM also proposes to burden contractors with additional recordkeeping requirements. In addition to weekly certified payroll data required by the Copeland Anti-Kickback Act of 1934, contractors are required to maintain all contracts and subcontracts, as well as bids, proposals, amendments, modifications, and extensions for those contracts and subcontracts. Failure to comply with recordkeeping requirements could result in the withholding of contract funds or debarment. The Department, through the promulgations of these recordkeeping requirements, demonstrates a fundamental ignorance of the expense and resources such recordkeeping requirements mandate. Such a requirement is illustrative of the Department's stated goal of serving the needs of labor unions above all else, even at the expense of fundamental principles of fairness and equity. It will further deter many small to mid-size

---

[67] Ibid.
[68] Ibid. at 15, 749.

Secretary Marty Walsh
May 17, 2022
Page 13 of 19

construction firms, of whom a great majority are minority owned, from bidding on Federal Projects due to the expense involved.  Such onerous paperwork burdens bring to mind the testimony from Samuel Carradine, the CEO of the National Association of Minority Contractors. In written testimony before the 103rd Congress, Samuel Carradine wrote that, "[r]ather than protecting local contractors from unfair competition, Davis-Bacon has practically fostered a closed group of large contractors who follow Federal construction work around the country to the exclusion of smaller, local contractors."[69] These additional paperwork and regulatory requirements will ensure that bidding on Federal projects remains exclusive to a "closed group of large contractors" with the resources to afford the exorbitant administrative costs a DBRA covered-contract would entail.

V.      *In attempting to broadly redefine civil subdivisions to include state highway districts and expand the term "site of work" to include material supply drivers and off-site construction, the Department exceeds its statutory authority in the former and re-opens well-settled areas of the law in the latter.*

The NPRM, by proposing to expand the definitions of civil subdivision and "site of work" to include state highway districts in the former and drivers dropping off materials from material suppliers in the latter, exceeds the statutory mandate of the DBRA.  The proposal's provisions to expand DBRA coverage to off-site construction where "significant portions" are constructed for specific use in a designated building or work also run counter to settled law.[70]

a.      The Department lacks statutory authority to designate state highway districts as civil subdivisions under the DBRA.

The DBRA merely gave the Secretary of Labor power to set prevailing wages "in the civil subdivision of the State in which the work is to be performed, or in the District of Columbia if the work is to be performed there."[71] The juxtaposition of "civil subdivision of the State . . . or in the District of Columbia" clearly illustrates that Congress defined a "civil subdivision" to be a county, city, town or other municipality as the District of Columbia lacked all requisite subdivisions, hence its inclusion. Moreover, at the time of Davis-Bacon's passage, there was a widely accepted distinction between state highway districts and civil subdivisions. The former was merely responsible for the maintenance of the highway, whereas the latter was responsible for a wide array of civil functions, including administering and enforcing state laws, collecting taxes, assessing public properly, recording public documents, conducting elections and issuing licenses. The Department's abrupt *volte-face* in attempting to broadly define "civil subdivision" to include state highway districts runs counter to decades of agency practice.

---

[69] "Repeal of the Davis-Bacon Act." 104th Congress, 1st Session. Report 104-80. May 12, 1995.
[70] 87 Fed. Reg. at 15, 729-31.
[71] 40 U.S.C. § 3142(b).

Secretary Marty Walsh
May 17, 2022
Page 14 of 19

A basic canon of administrative law is that an agency's interpretation of its enabling statute is to be accorded deference if its interpretation is "reasonable."[72] However, *Chevron* deference is not warranted if an agency fails to follow correct procedures when issuing a regulation.[73] In order to fulfill a basic procedural requirement of administrative rulemaking, the agency must give adequate reasons for its decision, particularly when reversing decades of regulatory policy stakeholders have come to rely upon.[74] For decades, DOL regulations have defined an "area in determining wage rates" under the DBRA to "mean the city, town, village, county, or other civil subdivision of the State in which the work is to be performed."[75] However, the NPRM does not cite any legislative history, either from when Davis-Bacon was enacted in 1931 or amended in 1935, to support its assertion that Congress intended state highway districts to be civil subdivisions. The only authority the Department cites to support its assertion that state highway districts were considered civil subdivisions at the time the DBRA was enacted is a circuit court opinion issued 12 years before the Act's original passage in 1931.[76] The rulemaking omits key details from the case's holding, namely that highway districts were defined as governmental subdivisions only after Article 292 of the Louisiana Constitution expressly "provided for the division of parishes into road districts" by defining their taxing and bond-issuing capacity, and only after two enabling acts of the legislature rendered the constitutional provisions effective.[77]

One state highway district is not akin to the other, and not every state expressly grants a state highway division taxing and bond-issuing authority, nor gives such districts formal legal status as county subdivisions. Many states circumscribe the authority of state highway districts merely to maintenance of highways and roads. That the rest of the proposal is reduced to acknowledging that Congress distinguished "immediate localities" from "civil subdivisions" when defining the appropriate geographic area of wage determination under the Federal-Aid Highway Act of 1956 is telling. The Department lacks any statutory or reasoned support for expanding the definition of civil subdivision to state highway districts, as Congress has always differentiated the two.  State highway districts lack both the attributes and broad legal remit of civil subdivisions. The attempt by the Department to re-designate state highway districts as such is arbitrary agency action.

b.  The Department's attempts to expand DBRA "site of work" coverage to include material supply drivers and off-site construction sites contradicts settled law.

---

[72] Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc. 467 U.S. 837 (1984).
[73] United States v. Mead Corp., 533 U.S. 218 (2001).
[74] Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto Ins. Co., 4463 U.S. 29, 43 (1983).
[75] 29 C.F.R. § 1.2.
[76] Wight v. Police Jury of Par. of Avoyelles, La., 264 F. 705, 709 (5th Cir. 1919)
[77] Ibid. at 707.

Secretary Marty Walsh
May 17, 2022
Page 15 of 19

The attempt by the Department to impermissibly expand the definition of "site of work" to include elements of off-site construction and material supply drivers is an overreach and ignores binding D.C. Circuit precedent.  In Building and Const. Trade Dept. v. U.S. Dept. of Labor Wage Appeals Bd., the D.C. Circuit held that the phrase "mechanics and laborers employed directly upon the site of work" within the meaning of the Davis-Bacon Act "restricted coverage of the Act to employees working directly on the physical site of the building, and thus, [a] regulation extending coverage of the Act to truck drivers was invalid."[78] The D.C. Circuit held the critical phrase "employed directly upon the site of the work" to convey a geographical limitation, stating that, "only employees who work *on the site* are covered by the Act."[79] Judge Patricia Wald, an appointee of President Carter, found "no ambiguity in the text: 'site of work' clearly connotes to us a geographic limitation."[80] Lest there be any confusion, the court held that "the ordinary meaning of the statutory language is that the Act applies only to employees working directly on the physical site of the public building or public work under construction."[81] Judge Wald even noted that, when members of Congress discussed Davis-Bacon coverage in hearings and debates, "they invariably expressed an assumption the Act's coverage would be restricted to mechanics and laborers who work directly on the project site."[82] Judge Wald cited painters who painted building materials in the mills before those materials were brought to the construction site, or off-site workers who constructed component buildings in the steel mills for reconstruction on the site of the work.[83]

The court thus refused to defer to the Department's expansive site of work definition, holding that "Congress intended the ordinary meaning of its words". Davis-Bacon's statutory language "restricts coverage of the Act to employees who are working directly on the physical site of the public building or public work being constructed."[84] In addition, contrary to the Department's proposal, "[m]aterial delivery truck drivers who come onto the site of the work merely to drop off construction materials are not covered by the Act even if they are employed by the government contractor."[85] The Department's 1991 regulation was thus invalid "insofar as it includes off-site material delivery truck drivers in the Act's coverage".  Yet again, the Department attempts to impermissibly expand the definition of "site of work" beyond that of the statutory text and legislative history. In doing so, the Department ignores binding authority and demonstrates a blatant disregard for taxpayer resources.

VI.     *By granting itself vast enforcement authority to incorporate anti-retaliation measures into Davis-Bacon covered contracts and impose unlimited remedial make-whole*

---

[78] 932 F.2d 985 (1991).
[79] Ibid. at 989 (emphasis in the original).
[80] Ibid. at 990.
[81] Ibid.
[82] Ibid. at 990-91.
[83] Ibid. (citing S. 3847, 72d Cong., 1st Sess. (1932)).
[84] Ibid. at 992.
[85] Ibid.

Secretary Marty Walsh
May 17, 2022
Page 16 of 19

> *relief via executive rulemaking, the Department exceeds its statutory authority and violates separation of powers principles.*

The Department's proposal to add broad anti-retaliation provisions to DBRA covered contracts and assume enforcement authority to impose remedial relief represents an assumption of power far beyond that which Congress intended.  In presuming to implement such an expansive enforcement regime, the Department shows a blatant disregard for basic principles of the separation of powers.

The scope of the enforcement powers the Department proposes to assume is practically unlimited.[86] Regarding anti-retaliation measures, the Department presumes to define what constitutes protected activity much as a legislature codifies a statute, with whistleblower protection extended to the filing of complaints, initiation of proceedings, "otherwise asserting any right or protection"; cooperating in an investigation or other compliance action, testifying in proceedings; or informing any other person about their rights under the DBA or Related Acts.[87] The proposal concedes the scope of anti-retaliation measures are "intended to be broad" in order to effectuate the so-called "remedial purpose" of the DBRA.[88] The Department then proceeds to assume unlimited authority to impose remedial make-whole relief to "restore the worker subjected to the violation to the position, both economically and in terms of work or employment status . . .that the worker would have occupied had the violation never taken place."[89]Available remedies include, but are not limited to, any back pay and benefits denied or lost by reason of the violation; other actual monetary losses sustained as a direct result of the violation; interest on back pay or other monetary relief from the date of the loss; and appropriate equitable or other relief such as reinstatement or promotion.

The NPRM's characterization of the DBRA as remedial statutes, or, as the text states, statutes with "remedial purpose", is inaccurate. Black's Law Dictionary defines a "remedial statute" as "a law whose purpose is to correct an existing law that isn't working or has caused some harm and not good."[90] Remedial is further defined by Black's as "affording a remedy; giving the means of obtaining redress."[91] Davis-Bacon, as initially enacted in 1931, was merely "a brief and relatively simple statement of policy" granting the Department wide discretion to establish a wage threshold "not less than the locally prevailing wage to be paid" but largely deprived DOL of effective enforcement mechanism to achieve the statutory aim.[92] To further the policy purposes of the statute, contracting agencies were granted the authority to withhold "funds

---

[86] 87 Fed. Reg. at 15, 747.
[87] Ibid.
[88] Ibid.
[89] Ibid. at 15,747-48.
[90] Black's Law Dictionary. Remedial Statute.
[91] Black's Law Dictionary. Remedial.
[92] The Secretary of Labor was curtailed from effective administration of the original Act in two significant respects: (1) his or her role emerged as one of conciliation rather than independent enforcement due to the Act's provision for postdetermination of prevailing wage rates; and (2) even assuming the Secretary's desire to curtail Davis-Bacon violations, the Act was without sanctions to impose against derelict government contractors. 40 U.S.C. §§ 276a-276a-5 (1976)).

Secretary Marty Walsh
May 17, 2022
Page 17 of 19

sufficient" from contractors to pay underpaid workers, the Comptroller General was granted the ability to bar violating contractors from federal procurement for three years, and laborers were afforded a private right of action against a contractor, but only after Congress expressly amended the Davis-Bacon Act in 1935 to provide for such remedial action.[93]

Therefore, the DBRA is a statute with "remedial purpose" only in so far as Congress has expressly granted the Department the authority to remedy underpayment of wages.[94] An enforcement scheme such as that envisioned by the Department, whereby the WHD defines what constitutes protected whistleblower activity in the manner of a legislature and is granted power to force private actors to reinstate employees or pay them back wages implicates constitutional rights, and therefore, is reserved for Congress to impose as subject matter experts and elected representatives.  To compare, the remit of the Equal Employment Opportunity Commission (EEOC), which is far more remedial in nature and substance, was only endowed with the ability to impose make-whole relief and pursue enforcement litigation after an express grant of authority by Congress.[95] The EEOC's power to sanction individuals who retaliate against subordinates filing charges of discrimination was also pursuant to a specific grant by Congress. The National Labor Relations Act also similarly empowers the National Labor Relations Board, under Section 10(j) of the Act, to pursue equitable such as reinstatement and back pay in federal court, as well as issue orders against employers requiring the same in agency proceedings.[96] Other examples are legion. The Occupational Safety and Health Administration enforces whistleblower protections arising under over 20 statutes-again only pursuant to a specific grant of congressional authority.[97]  The Administrator of the WHD has the ability to bring actions in federal court to restrain violations of the Fair Labor Standards Act (FLSA) again only due to an express grant of such authority by Congress. Congress also provided for whistleblower protection expressly in the FLSA, rendering it unlawful for employers "to discharge or in any manner discriminate against any employee because such employee has filed any complaint" of wage and hour violations.[98]

The creation of a byzantine enforcement scheme proposed by the Department, complete with the agency, at its own willful discretion, defining what constitutes whistleblower protection and imposing such equitable relief as it chooses, is thus wholly inappropriate for an executive rulemaking absent an express grant of statutory authority. As Congress has previously seen fit to expend time and resources endowing administrative agencies with the prerogative to pursue equitable relief or enforce whistleblower protection, it strains credulity to think, as the Department assumes, that an agency can simply assume power for broad enforcement schemes absent an express grant of congressional authority. The Department's assertion that the mere

---

[93] 40 U.S.C. § 276a(a) (1976)
[94] See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.").
[95] The Equal Employment Act of 1972 amended Title VII of the Civil Rights Act of 1964 to grant the EEOC authority to pursue litigation in federal court, and impose remedial make-whole relief, including back-pay, after a finding of violation. See 42 U.S.C. § 2000e-6(a).
[96] National Labor Relations Board. 10(j) Injunctions.
[97] OSHA Fact Sheet: OSHA's Whistleblower Program.
[98] 29 U.S.C. § 215(a)(3).

Secretary Marty Walsh
May 17, 2022
Page 18 of 19

"remedial character" of the DBRA justifies boundless regulatory authority to promulgate an unlimited enforcement scheme is chilling and unavailing. When the rights and liberties of private sector employers are implicated, regulatory agencies cannot pursue enforcement absent an express grant of congressional authority.[99]

VII.    Conclusion

Though the above criticisms of the NPRM are by no means exhaustive, they represent deep concerns with the Department's proposal to "modernize" the DBRA.  By restoring the thirty percent rule and ignoring numerous GAO and OIG reports that urge adoption of OES data and fundamental reform in the voluntary survey process, the Department ensures prevailing wages will be inflated at great detriment to the taxpayer. With the passage of the Infrastructure Investment and Jobs Act, the nation has an opportunity to restore antiquated infrastructure. With inflation already reducing the worth of the bill, the proposal contained within this NPRM will only further limit the number of infrastructure projects the federal government can pursue, greatly inflate the cost to the taxpayer of necessary infrastructure projects at rates far above market value, all while imposing boundless administrative and paperwork burdens on small to mid-size contractors. We therefore urge the Administration to refrain from pursuing this misguided proposal.

Sincerely,

Richard Burr
Ranking Member
U.S. Senate Committee on Health, Education, Labor
and Pensions

Bill Cassidy

Tim Scott

Mitt Romney

Roger Marshall, M.D.

Tommy Tuberville

---

[99] See La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)(Brennan, J.)(Holding that "an agency literally has no power to act . . .unless and until Congress confers power upon it.").

Secretary Marty Walsh
May 17, 2022
Page 19 of 19

Jerry Moran

John Barrasso, M.D.

Marsha Blackburn

John Boozman

Cynthia M. Lummis

Rick Scott

John Thune

Thom Tillis

Eric W. Leonard
202.719.7185
eleonard@wiley.law

Craig Smith
202.719.7297
csmith@wiley.law

# wiley

Wiley Rein LLP
2050 M St NW
Washington, DC 20036
Tel:  202.719.7000

wiley.law

May 17, 2022

Via Regulations.gov

Amy DeBisschop
Division of Regulations, Legislation, and Interpretation
Wage and Hour Division, U.S. Department of Labor
Room S-3502
200 Constitution Avenue NW
Washington, DC 20210

**Re:     Comments on RIN 1235-AA40: Proposed Rule, Updating the Davis-Bacon and Related Acts Regulations, 87 Fed. Reg. 15698 (Mar. 18, 2022)**

Dear Ms. DeBisschop:

We are partners in the government-contracts practice of Wiley Rein LLP with over 30 years of collective experience counseling and representing federal contractors and subcontractors in matters involving the Davis-Bacon Act (directly and through the Related Acts) and the parallel Service Contract Act. These comments on the Proposed Rule cited above are informed by our experience with those clients but are submitted on our own behalf.

Our comments address a discrete, but important, aspect of the Proposed Rule: the proposed addition of terms stating that when the DBA should cover a construction contract, but the DBA was not determined to have applied at award, the DBA will be read as having applied to the contract since its inception by operation of law. This change would be primarily reflected in a new provision in DoL's version of the DBA contract clause, 29 C.F.R. § 5.5(e). We appreciate that the Department of Labor has proposed these terms to address challenges it has encountered in DBA enforcement. But we are concerned about the effects that these proposed terms will have on contract administration—in particular, that contractors are made whole if the DBA is found to apply to a contract after its award—as well as enforcement issues related to withholdings. The consequences of leaving any uncertainty around the incorporation "by operation of law" scenario could be severe. Contractors could be subject to withholdings and left out of pocket for hundreds of thousands or even millions of dollars by the very agencies that had determined, erroneously per subsequent DoL findings, the DBA did not apply in the first place.

To improve contract administration, and reduce the risk of these potentially catastrophic unreimbursed cost increases and related adverse impacts on contractors that have done nothing but comply with the terms of their contract as awarded, we have three recommendations:

- Rather than provide for the DBA to apply to contracts by operation of law, DoL should instead adapt the SCA regulation at 29 C.F.R. § 4.5(c), which allows DoL to direct contracting agencies to add the SCA to contracts after award by modification. This

---

EXHIBIT

6

Amy DeBisschop
May 17, 2022
Page 2

approach would simplify determining whether and when the DBA applies to a contract and reduce the risk of a contractor's not being made whole for the increased costs associated with applying the DBA to a contract after award, all while addressing DoL's stated enforcement concerns.

- If DoL does stick with the operation-of-law term as proposed, it should condition that application by operation of law on either the contracting agency's or DoL's first determining that the DBA does in fact apply. This requirement, although not as effective in ensuring contractors are made whole as adapting § 4.5 from the SCA regulations, will still offer needed clarity around whether and when the DBA belatedly applied to a contract.

- If DoL does proceed as proposed, it should also defer the operation-of-law terms' effective date until the Federal Acquisition Regulation is updated to expressly require equitable adjustments in this situation. Coordinating timing this way will keep contractors from being caught between DoL regulations that have been updated and FAR provisions that have not yet been. Though we recognize that some federal construction contracts are awarded by agencies not subject to the FAR, a large enough share of these contracts are FAR-covered that our proposed deferral should adequately balance government-wide contract-administration considerations with DoL's enforcement considerations.

In submitting comments on this lone issue, we do not mean to diminish the other areas of the Proposed Rule that may warrant revision or other reconsideration.[1] Those areas are important to the construction community, and we encourage DoL to give comments on them full consideration.

1. **Adapting Section 4.5(c) from the SCA regulations can address DoL's identified enforcement challenges more simply and equitably.**

The Proposed Rule's preamble explains why DoL has proposed regulations that would make the DBA apply to contracts by operation of law: existing DBA regulations provide for DoL to direct incorporation of DBA *wage determinations* after contract award but do not spell out the same authority for directing incorporation of the DBA *as a whole*. *See* Proposed Rule at 15748 (discussing existing authority under 29 C.F.R. § 1.6(f)). This disjoint has apparently led to uncertainty about the Government's ability to apply the DBA as a whole to a contract after award and at times delayed getting the DBA applied in that scenario. *See id.* We understand and appreciate DoL's interest in streamlining the process for laborers and mechanics to be paid at the applicable prevailing rates when the DBA turns out in the middle of contract performance to be applicable. But DoL's proposed method for streamlining—applying the DBA by operation of law, principally through a new 29 C.F.R. § 5.5(e)—adds undue uncertainty about what a contract's terms are and whether a contractor will be compensated if those terms change at DoL's direction.

---

[1] In the spirit of keeping these comments focused, we have generally used terms specific to the Davis-Bacon Act, such as DBA and contracting agencies, even though the proposed operation-of-law terms may bear on Related Act-covered contracts, such that DoL's analysis and final rule might use terms focused more broadly on DBRA considerations.

Amy DeBisschop
May 17, 2022
Page 3

A better solution lies in DoL's existing SCA regulations. Under 29 C.F.R. § 4.5(c), when DoL "determines" before or after contract award "that a contracting agency made an erroneous determination that the Service Contract Act did not apply to a particular procurement," DoL gives the contracting agency notice, and the agency has 30 days to add the SCA clause and applicable wage determinations. The provision further specifies that DoL may require the SCA to be applied retroactively. *Id.* And the FAR includes a parallel direction to contracting officers at FAR 22.1015. Both the DoL and FAR provisions contemplate, and in the case of the FAR require, that a post-award addition of the SCA will be followed by an equitable adjustment to the contract for any resulting cost increases. DoL finalized this language for adding the SCA after award almost 15 years ago, and we see no reason why the same process could not work equally well for the DBA.

Adapting 29 C.F.R. § 4.5(c) to the DBA would address DoL's experiences with contracting agencies that have expressed confusion or hesitancy over DoL's ability to require applying the DBA after award. *See* Proposed Rule at 15748. The regulations would be clear on this point going forward with an adapted § 4.5(c) and consistent with the principles already set forth in the Proposed Rule that the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law. *See id.* at 15798. The § 4.5(c)-based approach likewise addresses the related enforcement challenge identified in the preamble: contracting agencies that believe they cannot add the DBA to a contract after award on account of the Competition in Contracting Act or a similar constraint. *See id.* We agree with DoL's statement in the preamble that such a belief is misplaced. *See id.* But in any event, an adapted version of the § 4.5(c) language should allay any contracting agencies' lingering uncertainty in this area. (Parallel directions in the FAR can only help.) We anticipate that with such language in place, few if any contracting agencies will feel their only option is to, as noted in the preamble, terminate a contract in the middle of construction rather than modify it to add the DBA clauses. *See* Proposed Rule at 15748. We have no reason to believe agencies are terminating many service contracts rather than add SCA provisions under § 4.5(c), and we anticipate that instances of termination would be even lower under the DBA given how disruptive it can be to terminate a construction contracts while hammers are still swinging.

Adapting § 4.5(c) from the SCA regulations also offers two significant advantages over DoL's proposed approach of applying the DBA by operation of law.

- The process would avoid uncertainty over when the DBA started to apply to a contract, which in turn avoids a host of potential disputes over whether the contractor (or arguably too, a subcontractor) was obligated to comply with the DBA all along. One can imagine a *qui tam* relator's filing a False Claims Act lawsuit along these lines, or a contracting officer's refusal to provide an equitable adjustment, notwithstanding the language DoL has included in its proposed 29 C.F.R. § 4.5(e) providing for contractors to be compensated in this scenario.

- The process would simplify administration of contracts for a mix of construction and services. Consider such a contract awarded without the DBA or SCA clauses. If DoL were to find mid-performance that both acts should apply to discrete, segregable aspects of the contract, it is much more straightforward to add the SCA and DBA contract clauses and wage determinations through the same contract modification under the same timelines with the same direction for equitable adjustments, as

wiley.law

Amy DeBisschop
May 17, 2022
Page 4

compared to having the DBA be read in by operation of law while the SCA starts to
apply only after a separate contract modification.

If not clear from above, we envision that an adapted version of § 4.5(c) would confer authority
on DoL to direct that the DBA be applied back to the beginning of contract performance (when
appropriate), just as with the SCA. So this alternative approach can apply the DBA to a contract
after award just as effectively as reading the DBA in by operation of law, but with far greater
clarity for everyone involved.

**2. Any post-award application of the DBA by operation of law must be conditioned
on a written finding that the DBA does in fact apply.**

If DoL instead proceeds with its proposed operation-of-law approach, the regulations should
expressly require a written determination by DoL or a contracting agency that the DBA applies
before the DBA can be deemed applicable by operation of law. As written, the proposed rule
does not include this type of condition precedent. The preamble suggested it as an alternative
proposal, though, and invited comments. *See* Proposed Rule at 15751. We fully support it.

Our support stems from the following question: if neither the contracting agency nor DoL has
determined that the DBA applies to a contract, who else should? The DBA is, as the Supreme
Court noted forty years ago, "not self-executing." *Univ. Research Ass'n v. Coutu*, 450 U.S. 754,
784 n. 38 (1981). Someone has to decide whether the DBA applies to a contract. The
contracting agency does so in the first instance, while DoL has the authoritative final say. *See,
e.g.*, *Arbor Hill Rehab. Project*, WAB Case No. 87-04, 1987 WL 247052, at *5-*6 (Nov. 3, 1987)
(discussing this split of responsibility); *Paper, Allied-Industrial, Chem. & Energy Workers Int'l
Union*, ARB Case No. 04-033, 2005 WL 3263821, at *5-*6 (Nov. 30, 2005). If the Proposed Rule
is finalized without requiring that there first be a determination of DBA coverage by a contracting
agency or DoL, then DoL will be letting just about any interpretive body—arbitrators, district
courts, state courts, other administrative agencies—decide whether the DBA applies to a
contract by operation of law. We also doubt DoL intends to give away its interpretive authority
this way, or that it can. Determining that the DBA applies to a contract, whether before or after
award, must stay with the entities that law and established practice vest with that responsibility.

Requiring a determination by a contracting agency or DoL is consistent with the *Christian*
doctrine that is discussed in the preamble. Again, the DBA is "not self-executing." *Coutu*, 450
U.S. at 784 n.38. The Armed Services Board of Contract Appeals has reached the same
conclusion ("The Davis-Bacon Act is not self-implementing") in rejecting arguments that the
DBA can be read into a contract under *Christian*. *BellSouth Commc'ns Sys., Inc.*, ASBCA No.
45955, Sept. 27, 1994, 94-3 BCA ¶ 27231 ("This is not a case where the Act was clearly
applicable at time of award, and where the omission of the required clauses and wage
determinations was a mere administrative oversight."). The same goes for the SCA: "The SCA
clause cannot just be read into the contract under the *Christian* doctrine . . . [b]ecause the SCA
requires a determination that it applies to a contract." *Sotera Def. Solutions, Inc.*, CBCA No.
6029, Aug. 29, 2019, 19-1 CPD ¶ 37421.

These decisions show that the Proposed Rule's preamble has drawn a faulty connection
between the DBA's importance in federal labor policy and whether the DBA can apply by
operation of law under the *Christian* doctrine. *See* Proposed Rule at 15749 (comparing DBA to
Miller Act provisions read into a contract under *Christian* by the Federal Circuit in *K-Con, Inc. v.*

Amy DeBisschop
May 17, 2022
Page 5

*Sec'y of the Army*, 908 F.3d 719 (Fed. Cir. 2018)). Borrowing from the words above, the DBA cannot just be read into a contract. Either the contracting agency or DoL must first decide that it does.

Where the *Christian* doctrine can apply is in a related but distinct scenario: when the contracting agency already has determined the DBA (or SCA) applies to a contract but omitted a required DBA (or SCA) contract clause or wage determination. In these instances, the *Christian* doctrine can potentially provide a basis to read in the omitted terms. *See BUI Const. Co. & Bldg. Supply*, ASBCA No. 28707, Feb. 15, 1984, 84-1 CPD ¶ 17183 (agency determined DBA applied but inadvertently omitted the clauses from contractor-facing versions of terms); *Miller's Moving Co.*, ASBCA No. 24707, Jan. 14, 1992, 92-1 CPD ¶ 43114 (agency omitted wage determinations from SCA-covered contract). Even the Federal Circuit decision cited in the preamble is of this type: *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1351 n. 1 (Fed. Cir. 2017), applied the *Christian* doctrine in a footnote to read in the correct SCA price-adjustment clause, not read in the SCA as a whole.[2]

Requiring a determination that the DBA does in fact apply not only comports with existing caselaw, it offers practical benefits as well. First, the requirement limits the risk of miscommunication among DoL, the contractor, and the contracting agency about whether the DBA has been made to apply after award. Second, the requirement fixes a date on which the DBA can be viewed as definitively found to apply. Having a firm date can keep distinct the time periods when a contractor must start applying the DBA prospectively (i.e., in regular paychecks going forward) versus retroactively (i.e., via backpay). A firm date also provides a clear anchor point for potential areas of dispute such as when a contractor knew the DBA definitively applied to a contract and how quickly the contractor came into compliance once the DBA was determined to apply.

These same considerations dictate that if DoL or a contracting agency determines after award that the DBA applies, the determination must be in writing. A written determination avoids confusion and provides an objective evidentiary record of when someone vested with the necessary interpretive authority decided the DBA applied and what the reasons were—which may be helpful in the various scenarios discussed above and more routine ones such as evaluations of requests for equitable adjustment, negotiations with subcontractors, incurred-cost audits, and appeals challenging the underlying post-award determinations of DBA coverage.

Bottom line, it would be inconsistent if the DBA could apply *at contract award* only if the contracting agency or DoL makes such a determination, while the DBA could apply to other contracts *for the first time after award* without that same type of determination. There is little reason not to impose the requirement universally.

---

[2] We accordingly disagree with any intimation in the preamble's Footnote 115 that *Call Henry* is support for the idea that the *Christian* doctrine can be used to read in the SCA as a whole. That is not an accurate statement of the current law.

**wiley.law**

Amy DeBisschop
May 17, 2022
Page 6

### 3. DoL should defer implementing any operation-of-law provision until the corresponding FAR provisions take effect.

Contractors navigating federal procurement rules face an even tougher challenge when multiple agencies publish and apply parallel sets of regulations applicable to the same situation. To illustrate the point, consider an example from contracts set aside for competition among small businesses. When agencies hold these set-aside competitions, the resulting small-business prime contractors are limited in how much work they can subcontract and to which types of firms. Congress revised this so-called "limitation on subcontracting" in the National Defense Authorization Act for Fiscal Year 2013. *See* Pub. L. No. 112-239 § 1651, 126 Stat. 2079 (Jan. 2, 2013). The Small Business Administration updated its regulations to implement this statutory change in early 2016. *See* 81 Fed. Reg. 34243 (May 31, 2016). But the FAR contract clause applying this limitation to most federal procurement contracts, FAR 52.214-19, did not receive corresponding updates until mid-2021. *See* 86 Fed. Reg. 44233 (Aug. 11, 2021). So small businesses pursuing set-aside contracts had to deal with inconsistent provisions governing how much and to whom they could subcontract for roughly five-and-a-half years.

The risk of similar inconsistency looms here. If DoL proceeds with regulations that will apply the DBA after contract award by operation of law, we anticipate that the FAR Council will follow by adding directions that in this scenario, contracting officers shall equitably adjust contracts to reflect the increased costs of the DBA obligations. This type of FAR provision would mirror how the FAR currently directs equitable adjustments following post-award additions of a DBA wage determination. *See* FAR 22.404-5(b)(2)(i); FAR 22.404-6(b)(5); *see also* FAR 22.1015 (parallel provision for SCA). But until that FAR update happens, many federal contracting officers will lack directions on dealing with this situation from FAR provisions specifically applicable to them.

We are concerned that contractors will be stuck in the middle between DoL provisions updated to read the DBA into contracts by operation of law and a version of the FAR that does not (yet) direct contracting officers to provide equitable adjustments in that scenario. It is not far-fetched to imagine an agency arguing that if the DBA applies by operation of law, the contractor was by extension obligated to comply all along and to price that compliance into its proposal. Indeed, that was the thrust of the agency's argument in the *Sotera Defense Solutions* decision cited above. To be sure, we appreciate that DoL's proposed operation-of-law contract clause (29 C.F.R. § 5.5(e)) states that "the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law." *See* Proposed Rule at 15798. But we see many equitable adjustments as potentially delayed or denied by contracting agencies until an equivalent command finally appears in the FAR.

We note that our proposed alternative, adapting § 4.5(c) from the SCA regulations, would avoid these problems. Under § 4.5(c), the SCA is added to a contract after award through a contract modification—presumably a bilateral modification that makes, or notes a forthcoming request for, an equitable adjustment. Our suggestion to defer implementation of the proposed operation-of-law provisions would thus be obviated if DoL instead adopts the § 4.5(c)-based approach because the bilateral modifications adding the DBA after award could likewise make equitable adjustments or reflect that such adjustments will be forthcoming.

Amy DeBisschop
May 17, 2022
Page 7

**4.  Conclusion**

Certainly the DBA is a remedial statute under which laborers' and mechanics' compensation is the primary consideration. But how DoL chooses from among the options available to give that primacy can have second-order effects on administering the very contracts to which the DBA applies, especially when the DBA's application is first determined after award. We appreciate the opportunity to make these suggestions about a discrete but important area of applying the DBA and welcome any follow-up questions or opportunities for discussion.

Respectfully Submitted,

Eric W. Leonard
Craig Smith

**wiley.law**



STEPHEN E. SANDHERR, Chief Executive Officer

May 17, 2022

VIA ELECTRONIC SUBMISSION: http://www.regulations.gov

Amy DeBisschop
Director, Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor
Room S-3502, 200 Constitution Avenue NW
Washington, DC 20210

**Re: Updating the Davis-Bacon and Related Acts Regulations Notice of Proposed Rulemaking (RIN 1235-AA40)**

Dear Ms. DeBisschop:

On behalf of the Associated General Contractors of America (hereinafter "AGC"), thank you for the opportunity to submit the following comments on the U.S. Department of Labor (hereinafter "DOL" or "Department") Wage and Hour Division's (hereinafter "WHD") notice of proposed rulemaking (hereinafter "NPRM") on the Updating the Davis-Bacon and Related Acts (hereinafter "DBRA") Regulations. The NPRM was published in the Federal Register on March 18, 2022.

The Associated General Contractors of America is the leading association for the construction industry. AGC represents more than 27,000 firms, including over 6,500 of America's leading general contractors, and over 9,000 specialty-contracting firms. More than 10,500 service providers and suppliers are also associated with AGC, all through a nationwide network of chapters. These firms, both union and open-shop, engage in the construction of buildings, shopping centers, factories, industrial facilities, warehouses, highways, bridges, tunnels, airports, water works facilities, waste treatment facilities, dams, water conservation projects, defense facilities, multi-family housing projects, municipal utilities and other improvements to real property. The bulk of these firms work on federal and federally assisted projects covered by the DBRA.

AGC applauds the Department's efforts around its most significant review of the DBRA regulations in 40 years. We also appreciate the clarity the NPRM would provide contractors as they focus on rebuilding the nation's infrastructure. Over the previous 40 years, contractors increasingly have been forced to rely on varying and many times conflicting layers of case law, guidance and regional interpretations by both the DOL and contracting agencies in their compliance with DBRA. The bulk of this proposal puts into

┌─────────────────┐
│    **EXHIBIT**   │
│                  │
│      **7**       │
└─────────────────┘

regulation what the Department considers acceptable as well as how it regularly interprets requirements via investigative and enforcement practices. While we might not entirely agree on every proposal, at the very least, contractors could now have more regulatory text to point to as concrete guidance in their DBRA compliance, instead of having to deal with an enforcement action after the fact with costly litigation or penalties.

AGC also appreciates the stakeholder outreach and inclusion provided prior the rulemaking. We were excited to participate in industry meetings and provide our input on the current state of the DBRA regulations as well as our opinions on what specifically was in desperate need of reforms. AGC had previously developed thoughtful and long-standing considerations of DBRA reform, both regulatory (32 considerations) and statutory, which were shared with the WHD. While we appreciate that several of those regulatory considerations of reform were considered and included in some form in the NPRM, we also are disappointed that only so few were considered out of roughly 32 regulatory reforms AGC shared. We hope that the Department reconsiders and consults our regulatory reform considerations as it finalizes these updates. AGC also believes that for the first comprehensive review of the DBRA regulations, the Department is missing several huge and unique opportunities to substantially improve the DBRA regulations. We recommend the Department focus on truly modernizing the regulations through clarity rather than added complexity and burden on contractors.

Additionally, WHD is requesting extensive comments on the proposed rule and has asked for specific data from the federal construction contractor community. The Department itself recognizes that this rulemaking "represents the most comprehensive review of the Davis-Bacon Act regulations in 40 years." WHD is proposing significant material changes at the federal, state and contract level that will require extensive consultation, discussion and coordination with AGC chapters and members to assess their impact and practicality. To best accommodate your request, AGC would like the opportunity to reach out to its members regarding the impact of the proposed rule on their companies. Unfortunately, sixty days does not warrant our membership organization enough time to draft a survey, receive feedback from members, analyze the results, and draft as thoughtful a response to your request for comments that we would have liked. Also, in construction, spring denotes the beginning of peak construction season and many of those who would provide AGC with thoughtful feedback are currently focused on recruiting workers for the season amidst a historic workforce crisis. As a result, again it will be extremely difficult for AGC to get as meaningful feedback as we would have liked from its members in time to properly prepare comments before the May 18 deadline. AGC formally submitted a request[1] for a 60-day extension to the current comment period, which was casually and quietly denied.[2] AGC believes that for the most significant review and update to the DBRA rules in 40 years, more time is needed for the Department to receive truly thoughtful input from all stakeholders impacted, not just the few consulted prior the rulemaking. WHD understands the DBRA and governing regulations are extremely complex and many organizations with affected members by this update need time to gather and educate themselves to provide thoughtful input. AGC questions, why the rush?

---

[1] Associated General Contractors of America (March 22, 2022)., *Request for a 60-Day Extension for Public Comments on RIN 1235-AA40 - Updating the Davis-Bacon and Related Acts Regulations Notice of Proposed Rulemaking*, retrieved from https://www.regulations.gov/comment/WHD-2022-0001-0034.
[2] U.S. Department of Labor (April 21, 2022), *Comment Period Extension Request Declination*, retrieved from https://www.regulations.gov/document/WHD-2022-0001-5513.

Regardless of the rigid timeline of the existing comment period, AGC would like to take the opportunity to address the following specific topics of the proposal by the Department:

**Reverting to the (pre-1983) 3-Step Process is Unnecessary and a Missed Opportunity at True Modernization of the Wage Determination (hereinafter "WD") Process**

AGC is disappointed and believes that WHD has missed a huge and unique opportunity to substantially improve the process of determining wages. Instead, the proposal appears to just make it easier on the WHD itself to set prevailing wages with less of the data it already collects, or lack thereof. DOL's almost exclusive reliance on voluntary wage surveys to produce and update WDs has created a compensation system for DBRA covered construction that poorly reflects the construction labor market in many parts of the country. WHD should focus on how to collect more accurate data, instead of being able to rely on less or even at times inappropriate data, to determine wages that are truly prevailing. Inaccurate WDs and classifications hinder the ability of contractors to compete, and many times expose them to unexpected liabilities.

The Department recognizes in the NPRM that contracting agencies and contractors alike are plagued with issues regarding WHD's WDs, including missing classifications, woefully outdated WDs, and/or many times completely inaccurate WDs which leave it up to the contractors themselves to sort out after award of a project. This proposal, along with others contained in the NPRM, is intended to supplement the wage survey program, but unfortunately does not help increase the accuracy and amount of wage data. Instead, WHD intends to continue to collect the same data, through the same methods, and utilize less and potentially improper data in producing WDs.

This proposal, amongst others in the NPRM, is obviously a response to the low participation of contractors in the Department's wage surveys. A major reason for the lack of contractor participation in wage surveys, and therefore lack of utilizable data, is the Department's insistence that wage rate and fringe benefit data be reported by how many workers in each craft classification were employed on each construction type by individual county and by individual project. Extracting this data from contractor payroll records is painstaking, especially when a survey is occurring during the high construction season (typically spring-fall). The Department should revise its wage survey process to allow contractors to report this information by the wage and fringe benefits paid to individual craft classifications in each county by construction type, instead of broken-down project-by-project.

**Variable Rates that are "Functionally Equivalent" Could Place Certain Contractors at a Competitive Disadvantage**

The use of a functionally equivalent rate in the manner the Department proposes could create wage rate and competitive inequities in many circumstances. For example, WDs CA2, for building, heavy and highway construction in three California counties, lists 25 different groups for "power equipment operator for all other work." Each group has a different wage rate, ranging from $48.25/hour to $52.93/hour. All groups have the same fringe benefit (FB) rate of $27.20/hour. Each group has a different list of equipment that they operate. Power equipment operators for cranes, piledriving and hoisting have 13 groups. Operators for tunnel work have 7 groups. In addition, there are hourly additions for premium pay and hazardous material work for each power equipment operator classification.

What would the "functionally equivalent" rate for the 25 groups of power equipment operators be in this WD? The difference between the lowest and highest wage rate is $4.68/hour (9.7%). Would the WHD simply use the rate in the middle of the range, or allow some percentage variation from a base "functional" wage? Would this be the "appropriate" "slight variation" WHD has in mind?  How would premium and hazardous material pay figure into this one "functional" rate?

A functional rate that is less than the CBA rate in a WD that would otherwise use the CBA rates and classifications could put contractors that are signatory to those CBAs at a competitive disadvantage in bidding, since the signatory contractors would be contractually obligated to pay the higher CBA rate while nonsignatory contractors would be free to pay the lower functional rate. Despite the Department's assurance that special rates would not be permitted, the use of "functional" wage rates might create incentives for contractors and unions to negotiate rates that accommodate this practice and preserve their competitiveness. When does this calculation/balance become too complicated, impractical, uncompetitive, more than a "slight variation" and "inappropriate?"

### Expanding the Definition of Area on Highway Projects Spanning Multiple Counties is Logical and True Modernization

A large highway project can encompass several counties.  Under current practice this can, and many times does, result in multiple WDs being issued and applicable to the same project. These WDs may have different wage rates for the same craft classifications, may not have the same classifications, or the job duties for the same classifications may be different in neighboring counties. Determining which WD applies and when, what to do about conflicting job duties for the same classification in different WDs, and classifications that are in one WD and not in another are common issues when multiple WDs are issued for the same project. This proposal properly addresses this situation by authorizing DOL to issue one WD for the entire project, regardless of its geographic scope and provides logical relief and harmonization to both contractors and contracting agencies alike. AGC believes this to be in the spirit of true modernization as most highway projects utilize the same workers from the same area and the entire project should be considered a construction market.

### Wage Rates from Federal Projects Should not be Used for Building and Residential Projects

DOL should not use wage data from federal projects for building or residential construction wage rates (or highway and heavy construction if it can be avoided). AGC is not aware of any significant deficiencies in the sources of private data for building and residential construction that would necessitate a change in the current practice or regulation.

### Adoption of State and Local Wage Rates and Periodic Adjustments to Update Outdated Open Shop Rates Could Increase Accuracy if Done Properly

AGC appreciates the Department's interest in considering less traditional methods to try to improve the accuracy of outdated rates. Adopting state and local wage rates could improve the accuracy and timeliness of rates if done properly. The viability and practicality of this proposal depends almost entirely on how much confidence one has in state procedures for collecting wage rate data and calculating prevailing wages. The proposal also gives the Administrator ultimately the authority to accept particular state and local rates, even with change. If the Department finalizes this proposal, any WD that includes state prevailing wages should transparently indicate which rates have been adopted and whether those rates have been modified from the original state rate.

Likewise, periodically adjusting woefully out-of-date open shop rates through creative and non-traditional methods where the Department cannot gather enough data could also improve the accuracy of rates if done thoughtfully. The Employment Cost Index (ECI) is a high-quality data series: large sample size, gathered and calculated according to scientifically sound principles. Updated each quarter and posted, with a press release, one month after the quarter (e.g., on the last business day of April--April 29, 2022--for Q1 2022).

There are, however, some choices about which series to use (apart from not seasonally adjusted or seasonally adjusted data). BLS posts data for wages and salaries and for total compensation, which includes employer-paid benefits and required payments for employer taxes and workers compensation. And data is posted for all private industry workers in the construction industry and in "construction, and extraction, farming, fishing, and forestry occupations" combined. If the Department considers this proposal, they should specify which series to use.

### Metro and Rural Wage Data Should not be Mixed; Defined Market Approaches Should be Used Instead

The prevailing rate should be based on a civil subdivision or other area that shares a common sphere of economic influence. Combining of counties or other civil subdivisions should only be done when they are economically related and part of the same sphere of influence, such as the NPRM grants to highway projects. But the Department should also retain flexibility in this matter instead of prescriptiveness. Every state, county, city and especially construction market is unique and so should the prevailing rate be based.

The Department's reliance on urban data for rural WDs to make up for insufficient rural data has resulted in erratic WDs and inappropriately impacted competitive bidding." The utilization of urban rates in rural counties have a selective impact on rural contractors and local construction workforces as urban contractors travel with their own workforces and undercut the locals. The Department needs to further clarify this proposal and set specific definitions and limitations to how it would identify a "contiguous local construction labor market." Instead, a defined market approaches should be utilized. Again, the Department should be proposing ways of increasing the collection of accurate utilizable wage data instead of being able to use less and inappropriate data in setting WDs.

Again, this proposal, amongst others in the NPRM, are obviously a response to the low participation of contractors in the Department's wage surveys. A major reason for the lack of contractor participation in wage surveys, and therefore lack of utilizable data, is the Department's insistence that wage rate and fringe benefit data be reported by how many workers in each craft classification were employed on each construction type by individual county and by individual project. Extracting this data from contractor payroll records is painstaking especially when a survey is occurring during the high construction season (typically spring-fall). The department should revise its wage survey process to allow contractors to report this information by the wage and fringe benefits paid to individual craft classifications in each county by construction type, instead of broken-down project-by-project.

### Frequently Conformed Rates Should be Included in Wage Determinations

As previously mentioned, inaccurate WDs and missing classifications are more the norm than not for DBRA covered projects. The current process leaves the burden upon the contractor to seek out accurate rates, almost always after award of a project. This can hinder the ability of contractors to compete, and many times exposes them unknowingly to liabilities. As DOL notes, it receives thousands of conformance requests every year because, again, so many WDs lack necessary classifications. With the lack of more

thoughtful ideas in this NPRM to increase the Department's collection of accurate utilizable wage data, this is logical preemptive action by the Department to provide contractors more information upfront in the contract bidding and award process.

**Coverage of a Portion of a Building or Work Proposal is not Consistent with the Davis-Bacon Act (hereinafter "DBA")**

This proposal seems to be directed to space that is leased by the government in privately owned/constructed facilities. All Agency Memoranda (hereinafter "AAM") 176 outlines five factors to consider when determining when construction performed to accommodate a government lease is substantial enough to be subject to the DBA. When a government agency is a party to a lease that includes construction to accommodate government requirements (e.g., build out offices, security provisions), DOL may consider the lease to also be a contract for construction if the amount of construction is substantial (over the $2000 threshold for DB applicability) and the government will occupy the space for an extended time.

In *District of Columbia v. Department of Labor*[3]. The court ruled that the DBA did not apply to the CityCenterDC project because DC was not a party to the construction contract and because the project was not a "public work" under the DBA. The court held that to be a public work:

(1) The project's construction must be publicly funded; or
(2) The government must own or operate the completed facility, as with a public highway or public park.

The court noted that

> the Department says that the phrase "construction . . . carried on directly by authority of or with funds of a federal agency" includes situations where D.C. neither builds the project nor expends funds for construction, but merely leases land to a developer who then pays for the construction by contracting with a general contractor. We disagree. DOL did not cite any cases where it has previously interpreted this regulatory language to stretch to situations in which there is no public funding for the construction. So, too, the Department has cited no cases with the similar language in the National Industrial Recovery Act or the Miller Act has been applied to a project with no public funding for the construction. In light of the history, context, and terms of the regulation, the Department's reading of its regulation is not reasonable. It would vastly expand the coverage of the regulation – and indeed would stretch the regulation beyond what the statute can reasonably bear. Put simply, the interpretation that the Department offers to this Court is inconsistent with the regulation, see *Auer v. Robbins*[4], and if adopted would make the regulation inconsistent with the statute, see *Chevron*[5].

The Department is proposing the same approach and definition here that the circuit court rejected in the CityCenter case. The DBA does not apply to all contracts "for which the government is responsible." According to the court, the DBA cannot reasonably be read to cover construction contracts to which D.C. is not a party. That reading would require erasing the phrase "to which the Federal Government or the District of Columbia is a party" from the statute. The courts acknowledged that it was not at liberty to

---

[3] *District of Columbia v. Department of Labor*, 819 F. 3d 444 (D.C. Cir. 2016).
[4] *Auer v. Robbins*, 519 U.S. 452 (1997).
[5] *Chevron*, 467 U.S. 837 (1984).

rewrite laws in that fashion. With all due respect, the Department is not at liberty to do so either.

Additionally, this proposal is especially open-ended – covering construction carried on "directly by authority of or with funds of a federal agency to serve the interest of the general public, even where construction of the entire building or work does not fit within this definition." It's not really a "definition" at all. "Directly by authority of . . . to serve the general public" can cover a lot of situations that do not involve a construction contract, such as the CityCenter leases. But even under this approach, they would still be subject to the DBA because they don't have to "fit within this definition."

The DBA applies only to publicly funded projects, or when the government owns or operates a facility. The Department's "longstanding" policy, or administrative or judicial decisions to the contrary that predate the court of appeals decision in CityCenter, do not constitute authority to amend the DBA through regulations and AAMs. If the Department seeks to change DBA coverage, it must seek legislative change.

## Contractor, Prime Contractor, Subcontractor Definitions Should Not Include "Business Owner"

The Department is silent on the status of "business owner" in the NPRM. According to Section 15f06 of the Field Operations Handbook (hereinafter "FOH"), an employee who owns at least a bona fide 20 percent equity interest in the enterprise in which employed, regardless of the type of business organization (e.g., corporation, partnership, or other), and who is actively engaged in its management, is considered a bona fide exempt executive. The salary and salary basis requirements do not apply to the exemption of business owners under the Fair Labor Standards Act regulations at 29 CFR 541.101. An individual with a 20 percent or greater interest in a business who is required to work long hours, makes no management decisions, supervises no one and has no authority over personnel does not qualify for the executive exemption. To qualify for the exemption, a minority owner with at least a bona fide 20 percent interest in the business must be actively engaged in management.

AGC reminds the Department that business owners meeting this definition are exempt from DBA coverage, are regularly employed and integral to projects. AGC opposes the inclusion of business owners in the definition of "contractor" or "subcontractor."

## Surveying Work Should not be Covered

The Department may recall AAM 212 which extended DBA coverage to those performing surveying work. It became clear soon thereafter that a distinction had to be made about those who were salaried exempt and supervising the crew versus which tasks and workers fell under the definition of laborers and mechanic. The Department received a flood a conformance requests (SF 1444) because surveyor rates did not appear in the applicable local wage determinations. Much to the industry's relief, the Department then issued AAM 235 rescinding AAM 212 and once again confirmed that surveying work is not covered by the DBA. DBA is one of the most complex regulations with which construction contractors are required to comply; further flipflopping on this issue, amongst others in the NPRM, would only introduce added confusion that will take significant time and effort by both the industry and the Department to sort out. AGC believes that nothing in industry practice has changed to warrant a change in this issue and that surveying work should continue to not be considered covered by the DBA.

## Site of Work and Related Provisions are an Unnecessary and Massive Expansion of DBA

DOL proposes to revise the site of work to (1) "further encompass" certain construction of "significant portions" of a building or work at a secondary site, (2) clarify application of the site of work to include

flaggers, (3) better delineate material suppliers and (4) set clear standards for truck drivers. DOL also proposes to use the term "nearby dedicated support site" to describe locations such as batch plants that are part of the site of work because they are dedicated exclusively, or nearly so, to the project and are adjacent or nearly adjacent to a primary or secondary construction site.

The 2000 rule amended the definition of the site to include a site away from the building or work where the site is established specifically for the contract and a "significant portion" of a building or work is constructed. Transportation between the sites is also covered. The *Ball*[6] and *Cavett*[7] decisions involved facilities that were no more than 3 miles from the site of work. This proposal seeks to use a more subjective standard of "nearby" to extend coverage off-site facilities.

The site of work provisions have been settled through litigation for decades now and the regulatory changes made in response to litigation have made application of the "site of work" and "adjacent or virtually adjacent" more consistent and predictable. Contractors understand the current site of work regulations and it appears the DOL is trying to get around the litigation and excessively expand the definitions. Additionally, the current limitation of DB coverage to adjacent or virtually adjacent facilities imposed by the *Ball* and *Cavett* decisions does not need further elaboration and does not apply to "nearby" facilities.

### *"Site of Work" Background*

*Building and Construction Trades Department, AFL-CIO v. U.S. Department of Labor Wage Appeals Board and Midway Excavators, Inc.*[8]

The court in *Midway* held that:

> The Act [DBA] covers only mechanics and laborers who work *on the site* of the federally-funded public building or public work, not mechanics and laborers employed off-site, such as suppliers, materialmen, and material delivery truck drivers, regardless of their employer. . .. Material delivery truck drivers who come onto the site of the work merely to drop off construction materials are not covered by the Act even if they are employed by the government contractor . . . 29 CFR 5.2(j), insofar as it includes off-site material delivery truck drivers in the Act's coverage, is invalid.

Following *Midway*, DOL published an interim final rule amending the regulations to state that "the transportation of materials or supplies to or from the site of the work by employees of the construction contractor or a construction subcontractor is not 'construction, prosecution, completion, or repair.'[9] Truck drivers employed by a contractor or subcontractor who transport materials to or from the 'site of work' would not be covered for any time spent off-site, but would remain covered for any time spent directly on the 'site of the work.'" At the same time, DOL noted that the *Midway* decision held that the Midway truck drivers who were engaged in making deliveries to the site were not covered under DBA even though they spent brief periods of time on the site."

[6] *Ball, Ball and Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C. Cir. 1994).
[7] *L.P. Cavett Company v. U.S. Department of Labor*
[8] *Building and Construction Trades Department, AFL-CIO v. U.S. Department of Labor Wage Appeals Board and Midway Excavators, Inc.,* 932 F.2d 992 (D.C. Cir. 1991).
[9] 29 C.F.R. 5.2.(j)(2).

DOL proposed to define this incidental time on site as less than 20 percent of an employee's workday or workweek. The 20 percent threshold was incorporated into FOH 15e16(c) on *material supplier* truck drivers. Specifically, if a material supplier truck driver "undertakes to perform a part of a construction contract as a subcontractor" such as "warranty and/or repair work," and if such work exceeds 20 percent of the driver's time in a workweek, the driver is covered for all on-site time during the workweek.

*Ball, Ball and Brosamer, Inc. v. Reich*[10]

This case involved a portable concrete plant two miles from the construction site. The court held that:

> The Secretary maintains that the regulations at 5.2(l)(2) satisfy the geographic limiting principle of the Davis-Bacon Act and *Midway*. This might be the case if the Secretary were applying the regulatory phrase "so located in proximity to the actual construction location that it would be reasonable to include them" only to cover batch plants and gravel pits located in actual or virtual adjacency to the construction site. *See* 29 CFR 5.2(l)(1). But such an application is not before us and we express no opinion on its validity. Instead, the Secretary attempts to find any tiny crack of ambiguity remaining in the phrase "directly upon the site of the work" and cram into it a regulation that encompasses other sites miles from the actual location of the public works.

> In *Midway*, we determined that "not surprisingly, that Congress intended the ordinary meaning of its words." 932 F.2d at 992. That is, the limitation in the statute making it applicable to "'mechanics and laborers employed directly upon the site of the work' restricts coverage of the Act to employees who are working directly on the physical site of the public building or public work being constructed."

> In the end, we reach the same conclusion we did in *Midway*. The statutory phrase "employed directly upon the site of the work," means "employed directly upon the site of the work." Laborers and mechanics who fit that description are covered by the statute. Those who don't are not.

*L.P. Cavett Company v. U.S. Department of Labor*[11]

The court in this case held that an asphalt plant 3 miles from a highway project was not a site of work. Specifically:

> In reaching our decision, we rely on the reasoning employed by the D.C. Circuit in *Ball, Ball & Brosamer, Inc. v. Reich*.

> In reaching its decision [in *Midway*], the [DC Circuit] court commented that "[n]othing in the legislative history suggests, as DOL has ruled, that Congress intended the employment status of the worker, rather than the location of his job, to be determinative of the Act's coverage."

> The statutory phrase "employed directly upon the site of the work" means that only employees working directly on the physical site of the public work under construction have to be paid prevailing wages.

---

[10] *Ball, Ball and Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C. Cir. 1994).
[11] *L.P. Cavett Company v. U.S. Department of Labor,* 101 F.3d 1111 (6th Cir. 1996).

> Moreover, if the geographic proximity of the Davis-Bacon Act were expanded in the manner advocated by the Department of Labor, we would create the difficult problem of determining which off-site workers were indeed closely enough "related" to the public work site to justify inclusion under the Act. The *Ball* court noted as much when it stated, "[T]he Secretary attempts to find any tiny crack of ambiguity remaining in the phrase "directly upon the site at the work" and cram into it a regulation that encompasses other sites miles from the actual location of the public works."

*In the Matter of Rogers Group, Inc., John C. Haydon and Rose Transport, Inc.*[12]

In this case, WHD argued that, when the time spent on site by material delivery truck drivers employed by DBA contractors and subcontractors during the course of the day is "significant," the de minimis exception cannot exempt them from DBA coverage for this "significant" time. WHD contended that the truck drivers spent their entire day furnishing materials and were on the sites between one and 52 times a day, for between 10 minutes and seven and one-half hours.

The administrative law judge (ALJ) rejected this argument, holding that in *Midway* the DC Circuit concluded that laborers and mechanics employed off-site are not covered by the DBA. Material delivery truck drivers who come onto the site only long enough to make their deliveries are not employed directly on the site of the work. The DC Circuit reiterated this interpretation in *Ball, Ball & Brosamer, Inc.* The Sixth Circuit relied on this reasoning in *Cavett.*

In response to these decisions, the Department published proposed revisions to its position on DBA applicability to truck drivers. The Department noted that truck drivers who transport material to or from the site would not be covered for time spent off-site, but would be covered for any time spent directly on the site that is more than de minimis.

The Department argued that the 2000 revision to 29 CFR 5.2(l)(1)[13] is entitled to *Chevron*[14] deference. The ALJ did not agree. This deference was rejected in *Midway.* Where the intent of Congress is clear, the court and agency must give effect to the unambiguously expressed intent of Congress. Both *Midway* and *Cavett* found no ambiguity in the plain language of the DBA. The Department's interpretations of the DBA and the scope of the *Midway* decision and its regulation are not entitled to deference either. Neither is the Field Operations Handbook (FOH). The FOH is contrary to the Sixth Circuit precedent expressly excluding material delivery truck drivers from DBA coverage. In addition, agency interpretations contained in agency manuals and guidelines such as the FOH lack the force of law and do not warrant *Chevron*-style deference.

The Department did not allege that the truck drivers employed by Rogers performed any work while on the site other than unloading the materials they delivered. The Department argued that a court must consider both the location where the drivers spent the majority of their time and the time spent on the site during each delivery. According to the ALJ, the Department infers from *Midway* that material delivery truck drivers were not entitled to DBA wages based on where the drivers spent most of their time and the amount of

---

[12] *In the Matter of Rogers Group, Inc., John C. Haydon and Rose Transport, Inc.*  Case No. 2012-DBA-00005 (5/28/13), Available at: https://www.oalj.dol.gov/Decisions/ALJ/DBA/2012/WAGE_and_HOUR_DIVISI_v_ROGERS_GROUP_INC-ROS_2012DBA00005_(MAY_28_2013)_162104_CADEC_SD.PDF.
[13] *Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction*, 65 Fed. Reg. 80278 (December 20, 2000) (to be codified at 29 CFR Part 5).  Available at: https://www.govinfo.gov/content/pkg/FR-2000-12-20/pdf/00-32436.pdf#page=12.
[14] *Chevron, U.S.A. v. Natural Res. Def. Counsel*, 467 U.S. 837 (1983).

time they spent on the site during each trip.

The ALJ disagreed. The *Midway* court concluded that material delivery truck drivers who come onto the site merely to drop off deliveries are not covered because their work serves the same function as materialmen, who are excluded from the DBA. Under *Midway* and *Cavett*, truck drivers who deliver materials from off-site facilities to the site are not covered because they are not employed directly on the site of the work. Material delivery truck drivers who enter the site of work only long enough to deliver construction materials, like those employed by Rogers, are employed off-site and not subject to the DBA.

DOL has not issued any opinion letters that specifically address the parameters of the site of the work as published in the 2000 regulatory amendments. The Administrative Review Board has also issued a limited number of decisions that address "site of the work." The following decisions provide limited guidance:

*In re Abhe & Svoboda, Inc.*,[15] the Board applied the previous regulatory definition of "site of the work" and found that laborers performing clean up duties on the ground below bridges that were being painted per the covered contract were on the site of the work.

*In re Forest M. Sanders*,[16] the Board held that a borrow pit was part of the site of the work if it was dedicated exclusively, or nearly so, to the performance of the road project and if it was adjacent or virtually adjacent to it, and remanded the case to WHD for further consideration.

*In re Gary J. Wicke*,[17] the Board held that although the previous definition applied in this case, it affirmed WHD's determination that a borrow pit 3-5 miles from construction site was not on the "site of work," not adjacent or virtually adjacent to it, or exclusively dedicated to the project, noting that the Administrator's determination was consistent with the court of appeals decisions and the revised regulations.

### Current DOL Site of Work Guidance

The site of the work is currently defined as "the physical place or places where the building or work called for in the contract will remain; <u>and</u> any other site where a significant portion of the building or work is constructed, provided that such site is established specifically for the performance of the contract or project." 29 CFR § 5.2(l)(1); *see also* FOH 15b04.[18] Batch plants, borrow pits, job headquarters, tool yards, etc., are part of the site of the work, provided they "are dedicated <u>exclusively</u>, or nearly so, to performance of the contract or project" and are "<u>adjacent or virtually adjacent</u> to the site of the work" as defined in 29 CFR § 5.2(l)(1). 29 CFR § 5.2(l)(2) (emphasis added); FOH 15b04. However, the site of the work does not include permanent home offices, branch plant establishments, tool yards, etc., "whose location and continuance in operation are determined wholly without regard" to the particular contract or project. 29 CFR § 5.2(l)(3). The regulations further address permanent facilities of materials suppliers.

As listed in FOH 15b04, examples of site of the work include:

1. If a small office building is being erected, the "site of work" will normally include no more than the building itself and its grounds.

---

[15] *In re Abhe & Svoboda, Inc.*, ARB No. 01-063, 2004 WL 1739870 (ARB July 30, 2004).
[16] *In re Forest M. Sanders*, ARB No. 05-107, 2007 WL 4248530 (ARB Nov. 30, 2007)
[17] *In re Gary J. Wicke*, ARB No. 06-124, 2008 WL 4462982 (ARB Sept. 30, 2008)
[18] Available at: https://www.dol.gov/agencies/whd/field-operations-handbook.

2. In the case of larger contracts, such as for airports, highways, or dams, the "site of the work" is necessarily more extensive and may include the whole area in which the construction activity will take place.

3. Where a very large segment of a dam is constructed up-river and floated downstream to be affixed onto a support structure, the secondary construction site would be within the meaning of "site of the work" for Davis-Bacon purposes if it was established for and dedicated to the dam construction project.

This definition has been in place since the Department's December 20, 2000, final regulations, effective January 19, 2001, that revised the definitions of "site of the work" and "construction, prosecution, completion, or repair." 65 FR 80268-01 (Dec. 20, 2000). The revisions were made to clarify the regulatory requirements in response to three U.S. Court of Appeals decisions that held that DOL's application of the prior regulatory definitions was inconsistent with the DBA limitation to those workers employed "directly on the site of the work." 65 FR at 80270. The preamble to the final regulations includes the following DOL guidance and observations:

1. DOL is "constrained" "to limit prevailing wage coverage of off-site, dedicated support facilities to those that are either adjacent or virtually adjacent to the construction location." 65 FR at 80271.

2. Dedicated support facilities are viewed as included within the site of the work only where they are located on, adjacent, or virtually adjacent to the site of the public building or public work. 80271-72.

3. The Department does not precisely define the terms adjacent or virtually adjacent. It believes that the courts intended it to apply the site of work requirement "narrowly, but with common sense and some flexibility" and determinations should be made on a case-by-case basis. 80272.

4. Establishing a specific maximum distance beyond which off-site facilities would not be covered "would be ill-advised." "[I]t can be almost impossible to determine the exact outer boundaries of large public works projects, such as . . . a major highway construction project. Thus, a numerical figure representing the maximum distance a dedicated facility can be located from the construction site would be arbitrary and impractical to apply." "[T]he site of work limits for the construction of a single building in an urban location would likely be restricted, and a dedicated facility located only a few city blocks away from the building "would most likely not be considered 'virtually adjacent' for Davis-Bacon purposes." 80272-73.

### *"The Site of Work", "Significant Portions", and "Nearby Dedicated Support Site" Have Already Been Litigated*

The site of work regulatory requirement does not apply to related acts that extend DB coverage to all laborers and mechanics employed in the "development" of a project (citing housing acts). The material supplier exception does not apply to work under statutes that extend DB coverage to all laborers and mechanics employed in the "development" of a project, regardless of whether they are employed by contractors or subcontractors. The adjacent or virtually adjacent limitation on coverage of material suppliers was adopted after the *Ball*[19] and *Cavett*[20] decisions. And the provision that exempts transportation of material

---

[19] *Ball, Ball and Brosamer, Inc. v. Reich,* 24 F.3d 1447 (D.C. Cir. 1994)

[20] *L.P. Cavett Company v. U.S. Department of Labor,* 101 F.3d 1111 (6th Cir. 1996)

to or from the site is from the 1992 interim final rule implementing *Midway*[21].

As covered above, the site of work provisions have been settled through litigation for decades now and the regulatory changes made in response to litigation have made application of the "site of work" and "adjacent or virtually adjacent" more consistent and predictable. Contractors understand the current site of work regulations and it appears the DOL is trying to get around the litigation and excessively expand the definitions. Additionally, the current limitation of DB coverage to adjacent or virtually adjacent facilities imposed by the *Ball* and *Cavett* decisions does not need further elaboration and does not apply to "nearby" facilities.

We anticipate that by dramatically revising and expanding the definitions as proposed, the result would lead to further costs and compliance nightmares. Why drastically rewrite existing guidelines that contractors currently are familiar with? AGC recommends that the WHD instead put into regulation the already clear and existing rules that contractors regularly turn to in compliance and have for a long time. In a nutshell, why create unnecessary confusion?

AGC also recommends that the Department:

- Limit Davis-Bacon Act coverage to the physical site of construction;
- Revise regulations to codify the enforcement practice of applying a de minimis threshold that excludes coverage of activities at the site of the work that amounts to 20% or less of the employees' work hours that week; and
- Expand application of the de minimis rule to all covered workers and activities at the site of the work, not just truck drivers who are loading and unloading materials.

## *Flagger Distinctions and Thresholds Should be Retained*

The Department proposes to clarify, in the definition of "nearby dedicated support sites," that such workers, even if they are not working precisely on the site where the building or work would remain, are working on the site of the work if they work at a location adjacent or virtually adjacent to the primary construction site, such as a few blocks away or a short distance down a highway.

Coverage of flaggers and traffic directors is addressed in 15e10 of the FOH. Flagger duties are manual and physical in nature and integrally related and necessary to the construction activities at the site. Employees of traffic service companies which operate as subcontractors on DBA projects are generally covered. However, traffic service companies that rent equipment to the prime contractor and perform only incidental functions at the site in connection with delivery of equipment are regarded as material suppliers and not covered by DBA unless they spend a substantial amount of time (20% or more) in a workweek on the site (15e16).

The Department should maintain the distinction between flaggers and employees of traffic service companies, as well as retain the 20% threshold for traffic service company employees.

---

[21] *Building and Construction Trades Department, AFL-CIO v. U.S. Department of Labor Wage Appeals Board and Midway Excavators, Inc.,* 932 F.2d 992 (D.C. Cir. 1991)

## *Material Supplier Distinctions and Thresholds Should be Retained*

The Department proposes to clarify the distinction between subcontractors and material suppliers. Employees of material suppliers are not currently covered under the DBA and "most of the Related Acts." The Department proposes three criteria for the exemption:

(1) *the employer's only obligation for work on the contract is for delivery of materials, which can include pick-up, but not exclusive of, delivery;*
(2) *the employer also supplies material to the general public; and*
(3) *the employer's facility is not established specifically for the contract or located at the site (citing Zachery, AAM 31, 45, 53).*

If the employer engages in other construction work at the site, it is a subcontractor rather than a material supplier.

DBA coverage of material suppliers is largely already addressed by 15e16 of the FOH, and AGC recommends that Department retain the current FOH guidance on material suppliers and/or that the Department clarify its current guidance.

## *Truck Driver Distinctions and Thresholds Should be Retained*

DBA coverage of truck drivers is largely addressed by section 15e22 of the FOH. The DOL proposal would eliminate the de minimus rule and the 20% threshold for suppliers that come on site for functions like equipment repair. DOL maintains that there is "uncertainty" about how and when the de minimus rule applies. The Department should revise regulations to codify the enforcement practice of applying a de minimis threshold that excludes coverage of activities at the site of the work that amounts to 20% or less of the employees' work hours that week

The FOH (FOH 15e17) explains contractors' obligations under the DBA and Contract Work Hours and Safety Standards Act ("CWHSSA") when using the services of a truck driver who owns and operates his or her own truck as follows:

> As a matter of administrative policy, the provisions of DBRA/CWHSSA are not applied to bona fide owner-operators of trucks who are independent contractors. For purposes of these acts, the certified payrolls including the names of such owner-operators need not show hours worked nor rates paid, but only the notation owner-operator. This position does not pertain to owner-operators of other equipment such as bulldozers, scrapers, backhoes, cranes, drilling rigs, welding machines, and the like. Moreover, employees hired by owner-operators are subject to DBRA in the usual manner.

This proposal is silent on truck owner-operators. AGC requests that DOL expressly adopt in the final rule the above policy limiting contractors' obligations under DBA and CWHSSA with regard to such owner-operators.

*Transportation Distinctions and Thresholds Should be Retained*

DOL proposes to cover "transportation" that:

(1) Takes place entirely on the location of the site;
(2) Of portions of the building or work between a "secondary construction site" and a "primary construction site";
(3) Between a "nearby dedicated support site" and either a primary or secondary site;
(4) A driver's or driver's assistant "onsite activities essential or incidental" to offsite transportation "where the time spent is not so insignificant that it cannot be practically recorded"; and
(5) Any transportation and related activities whether on or offsite under a related statute that extends coverage to laborers and mechanics employed in the construction or "development" of a project.

Items 1, 2, 3 and 5 are reflected in current regulations. The essential or incidental activities in item 4 related to the transportation of material include loading, unloading, and waiting time where time is not so insubstantial that it is not practical to precisely record. This is the same standard as the "de minimis" standard in the Fair Labor Standards Act (FLSA). DOL assumes that in the vast majority of cases it will be feasible to record the time spent on site.

DBA coverage under the transportation proposal is largely dependent on the proposal for the site of work. If "secondary construction sites," "nearby dedicated support sites" and "related activities" under related acts are covered, truck driver DBA coverage will be significantly expanded. This proposal is also silent with respect to truck owner-operators. It appears to eliminate them. The proposal for drivers and driver's assistants to cover time that "is not so insignificant that it cannot be practically recorded" is impractical. The FLSA FOH advises that:

- "In recording working time, insubstantial, or insignificant periods of time outside the scheduled working hours may be disregarded. The courts have held that such trifles are de minimis.  This rule applies only where a few seconds or minutes of work are involved and where the failure to count such time is due to considerations justified by industrial realities.  An employer may not arbitrarily fail to pay for any part, however small, of the employee's fixed or regular working time"; and
- "It has been found that in some industries, particularly where time clocks are used, there has been the practice of recording the employee's starting and stopping time to the nearest 5 minutes, or to the nearest 1/10 or 1/4 of an hour.  For enforcement purposes, this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in the failure to compensate the employees properly for all hours they have actually worked."

AGC again recommends that the current regulations and guidance with respect to truck drivers, including the de minimis rule and the 20% threshold, should be codified. The proposal is not consistent with *Midway*, *Ball* or *Cavett*, and the proposal for drivers and driver assistants is impractical and unnecessary.

*"Development Statute"*

"Development statute" means a statute that requires payment of DBA prevailing wages to all laborers and mechanics employed in the development of a project, regardless of the site or whether the laborer or

mechanic is employed by a contractor or subcontractor.

In *Cavett*, the Department contended that even if the court decided that the phrase "site of the work" in the DBA was unambiguous, the Secretary is not precluded from applying the broader definition of that phrase (encompassed in 29 CFR 5.2(l)) to the contract in question because it is covered by the Federal-Aid Highways Act (a Davis-Bacon Related Act). The Department asserts that unlike the DBA, the Federal-Aid Highways Act does not contain language limiting its scope to employees working "directly on the site of work."

The Federal-Aid Highways Act specifically notes that the prevailing wage determination shall be "in accordance with" the Davis-Bacon Act. According to the court, this means that the Federal-Aid Highways Act incorporates from the DBA not only its method of determining prevailing wage rates but also its method of determining prevailing wage coverage. In other words, if 29 CFR 5.2(l) is inconsistent with the DBA it must also be inconsistent with the Federal-Aid Highways Act.

AGC points out the court's observation in *Cavett* and recommends that, if the Department believes that DBA coverage under development statutes, or under any related act, is different than it is under the DBA, it has the obligation to promulgate regulations defining that coverage before it can apply or enforce different standards.

## Contract Clauses by Operation of Law Should be Clarified

The Department has always maintained that the DBA clauses required by the regulation are applicable by operation of law, even when they are not physically in the contract. However, this has never been "official." Before the Department enforces the DBA and initiates action for back wage collection, it retroactively incorporates the clauses and the appropriate WD into the contract. This proposal would make that step unnecessary. As the Department notes, if this creates a back wage liability for the contractor because the contracting agency failed to include the clauses and WD in the contract, the contractor must be compensated for the additional costs.

AGC asks for further clarifications. It is absolutely necessary that prime contractors be compensated for any increased costs caused by a contracting agency failure.

## Post-Award WD Correction Should be Clarified

DOL can direct an agency to include a WD after contract award. Contractors must be compensated for any increased costs under current regulations. The Department is proposing that the Administrator may "otherwise" direct the retroactive requirement. It is not clear from the wording of this proposal whether the authorization for the Administrator to "otherwise" direct the retroactive requirement is referring to including the WD after contract award or the requirement that contractors must be compensated for any increased costs as a result.

AGC recommends additional clarification on this point. Does this proposal authorize the Administrator to deny compensation to contractors when a WD is retroactively included in a WD? If a WD is not included in a contract because of the failure of a contracting agency, and is not retroactively included by the Administrator, what consequence does this have for contractors with respect to any increased costs? Again, it is absolutely necessary that prime contractors be compensated for any increased costs caused by a contracting agency failure.

## Conclusion

AGC reiterates our appreciation for the Department's efforts regarding its most significant review of the DBRA regulations in 40 years and hopes it provides necessary clarity on the DBRA that make sense for today's contractors. AGC also appreciates the opportunity to engage in the rulemaking process and looks forward to working with the WHD as it continues to amend regulations that impact construction employers. If we can aid in any way, please do not hesitate to contact me.

Sincerely,

Cc:    Martin J. Walsh, Secretary
U.S. Department of Labor

Jessica Looman, Acting Administrator
Wage & Hour Division
U.S. Department of Labor