**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

ASSOCIATED GENERAL CONTRACTORS
OF AMERICA; ASSOCIATED GENERAL
CONTRACTORS OF TEXAS; LUBBOCK
CHAMBER OF COMMERCE; and
J. LEE MILLIGAN, INC.,

               Plaintiffs,

v.

U.S. DEPARTMENT OF LABOR and JULIE
SU, in her official capacity as Acting U.S.
Secretary of Labor,

               Defendants.

Case No. 5:23-CV-0272-C

**COURT'S FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW AND ORDER**
**GRANTING PRELIMINARY INJUNCTION**

Plaintiffs Associated General Contractors of America ("AGC of America"), Associated

General Contractors of Texas ("Texas AGC"), Lubbock Chamber of Commerce ("Lubbock

Chamber"); and J. Lee Milligan, Inc. (collectively hereinafter "Plaintiffs") filed their Complaint

on November 7, 2023. ECF No. 1.  Plaintiffs filed their First Amended Complaint ("FAC") on

December 18, 2023.  ECF No. 5.

Plaintiffs name the following persons and/or entities as the Defendants: United States

Department of Labor ("DOL") and Julie Su, in her official capacity as Acting U.S. Secretary of

Labor.

Plaintiffs seek a preliminary injunction barring implementation and enforcement of

specified portions of § 5.2 and the entirety of § 5.5(e) of the DOL's "Updating the Davis-Bacon

and Related Acts Regulations" published August 23, 2023, 88 Fed. Reg. 57526 (Aug. 23, 2023) ("Final Rule") (to be codified at 29 C.F.R. pts. 1, 3, 5) (hereinafter the "challenged Final Rule provisions").

On the 10th day of June, 2024, came on for hearing Plaintiffs' Motion for Injunctive Relief in the above-styled and-numbered cause. All parties appeared and announced ready.

The Court heard evidence from five (5) witnesses for Plaintiffs and admitted various documentary exhibits into the record. Defendants called no witnesses and introduced two exhibits into the record.

Based upon the evidence adduced, the Court makes the following findings of fact:

## I.   **FINDINGS OF FACT**

At the hearing, the Court heard testimony from the following witnesses, and the Court finds the following facts based upon their testimony and the exhibits admitted into evidence in connection with such testimony:

### A.   **Witnesses**

1.      Jimmy Christianson is the Chief Operating Officer of the Associated General Contractors of America ("AGC of America"). Prior to his change to COO in April of 2024, he served at AGC of America as Vice President of Government Relations. In his capacity as Vice President of Government Relations, Mr. Christianson advocated to support or track federal legislation impacting the construction industry going through Congress, would talk to agencies and track and monitor federal regulatory developments, proposed rules, and federal agencies impacting construction, including the Davis-Bacon Act ("DBA") Final Rule, and rulemaking. He also oversaw litigation regarding procurement and labor and employment law matters through the association. Mr. Christianson engages in interaction with the federal agencies, including the

2

Department of Labor, U.S. Army Corps of Engineers, General Services Administration, Department of Veteran Affairs, and the US Navy.  Tr. (Christianson) at p. 6, line 23 – p. 7, line 22 and p. 8, lines 12-18.

2.      Doug Tabeling is General Counsel and Corporate Secretary for Carroll Daniel Construction Company. Mr. Tabeling's responsibilities as General Counsel and Corporate Secretary include reviewing contracts ensuring that the company is in compliance with statutory, regulatory, and other legal obligations, on a wide variety of matters from project specific issues to corporation matters.  Prior to joining Carroll Daniel Construction, he was an attorney in private practice for 15 years representing construction contractors, owners and other participants in construction projects all over the country. Tr. (Tabeling) at p 25, line 23 – p. 26, line 15.

3.      Carroll Daniel Construction Company is a building contractor that constructs commercial buildings, including K-12 schools, post-secondary education facilities, city and county administrative buildings, manufacturing facilities, and industrial warehouses.  The company is based in Gainesville, Georgia and conducts business in approximately 14 states in the South.  The company works almost entirely as a prime contractor competitively bidding on federally assisted projects and privately funded projects.  Carroll Daniel Construction Company is a member of AGC of America as well as AGC Georgia and Carolina's AGC chapters.  Tr. (Tabeling) at p. 26, lines 17 – p. 29, line 15.

4.      Approximately 10 percent of Carroll Daniel Construction Company's project  are subject to the DBA.  The steps the company takes to ensure it is in compliance with the DBA include reviewing the bid solicitations to determine whether the DBA applies to a project, also ensuring that the specialty trade subcontractors the company works with also understand the requirements and their obligations, submitting certified payroll records and collecting and

3

submitting certified payroll records from subcontractors. Tr. (Tabeling) at p. 29, line 17 – p. 30, line 17 and p. 37, line 5 – p. 38, line 10.

5.      Doug Waltersheid is the president of Plaintiff J. Lee Milligan, Inc., and has held that position since 2004. J. Lee Milligan is a heavy highway and civil contractor located in Amarillo, Texas, and works as both a prime contractor and subcontractor performing work on federally funded projects for the Texas Department of Transportation and some municipal entities, like the City of Amarillo. Tr. (Waltersheid) at p. 53, line 4, - p. 54, line 20.

6.      J. Lee Milligan, Inc. is a member of AGC of Texas and AGC of America. Approximately 85% of its projects are subject to the DBA. J. Lee Milligan, Inc. takes steps to ensure it complies with the DBA, including maintaining payroll records and attaching the DBA requirements to subcontracts with subcontractors and monitoring the subcontractors' submission of payroll records. Tr. (Waltersheid) at p. 54, lines 4 – 10 and p. 55, line 23 – p. 56, line 12.

7.      John Ramage is an estimator for 71 Construction and has held that position for 10 years. He has been in the construction industry for 27 years, and he has held different positions, including project engineer, project manager, and estimator. 71 Construction is located in Casper, Wyoming and performs paving, underground utilities, and excavation work on projects in Wyoming. The company's annual dollar volume over the last couple of years, including 2023 is approximately $25 million. Tr. (Ramage) at p. 67, line 4 – p. 68, line 18.

8.      71 Construction has been an AGC of America member for 35 years and is also a member of AGC Wyoming. The company typically works on federally funded projects with the Wyoming Department of Transportation, cities, and schools, and those projects are awarded to the lowest responsible bidder. 71 Construction often works as a prime contractor and uses subcontractors on its projects, which subcontractors are selected by competitive bid and perform

4

traffic control, signage, striping, electrical work, and fencing.  Tr. (Ramage) at p. 68, line 24 – p. 70, line 12.

9.      Approximately 20 percent of 71 Construction's projects are subject to the DBA. 71 Construction takes steps to ensure it is compliance with the DBA including tracking all its workers times and ensuring they are paid the prevailing wage, maintaining and submitting certified payroll records to the project owner, and where 71 Construction is the prime contractor, also ensuring that subcontractors do what is needed to meet the prevailing wage requirements.  Tr. (Ramage) at p. 71, lines 5-16.

10.      Chris Chambers is an owner of Chambers Engineering.  Chambers is the treasurer and an executive board member of the Lubbock Chamber of Commerce ("Lubbock Chamber"). Chambers Engineering is a member of the Lubbock Chamber, and has been a member for approximately eight years.  Tr. (Chambers) at p. 84, line 16 – p. 85, line 10.

11.      The Lubbock Chamber is the largest business consortium on the Texas South Plains, representing roughly 1500 local businesses, mostly small businesses.  Some of its members do federal contracting work that is subject to the DBA, including Chambers Engineering.  Tr. (Chambers) at p. 85, line 14 – p. 86, line 11.

12.      Chambers Engineering is an engineering and contracting company with offices in Fort Worth and Lubbock, Texas.  Chambers Engineering performs work in the Dallas Fort Worth ("DFW") area as well as in the rural counties in the Texas Panhandle, including DBA covered projects at the DFW and Dallas Love Field airports.  Chambers Engineering also performs on federally funded projects for K-12 schools.  Chambers Engineering holds federally recognized special designations as a Disadvantaged Business Enterprise.  Its average annual revenue is

5

approximately $15 million, and employs fewer than 50 employees. Tr. (Chambers) at p. 86, line 14 – p. 87, lines 6, and 18-21.

13.     Approximately 75 percent of Chambers Engineering's projects involve the DBA. The company directly employs workers who receive DBA wages, including workers performing different job classifications on a single project. Chambers Engineering reviews the specifications and contracts for the DBA provisions and also makes sure that its subcontractors are aware of any DBA requirements. Where the bid specifications do not list the DBA provisions, the company does not apply the DBA to its contracts. Tr. (Chambers) at p. 90, line 21 – p. 92, line 7.

## B.     The DOL's Final Rule adversely affects members of Plaintiff Associations and Plaintiff J. Lee Milligan, Inc.

14.     AGC of America is a national trade association that represents construction companies across the country. AGC of America members include prime or general contractors, subcontractors, sometimes called specialty contractors, construction material suppliers, and service providers for the construction industry, which includes insurance agents, brokers, consultants, and lawyers. AGC of America has about 16,000 contractor members which includes national, regional, and local contractors, including small contractors with an annual volume of less than $45 million. Some of these contractors, including the small contractors with an annual volume of less than $45 million, perform work subject to the DBA. The purpose of the AGC of America is to advocate on behalf of its members' interests before government entities, traditionally the federal government, Congress, federal agencies, and in federal court. AGC of America also provides other services to its members including training, education, and professional development. Tr. (Christianson) at p. 8, lines 3-11, and p. 9, line 5 – 25.

15.     AGC of America is affiliated with state and local chapters, including AGC of Texas, which is one of 11 local AGC of America chapters in the State of Texas. AGC of America

6

has 89 chapters, which includes chapters in every state as well as Washington, D.C. and Puerto Rico. Members of local chapters are also members of AGC of America. AGC of Texas' membership includes highway and infrastructure contractors, utility contractors, and construction material suppliers. AGC of Texas members include national and local contractors that perform work that is subject to the DBA. A significant number of AGC of America's contractors perform subject to the DBA, including Plaintiff J. Lee Milligan, Inc., 71 Construction, and Carroll Daniel Construction Company, which are adversely affected by the Final Rule provisions challenged in this matter. Tr. (Christianson) at p. 10, lines 1 – p. 11, line 18 and p. 13, lines 12 – p. 14, line 15.

16.     AGC of America works with its members in understanding the impact on them of federal rules and regulations, including the DBA, and the operation of law provision contained in the Final Rule. AGC spent a significant amount of time talking with its members, reaching out to them at conferences, and working with them through various committees within the association to understand all the provisions in the Final Rule and how they would or would not impact them. Tr. (Christianson) at p. 14, line 19 – p. 15, line 5.

17.     AGC contractors are adversely impacted by the operation-of-law provision on the bidding process. Contractors bidding a contract need to know up front what the requirements are for the contract so they can bid accordingly. When it comes to DBA, contractors must know if the DBA requirements are in the contract or not, and, traditionally, the DBA requirements are explicitly included in a provision in the contract, as required by the express language of the DBA. Contractors need to know this so that they can inform their subcontractors that they must abide by Davis-Bacon prevailing wages and file certified payrolls. In addition, contractors need to be able to make sure that, as a contractor, they can do the same to ensure that they are paying their

employees the prevailing wage rate.  Tr. (Christianson) at p. 15, lines 13-25; Tr. (Tabeling) at p.
36, line 20 – p. 42, line 11); Tr. (Waltersheid) at p.m. 59, lines 7-14.

18.     AGC contractors predominantly bid projects on a competitive bidding program,
and so price matters.  The construction industry operates on extremely thin profit margins.  Thus,
contractors can lose a job due to only including a one percent margin, so every cost matters.  In
some cases, the DBA prevailing wage would be higher than the market wage, so contractors are
paying a higher wage because of Davis-Bacon requirements.  But always, at a minimum,
contractors are administratively required to file certified payroll, and then also have to ensure that
their subcontractors are doing the same and paying their employees the prevailing wage, resulting
in associated overhead costs.  Tr. (Christianson) at p. 16, lines 15 – 25.

19.     The operation-of-law clause impacts several specific funding laws that have and
may adversely affect AGC members.  As a result of the COVID pandemic, there was an increase
of federal funds that went to areas and construction projects that traditionally never received
federal funds or rarely received federal funds.  These include the American Rescue Plan Act, which
was enacted in March of 2022, and included over a trillion-dollar COVID relief, the CARES Act
and the Consolidated Appropriations Act of FY 2021.  Each law funded a program called the
Elementary and Secondary School Education Relief Fund program (ESSER).  The ESSER
program was enacted to provide approximately $190 billion worth of funds that could be used for
education loss, and COVID mitigation and  prevention in schools.  ESSER funds are also for
eligible construction uses.  School construction is not traditionally funded with federal funds.
Schools are funded largely by state and local government funds.  The issue is that state departments
of education and local school districts that are receiving federal funds frequently have not
understood, and still many of them do not understand, what DBA is and if it applies to construction

8

contracts. Under the ESSER III program under the American Rescue Plan Act tranche of funds, such federal funds are available through the end of September 2024. Other similar types of federal funding programs with a similar impact on AGC members include the Infrastructure Investment and Jobs Act enacted in November 2021 that expanded a reach of federal funds to many new construction programs including energy programs and water utility programs that has more eligible uses for entities that would not necessarily rely on federal funds. Also, the Inflation Reduction Act requires compliance with the DBA in order to get a tax credit for renewable energy projects. Similar to the school districts that never previously knew what DBA is, with the Inflation Reduction Act, small developers, for example, that are building multi-family projects who will be seeking these tax credits historically don't understand prevailing wage law, if it applies, and how to comply with the DBA. Funding under The Inflation Reduction Act is the first time that construction labor requirements through the federal government have been put on traditionally private construction work. Tr. (Christianson) at p. 17, line 5 – p. 19, line 19. Specific AGC members testified that they have been impacted by similar issues where the awarding body failed to include the DBA requirements in the bid specifications and contract. Tr. (Tabeling) at p. 42, line 12 – p. 45, line 2; Tr. (Ramage) at p. 72, line 23 – p. 74, line 20. Lubbock Chamber members have been impacted by similar issues with federal funding programs like ESSER. Tr. (Chambers) at p. 96, line 18 – p. 99, line 16.

20.     AGC contractors are adversely impacted when the DBA provisions are not included in the bid specification and contract at the time of bid but are then added later during the project or after the project is completed. Specifically, AGC contractors are required to expend considerable administrative time and expense to ensure that all affected workers are paid the required DBA rates, plus subcontractors, who have often completed their scope of work, been

9

paid and left the project, retroactively comply with the DBA requirements, and that all certified payroll records are completed and submitted. Doing so as to be in full compliance after-the-fact with the DBA is nearly impossible. Tr. (Tabeling) at p. 42, line 12 – p. 45, line 22 and p. 47, line 22 – 52, line 11; Tr. (Waltersheid) at p. 57, line 5 to p. 59, line 14; Tr. (Ramage) at p. 69, line 21 – p. 70, line 12 and p. 72, line 6 – p. 74, line 20; Tr. (Chambers) at p. 94, line 6 – p. 95, line 9 and p. 96, line 18 – p. 100, line 7

21.     AGC contractors typically have a material supply operation because it is an investment in their business and enables them to gain a competitive advantage over those contractors that do not have a material supply operation. Such contractors with material supply operations are adversely affected, however, by the material supplier provisions in the Final Rule. Contractors that have made a business investment in their businesses by expanding to include commercial material supply are now competitively disadvantaged because they must pay prevailing wages and administer the DBA requirements where they use their own material supply operations on their projects, where their competitors who only provide material supply on the same project are not subject to the DBA under the Final Rule. Tr. (Christianson) at p. 20, line 14 – p. 21, line 8; Tr. (Waltersheid) at p. 62, lines 17-22; Tr. (Ramage) at p. 77, lines 7-13.

22.     AGC contractors are also adversely affected by the on-site trucking provisions in the Final Rule. The trucking provisions require contractors to track their truck drivers' time on the job site to ensure any time that is more than a *de minimis* amount of time spent on-site is recorded on the certified payroll records and paid at least the applicable DBA rate. What constitutes a *de minimis* amount of time is not defined under the Final Rule. AGC members are adversely affected by this  trucking provision because they are either having to figure out a way administratively to track the truck drivers' time spent on-site that is more than *de minimis* and pay the drivers the

10

applicable DBA wage rates, and completing certified payrolls records, or to apply the DBA rate for the entire time to not run afoul of the DBA. A contractor's choice on compliance under this scenario may affect bids, and with the thin margins in the construction industry, those costs can be the difference between winning a bid and not. Tr. (Christianson) at p. 21, line 13 – p. 22, line 14; Tr. (Ramage) at p. 77, line 12 – p. 79, line 14).

      **C.**     **The Final Rule adversely affects small employers.**

     23.     Chris Chambers testified as a small business owner operating in Lubbock, Texas. Tr. (Chambers) at p. 86, lines 19-20.

     24.     Mr. Chambers testified about the time and expense the company takes to comply with the DBA requirements on its projects, including completing the wage reports by hand with his other company owner and a project manager. Mr. Chambers testified that the company investigated purchasing software to replace the preparation of wage reports by hand but that the software costs around $50,000, and that the company cannot afford the software at this time. Mr. Chambers testified that with the new regulations, the company will need to "be a little better at the way we keep records" and to impress upon subcontractors to make sure that their record keeping is in better condition. Tr. (Chambers) at p. 87, line 22 – p. 89, line 2.

     25.     Mr. Chambers also testified about the adverse impact it faces with subcontractors where the subcontractors did not comply with the DBA requirements and did not pay the proper DBA rates and did not turn in the payroll reports because of the difficulty getting the right classification of the workers on the project and getting the record keeping after the subcontractor has left the job before the project is completed. Mr. Chambers described that if the record keeping is not done as the job progresses, that it is an arduous task to go back and get those records after the fact. Further, he described that it is impossible for the company owner to accurately certify that

such records are accurate. Mr. Chambers testified that the operation of law provision presents a huge problem for Chambers Engineering as a prime contractor, because it will result in some workers not being paid their full wages. Tr. (Chambers) at p. 92, line 25 – p. 95, line 23.

26.     Mr. Chambers testified about past experiences where the project owner, a local school district, failed to disclose that the project was subject to the DBA as a result of federal funding under the ESSER program. In that case, Chambers Engineering did not learn that the project was subject to the DBA until after the project started, when it was informed of the DBA requirement by the project owner's superintendent. Mr. Chambers testified that it took the company 30 to 40 days to create the certified payroll records after the fact. Further, although the school paid the company for the differential due to the DBA, the company was not compensated for the administrative time it took to make the corrections. Mr. Chambers explained that the operations of law provision will impose additional administrative costs to stay in compliance. Tr. (Chambers) at p. 96, line 18 – p. 99, line 16.

27.     Mr. Ramage testified as an estimator for a small business operating in Wyoming. Tr. (Ramage) at p. 68, lines 10 – 15.

28.     Mr. Ramage testified that as a result of the Final Rule's material supplier and transportation provisions, that it increased the costs of its bids. Mr. Ramage explained that the company has incorporated the increased DBA rates for its drivers in its bids when they are on-site, concluding that they are erring to "the side of caution and say that any time is more than *de minimis*." Tr. (Ramage) at p. 77, line 9 – p. 78, line 1. This practice will add unnecessary costs to federally funded construction projects.

29.     To the extent any of the foregoing Findings of Fact should more properly be denominated as Conclusions of Law, they are hereby deemed to be such.

12

## II.    CONCLUSIONS OF LAW

Based upon the above findings, the Court makes the following conclusions of law:

### A.    Legal Background

#### 1.    The Davis-Bacon Act

1.    The DBA, as enacted in 1931 and subsequently amended, requires the payment of minimum prevailing wages determined by the Department to laborers and mechanics working on federal contracts in excess of $2,000 for the construction, alteration, or repair, including painting and decorating, of public buildings and public works. *See* 40 U.S.C. § 3142.

2.    Congress has also included the DBA prevailing wage requirements in numerous other statutes (referred to as "Related Acts") under which federal agencies assist construction projects through grants, loans, loan guarantees, insurance, and other methods. Related Acts include the National Housing Act of 1934, Pub. L. 73-479; the Federal-Aid Highway Act of 1956, Pub. L. 84-627, 2, and the Infrastructure Investment and Jobs Act of 2021, Pub. L. No. 117-58 (the Bipartisan Infrastructure Law). The Department maintains a list of Related Acts on its government contracts compliance assistance website at:

https://www.dol.gov/agencies/whd/government-contract.

3.    The Secretary of Labor has the responsibility to "prescribe reasonable regulations" for contractors and subcontractors on covered projects. *See* 40 U.S.C. § 3145. The Secretary, through Reorganization Plan No. 14 of 1950, also has the responsibility to "prescribe appropriate standards, regulations and procedures" to be observed by Federal agencies responsible for the administration of the Davis-Bacon and Related Acts ("DBRA") "[i]n order to assure coordination of administration and consistency of enforcement of the labor standards provisions" of the DBRA. 15 FR 3173, 3176, effective May 24, 1950, reprinted as amended in 5 U.S.C. app. 1.

13

4. The DBA expressly requires that the public federal bid advertisement specification and contracts contain specified provisions concerning the minimum wages to be paid to the laborers and mechanics employed directly on the site of the work by contractors and subcontractors. The wages to be paid must be "computed at wage rates not less than those stated in the advertised specifications." Specifically, 40 U.S.C. § 3142(a) requires that "the *advertised specifications* for every contract in excess of $2,000 to which the Federal Government or the District of Columbia is a party, for construction, alteration, or repair, including painting and decorating, of public buildings and public works of the Government or the District of Columbia that are located in a State or the District of Columbia and which requires or involves the employment of mechanics or laborers *shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics*." [emphasis added.].

5. Further, 40 U.S.C. § 3142(c) provides that every "contract based upon the specifications referred to in subsection (a) must contain stipulations that: (1) the contractor or subcontractor shall pay all mechanics and laborers employed directly on the site of the work, unconditionally and at least once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and the laborers and mechanics; (2) the contractor will post the scale of wages to be paid in a prominent and easily accessible place at the site of the work; and (3) there may be withheld from the contractor so much of accrued payments as the contracting officer considers necessary to pay to laborers and mechanics employed by the contractor or any subcontractor on the work the difference between the rates of wages required by

the contract to be paid laborers and mechanics on the work and the rates of wages received by the laborers and mechanics and not refunded to the contractor or subcontractors or their agents.

6.      40 U.S.C. § 3143 provides "Every contract within the scope of this subchapter shall contain a provision that if the contracting officer finds that any laborer or mechanic employed by the contractor or any subcontractor directly on the site of the work covered by the contract has been or is being paid a rate of wages less than the rate of wages required by the contract to be paid, the Federal Government by written notice to the contractor may terminate the contractor's right to proceed with the work or the part of the work as to which there has been a failure to pay the required wages. . . ."

7.      Under its express language, the DBA applies only to "mechanics and laborers employed directly on the site of the work." 40 U.S.C. §§3141-3148; §3142 (c)(1). This plain language is simple and unambiguous. Thus, under its terms, DBA applies only to mechanics and laborers, and only if they are "employed directly on the site of the work."

### 2.      DOL's Final Rule interpreting the Davis-Bacon Act.

8.      On March 18, 2022, the Department published a notice of proposed rulemaking (NPRM), 87 FR 15698, proposing to update and modernize the regulations at 29 CFR parts 1, 3, and 5, which implement the Davis-Bacon Act (DBA) and the Davis-Bacon Related Acts (collectively, the DBRA).  The proposed rule contained several significant changes to existing regulations concerning how the DOL applies and enforces the DBA and DBRA.

9.      DOL published its Final Rule on August 23, 2023.  It became effective on October 23, 2023.  DOL'S Final Rule applies to new contracts that are entered into after October 23, 2023, and to a narrow subset of existing contracts (contracts entered into prior to October 23, 2023).The Final Rule contains significant changes having far-reaching effects on local, state, and federal

contractors and other construction businesses. In pertinent part for purposes of this case, the Final Rule amends the DBA by imposing a stealth self-implementing DBA requirement into contracts by an operation-of-law provision that contradicts the express statutory language of the Act. Further, the Final Rule amends the Act to extend the DBA to apply to workers who are not mechanics and laborers, and to extend the scope of the work covered by DBA to include work that is not performed "directly on the site of the work."

10.     DOL's Final Rule constitutes final agency action.

11.     Section 5.5(e) of the Final Rule provides that the labor standards contract clauses and appropriate wage determinations are effective "by operation of law" and considered to be incorporated even when they have been wrongly omitted from a covered contract. *See* 29 CFR §§ 5.5(e), 88 Fed. Reg. 57739.

12.     The Final Rule does not require the DOL or any other federal administrative body to make a determination of the application of the DBA to the contract.

13.     The Final Rule purports to codify the DOL's long-standing subregulatory guidance that the DBA and the vast majority of Related Acts entirely exclude from coverage bona fide "material suppliers." The Final Rule does so by defining the term "material supplier" and amending the regulatory definitions of contract and contractor to exclude material suppliers from their scope. *See* Section 5.2, 88 Fed Reg. 57731-57734.

14.     The Final Rule further explains that if an entity engages in any construction, alteration, completion, or repair work that is not incidental to material supply at the site of the work, it is now a contractor or subcontractor, not a material supplier, and must follow DBA's requirements. *See* Section 5.2, 88 Fed. Reg. 57733, [emphasis supplied]. In such a case, workers' time at the site of the work would be covered by the DBA, subject to a *de minimis* exception. This

regulation eliminates a 20-percent threshold for material suppliers that had been set out previously in subregulatory guidance, including WHD's Field Operations Handbook ("FOH").

15.     The Final Rule articulates the circumstances under which onsite activities essential or incidental to offsite transportation (e.g., pickup, dropoff, loading of materials and waiting time) by employees of contractors or subcontractors is covered.  Specifically, the Final Rule considers "covered transportation," to also include "[o]nsite activities essential or incidental to offsite transportation, defined as activities conducted by a truck driver or truck driver's assistant on the site of the work that are essential or incidental to the transportation of materials or supplies to or from the site of the work, such as loading, unloading, or waiting for materials to be loaded or unloaded, but only where the driver or driver's assistant's time spent on the site of the work is not de minimis." *See* 29 CFR 5.2, 88 Fed. Reg. 57732.

### 3.     Plaintiffs' standing

16.     "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977).  Plaintiffs AGC of America, AGC of Texas, and Lubbock Chamber have standing to bring this litigation on behalf of their members.

17.     Plaintiff J. Lee Milligan, Inc. has standing to bring this litigation.

### 4.     Evidence outside the administrative record

18.     This Court may receive and consider evidence outside of the administrative record relating to Plaintiffs' motion for a preliminary injunction. This Court has explained:

17

19.     A court may . . . elect to allow extra-record evidence to determine whether an agency's final action meets the test of rationality under the following circumstances:

    1.    when agency action is not adequately explained in the record before the court;

    **2.**    **when the agency failed to consider factors which are relevant to its final decision;**

    3.    when an agency considered evidence which it failed to include in the record;

    **4.**    **when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;**

    **5.**    **in cases where evidence arising after the agency action shows whether the decision was correct or not;**

    6.    in cases where agencies are sued for a failure to take action;

    7.    in cases arising under NEPA; and

    **8.**    **in cases where relief is at issue, especially at the preliminary injunction stage.**

*Davis Mts. Trans-Pecos Heritage Ass'n v. United States Air Force*, 249 F. Supp. 2d 763, 776 (N.D. Tex. 2003) (citation omitted; emphasis added), *vacated sub nom. on other grounds, Davis Mountains Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin.*, 116 F. App'x. 3 (5th Cir. 2004). Numerous of these factors apply in this case.[1]

---

[1] The Fifth Circuit has referred to a three-factor test for considering materials outside of the administrative record. In *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010), the Court explained supplementation of the administrative record is appropriate where "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, ... (2) the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review." Courts within the Fifth Circuit have concluded that "[m]ost, and perhaps all, of the eight *Davis Mountains* exceptions fit within the three broader categories in *Medina.*" and "it does not seem that there will often be a significant practical distinction between the eight exceptions listed in *Davis Mountains* and the three listed in *Medina.*" *Gulf Coast Rod Reel & Gun Club, Inc. v. U.S.*

20.     As explained below, to obtain a preliminary injunction, Plaintiffs must demonstrate (1) a substantial likelihood of success on the merits of their case; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any damage that the injunctive order might cause the Defendants; and (4) that the order will not be adverse to the public interest. *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). "The four prerequisites for preliminary injunctive relief are mixed questions of fact and law." *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984).

21.     As noted in *Davis Mountains*, the consideration of evidence outside of the administrative record is appropriate "in cases where relief is at issue, especially at the preliminary injunction stage." 249 F. Supp. 2d at 776. Indeed, at the preliminary injunction stage, it is necessary to consider evidence concerning, for example, the substantial threat of irreparable harm, the balance of hardships, and the impact on the public interest at stake. DOL has not shown that its administrative record could possibly contain evidence on these issues, which the Court must consider in determining whether to grant preliminary injunctive relief.

22.     Additionally, Plaintiffs allege claims outside the Administrative Procedures Act ("APA"). Specifically, Plaintiffs challenge the Final Rule based on violations of Article 1, section 1 and Article II, section 3, of the United States Constitution, that Sections 5.2 and 5.5(e) of the Final Rule are contrary to constitutional right, because Defendants, who are members of the Executive Branch, engaged in prohibited legislative activity. Defendants did not merely interpret or administer the statute that Congress enacted. Instead, they created substantive requirements wholly

---

*Army Corps of Engineers*, No. 3:13-CV-126, 2015 WL 1883522, at *3 (S.D. Tex. Apr. 20, 2015). *See also La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, No. B:08-487, 2011 U.S. Dist. LEXIS 33615, 2011 WL 1230099, at *9 (S.D. Tex. Mar. 30, 2011) (same)

untethered to the statutory text. They accomplished this through and by the means of issuing ambiguous regulations, 29 C.F.R. §§ 5.2 and 5.5(e).

23.     By engaging in legislative activity from the Executive Branch, Defendants violated Article I, section 1 and the separation of powers required therein.

24.     By engaging in legislative activity from the Executive Branch, Defendants violated Article II, section 3 (the "Take Care Clause"), by failing to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

25.     Plaintiffs also assert a challenge under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601.   Based on these constitutional and RFA challenges, consideration of extra-administrative record evidence is appropriate.

26.     Moreover, extra-record evidence may be admitted "to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors." *Medina Cty.*, 602 F.3d at 706; *see also Davis Mts.*, 249 F. Supp. 2d at 776 (exceptions to "record rule" appropriate "when the agency failed to consider factors which are relevant to its final decision," "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly," "in cases where evidence arising after the agency action shows whether the decision was correct or not," and "in cases where relief is at issue, especially at the preliminary injunction stage.").

27.     Finally, Plaintiffs allege that DOL's challenged Final Rule provisions also violate the APA because it is arbitrary, capricious, and an abuse of discretion pursuant to 5 U.S.C. § 706(2)(A).

28.     Plaintiffs have presented evidence showing, among other facts, that:

•         The DOL's operation of law provision creates undue uncertainty for bidders on competitively bid contracts, as to what the contract terms are and whether the DBA requirements apply, which invariably leads to discrepancies in bid submissions among contractors that interpret the potential application of the DBA differently.  This is particularly a real-world concern as demonstrated by state and local public agencies that receive federal funds triggering the DBA requirements but fail to include the DBA requirements in the contract documents, causing the contractor expense and time to ensure compliance by the contractor and subcontractors with the DBA after the project is completed. Tr. (Christianson) at p. 15, line 13 – p. 19, line 19; Tr. (Tabeling) at p. 42, line 12 – p. 45, line 22 and p. 47, line 22 – 52, line 11; Tr. (Waltersheid) at p. 57, line 5 to p. 59, line 14; Tr. (Ramage) at p. 69, line 21 – p. 70, line 12 and p. 72, line 6 – p. 74, line 20; Tr. (Chambers) at p. 94, line 6 – p. 95, line 9 and p. 96, line 18 – p. 100, line 7.

•         The DOL's material supplier provision, as a practical matter, arbitrarily punishes those contractors that also maintain commercial material supplier operations by making it a competitive disadvantage to them to use their own material supplier services, since such delivery drivers will be subject to the DBA, including its administrative and wage requirements, while delivery drivers employed by other commercial delivery services are not subject to the DBA requirements, even though the work performed by the driver is the same work in each case. Tr. (Christianson) at p. 20, line 21 - p. 21, line 8; Tr. (Waltersheid) at p. 60, line 20 - p. 62, line 4; Tr. (Ramage) at p. 74, line 24 – p. 77, line 16.

•         The DOL's trucking provision is arbitrary and capricious insofar as it places the contractor in the Hobson's choice of either (1) treating all time spent on-site by drivers performing delivery services as compensable time under the DBA and maintaining and submitting certified payroll records for such workers, thereby ensuring DBA compliance, but also increasing labor

21

costs which may materially impact success on competitively bid contracts, or (2) ascertaining what constitutes *de minimis time*, which remains undefined by the DOL, and determining when the driver's time on the site, aggregated over the day or workweek, exceeds a *de minimis* period of time. Tr. (Ramage) at p. 77, line 12 – p. 79, line 14.

29.     This type of evidence is properly considered by the Court "to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors." *Medina Cty.*, 602 F.3d at 706; *see also Davis Mts.*, 249 F. Supp. 2d at 776.

**B.      Plaintiffs are entitled to a preliminary injunction.**

30.     Plaintiffs are entitled to injunctive relief.

31.     To secure a preliminary injunction, Plaintiffs must demonstrate (1) a substantial likelihood of success on the merits of their case; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any damage that the injunctive order might cause the Defendants; and (4) that the order will not be adverse to the public interest. *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Dallas Cowboys Cheerleaders v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir. 1979); *Barton v. Huerta*, 2014 WL 4088582, at *1 (N.D. Tex. 2014), *aff'd*, 613 F. App'x 426 (5th Cir. 2015).

32.     To preserve the status quo, federal courts regularly enjoin federal agencies, including DOL, from implementing and enforcing new regulations pending litigation challenging them. *See, e.g.*, *National Federation of Independent Business v. Perez*, 2016 WL 3766121 at *46 (N.D. Tex. 2016) (granting plaintiffs' application for preliminary injunction enjoining on a national basis DOL from implementing DOL's Persuader Advice Exemption Rule "pending a final resolution of the merits"); *Texas v. United States*, 95 F. Supp. 3d 965, 983 (N.D. Tex. 2015) (granting plaintiffs' application for preliminary injunction and enjoining DOL from applying a

22

new rule "pending a full determination of this matter on the merits"); *Bayou Lawn & Landscape Servs. v. Oates*, 713 F.3d 1080, 1083, 1085 (11th Cir. 2013) (affirming district court order granting a preliminary injunction prohibiting DOL's enforcement of certain rules during the pendency of action).

### 1.   Plaintiffs have shown a substantial likelihood of success on the merits.

33.   Plaintiffs are substantially likely to succeed on their claims.

### a.   Plaintiffs will likely succeed on their claim that DOL lacks statutory authority to promulgate and enforce the challenged Final Rule provisions.

34.   The Court finds that Plaintiffs are likely to succeed on their claim that challenged Final Rule provisions exceed DOL's authority under the DBA.

35.   "An agency must interpret its implementing legislation in a reasonable manner and may not make findings or promulgate regulations in a manner that is arbitrary or capricious in substance, or manifestly contrary to the statute." *Highland Med. Ctr. v. Leavitt*, No. 5:06-cv-082-C, 2007 WL 5434880, at \*3 (N.D. Tex. 2007) (quoting *Clark Reg'l Med. Ctr. v. United States HHS*, 314 F.3d 241, 244 (6th Cir. 2002)).

36.   When reviewing an agency's construction of a statute under the APA, courts apply the two-step analysis established by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984). Under step one, where "Congress has directly spoken to the precise question at issue," courts must "give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. Courts "must reject administrative constructions which are contrary to clear congressional intent." *Highland Med. Ctr.,* 2007 WL 5434880, at \*3 (internal quotation marks omitted). On the other hand, "if Congress' intent is unclear, the court must determine whether the agency's construction is based upon a permissible construction of the statute." *Id.* (internal

quotation marks omitted). Pursuant to the APA, courts must "hold unlawful and set aside an action by an agency that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Odessa Reg'l Hosp. v. Leavitt,* 386 F. Supp. 2d 885, 890 (W.D. Tex. 2005) (quoting *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504 (1994)) (internal quotation marks omitted); 5 U.S.C. § 706(2)(A).

37.     The challenged Final Rule provisions must be set aside because DOL "exercise[d] its authority in a manner inconsistent with the administrative structure that Congress enacted into law." *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 91 (2002)  (internal citation and quotation omitted)

38.     Under *Chevron* step 1, where statutory language has a "plain and unambiguous meaning," the court need look no further. *United States v. Kay,* 359 F.3d 738, 742 (5th Cir. 2004). "If the intent of Congress is clear,-that is, the statute is unambiguous with respect to the question presented—the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Khalid v. Holder,* 655 F.3d 363, 366 (5th Cir. 2011) (internal quotation marks omitted) (quoting *Chevron,* 467 U.S. at 842–43), *abrogated on other grounds by Scialabba v. Cuellar de Osorio,* 573 U.S. 41 (2014).

39.     Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose. *Thompson v. Goetzmann,* 337 F.3d 489, 498 n.19 (5th Cir. 2003) (citing *INS v. Phinpathya,* 464 U.S. 183, 189 (1984) (noting that "in all cases involving statutory construction, our starting point must be the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used")); *Caminetti v. United States,* 242 U.S. 470, 486 (1917) ("Statutory words are uniformly presumed, unless the contrary

24

appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them."); *White v. Black,* 190 F.3d 366, 368 (5th Cir. 1999) ("The canons of statutory construction dictate that when construing a statute, the court should give words their ordinary meaning and should not render as meaningless the language of the statute."). As the Supreme Court has explained, "[c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992). Indeed, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Id.* (citation and quotation omitted). *See also Thompson,* 337 F.3d at 497 (applying *Chevron,* court declined to consider legislative history where the statute was clear on its face, noting "we decline to find ambiguity where none exists").

40.     None of the challenged Final Rule provisions pass step 1 of the *Chevron* analysis. Each violates the APA because it is "in excess of the statutory jurisdiction, authority, or limitations, or short of statutory right[s]." 5 U.S.C. § 706(2)(C).

41.     The Court finds that Plaintiffs are likely to succeed on their claim that Section 5.5(e) of the Final Rule applying the DBA by operation of law contradicts the DBA.

42.     The DBA expressly requires that public federal bid advertisement specification and contracts contain specified provisions concerning the minimum wages to be paid to the laborers and mechanics employed directly on the site of the work by contractors and subcontractors. The wages to be paid must be "computed at wage rates not less than those stated in the advertised specifications." 40 U.S.C. § 3142(c)(1). Specifically, 40 U.S.C. § 3142(a) requires that: "The *advertised specifications* for every contract in excess of $2,000, to which the Federal Government or the District of Columbia is a party, for construction, alteration, or repair, including painting and decorating, of public buildings and public works of the Government or the

District of Columbia that are located in a State or the District of Columbia and which requires or involves the employment of mechanics or laborers *shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics.*" *See* 40 U.S.C. § 3142(a) (emphasis added).

43.  40 U.S.C. § 3142(c) provides that: "Every contract based upon the specifications referred to in subsection (a) must contain stipulations that: (1) the contractor or subcontractor shall pay all mechanics and laborers employed directly on the site of the work, unconditionally and at least once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and the laborers and mechanics; (2) the contractor will post the scale of wages to be paid in a prominent and easily accessible place at the site of the work; and (3) there may be withheld from the contractor so much of accrued payments as the contracting officer considers necessary to pay to laborers and mechanics employed by the contractor or any subcontractor on the work the difference between the rates of wages required by the contract to be paid laborers and mechanics on the work and the rates of wages received by the laborers and mechanics and not refunded to the contractor or subcontractors or their agents." *See* 40 U.S.C. § 3142(c).

44.  40 U.S.C. § 3143 provides: "Every contract within the scope of this subchapter shall contain a provision that if the contracting officer finds that any laborer or mechanic employed by the contractor or any subcontractor directly on the site of the work covered by the contract has been or is being paid a rate of wages less than the rate of wages required by the contract to be paid, the Federal Government by written notice to the contractor may terminate the contractor's right to

26

proceed with the work or the part of the work as to which there has been a failure to pay the required wages." *See* 40 U.S.C. § 3143.

45.     Defendants' reliance on application of the *Christian* doctrine to support the operation-of-law provision *See* Dkt. 27, at p. 16-18, *citing K-Con, Inc. v. Sec'y of Army,* 908 F.3d 719 (Fed. Cir. 2018) and *G.L. Christian & Assocs v. United States,* 312 F.2d 418 (Ct. Cl. 1963) is unavailing. Most significantly, the United States Supreme Court rejected application of the *Christian* doctrine to the DBA as "misplaced," noting that the DBA is "not self-implementing." *Univs. Research Ass'n v. Coutu,* 450 U.S. 754, 784 n. 38 (1981). The Armed Services Board of Contract Appeals has reached the same conclusion ("The Davis-Bacon Act is not self-implementing") in rejecting arguments that the DBA can be read into a contract under *Christian. BellSouth Commc'ns Sys., Inc.,* ASBCA No. 45955, 94-3 BCA ¶ 27,231 ("This is not a case where the Act was clearly applicable at time of award, and where the omission of the required clauses and wage determinations was a mere administrative oversight").

46.     DOL lacks authority under the DBA statute to impose section 5.5(e), as the statute explicitly requires the contracting agency to include the DBA requirements. Given this statutory language, DOL as a regulatory agency does not have the power to make any determination that the DBA requirements are applicable by operation of law, and that contractors are liable for violations, where not included by the contracting agency as requirements.

47.     Defendants engaged in egregious violations of Article II, section 3 of the Constitution, because rather than taking care to faithfully execute the DBA, Defendants instead usurped Congress' law-making power and attempted substantive amendments to the DBA. Presidents and their agencies act *ultra vires* and do violence to the Constitution when they attempt to unilaterally amend Acts of Congress to suit their policy choices. Under Article I, section 1 of

27

the Constitution, Presidents and their agencies cannot amend by executive fiat acts of Congress. Doing so violates the Constitution, and this preliminary injunction shall issue to prevent this blatantly unlawful action.

48.     The operation-of-law provisions do not give contractors sufficient notice of the applicability of DBA requirements, and this lack of notice is not consistent with basic contract and procedural due process principles. *See* 29 C.F.R. § 5.5(e); Final Rule, 88 Fed. Reg. at 57739.

49.     The Court finds that Plaintiffs are likely to succeed on their claim that the trucking provisions in Section 5.2 of the Final Rule applying the DBA to time spent by drivers on site contradicts the DBA.

50.     When enacting the DBA, Congress used precise language, and deemed that the DBA applies only to "mechanics and laborers employed directly on the site of the work." 40 U.S.C. §§ 3141-3148; § 3142 (c)(1). This plain language is simple and unambiguous. Under its terms, DBA applies only to mechanics and laborers, and only if they are "employed directly on the site of the work." *Id.*

51.     Expanding the DBA to apply to trucking impermissibly conflicts with the statute, which defines its coverage and is limited to "construction, alteration, or repair, including painting and decorating, of public buildings and public works . . . ." 40 U.S.C. § 3142(a). Truck drivers are not de facto "mechanics and laborers employed directly on the site of the work." *Id.* § 3142(c)(1). The DBA applies based on the nature of the function a worker performs, *i.e.*, whether the worker is performing duties of a laborer or mechanic on site as statutorily required.

52.     The amendment is neither a clarification nor an updating of the Act that a President or his agencies can lawfully undertake. It is a fundamental change to the Act by adding

28

"transportation" as a category of work covered by DBA, contrary to the congressional limitations of DBA to covering only mechanics and laborers employed directly on the site of work.

53.    The expansion is also inconsistent with the substantial body of case law interpreting the application of DBA to transportation drivers. *See Bldg. and Constr. Trades Dep't AFL-CIO v. United States Dep't of Lab. Wage Appeals Bd.,* 932 F.2d 985, 992 (D.C. Cir. 1991); *H. B. Zachary Co. v. U.S.,* 344 F.2d 352, 361 (Ct. Cl. 1965); *Ball, Ball & Brosamer, Inc. v. Reich,* 24 F.3d 1447, 1453 (D.C. Cir. 1994); *L.P. Cavett Co. v. United States Dep't of Lab.,* 101 F.3d 1111, 1112 (6th Cir. 1996)*; Frank Bros. v. Wisconsin Dep't of Transp.,* 409 F.3d 880, 882–83 (7th Cir. 2005)*.*

54.    In *Midway*, the court concluded that material transportation drivers were not covered under the DBA because Congress intended that the location of an employee's job was determinative of the DBA's coverage, and that the DBA "covers only mechanics and laborers who work *on the site* of the federally-funded public building or public work, not mechanics and laborers employed *off-site*, such as suppliers, materialmen, and material delivery truckdrivers." *Midway*, 344 F.2d at 992. The court also concluded that "Material delivery truck drivers who come onto the site of the work merely to drop off construction materials are not covered by the Act *even if they are employed by the government contractor*." *Id.* (emphasis added).  In assessing the truck driver provision at issue, it is necessary to consider the statute's language "directly on the site of the work" in relation to the long-recognized material transportation exclusion. The essence of the material delivery exemption is the *function* that is being performed. *See Midway,* 932 F.2d 985. That function is not a "construction" one within the meaning of the DBA.

29

55.     The Court finds that Plaintiffs are likely to succeed on their claim that the material supplier provisions in Section 5.2 of the Final Rule provision applying the DBA to material suppliers operated by contractors or subcontractors contradicts the DBA.

56.     The DBA applies only to "all mechanics and laborers employed directly on the site of the work." *See* 40 U.S.C. §§ 3142(a) and (c). The Final Rule purports to codify DOL's long-standing subregulatory guidance that the DBA and the vast majority of DBA Related Acts entirely exclude from coverage bona fide "material suppliers." The Final Rule does so by defining the term "material supplier" and amending the regulatory definitions of contract and contractor to exclude material suppliers from their scope. *See* 29 C.F.R. § 5.2; Final Rule, 88 Fed. Reg. at 57731-34

57.     However, the Final Rule's application of the DBA to material suppliers that are operated by contractors or subcontractors ignores the statutory language of the DBA, essentially determining that a bona fide material supplier will be considered covered by the DBA based simply upon its connection to a contractor or subcontractor. The Final Rule in this regard amounts to a fundamental amendment to the DBA, and one which would reclassify employees of bona fide material suppliers as "mechanics and laborers," in a manner clearly contrary to the plain language of the DBA.

58.     The Final Rule arbitrarily and capriciously  discriminates against those bona fide material suppliers that meet the elements of the material supplier exception with respect to such workers who also operate on the contract as contractors employing workers on the project who are performing construction work and accordingly, are laborers or mechanics. If two material suppliers were performing the exact same type of material supply services, yet one company also employed some workers who were performing construction work, the one performing construction work would be at a competitive disadvantage because it would necessary be required to treat its workers

performing bona fide material supply duties as laborers or mechanics and pay them prevailing wages, whereas the pure material supplier does not have such burdens. This is not consistent with the Act, or the principles set forth in *Midway.*

> **b.     Plaintiffs will likely succeed on their claim that DOL's new Advice Exemption Interpretation violates the Regulatory Flexibility Act (RFA).**

59.     Plaintiffs have also shown a substantial likelihood of success on their claim that DOL's new Final Rule violates the RFA.

60.     The RFA imposes a procedural requirement on agencies to engage in a "'reasonable, good-faith effort'" to carry out the statute's mandate. *U.S. Cellular Corp. v. FCC,* 254 F.3d 78, 88 (D.C. Cir. 2001). The RFA requires a court to consider "the regulatory flexibility analysis as part of its overall judgment whether a rule is reasonable," and a court "may, in an appropriate case, strike down a rule because of a defect in the flexibility analysis." *Transmission Access Policy Study Grp. v. FERC,* 225 F.3d 667, 737-38 (D.C. Cir. 2000); *see also Nat'l Tel. Co-op. Ass'n v. FCC,* 563 F.3d 536, 540 (D.C. Cir. 2009) ("A regulatory flexibility analysis is, for APA purposes, part of an agency's explanation for its rule."); 5 U.S.C. § 611(a)(2) (vesting the court with jurisdiction to review an agency's compliance with 5 U.S.C. § 604). In particular, DOL must ensure that the Final Rule addresses the costs imposed on the numerous small businesses directly impacted by the Final Rule. *Nat'l Tel. Co-op.,* 563 F.3d at 540 (RFA "makes the interests of small businesses a 'relevant factor'" and the APA together with the RFA requires "that a rule's impact on small businesses be reasonable and reasonably explained").

61.     Agencies must also respond to any concerns raised by the Small Business Administration ("SBA") through its office of Advocacy. *Id.* § 604(a)(3). Courts have found regulations invalid under the RFA where a federal agency's final regulatory flexibility analysis,

along with the rest of the record, demonstrates that the rule constitutes such an unreasonable assessment of burdens and benefits imposed upon small business as to be arbitrary and capricious. *See Thompson v. Clark,* 741 F.2d 401, 405 (D.C. Cir. 1984). *See also, National Federal of Independent Business v. Perez,* No. 5:16-CV-00066-C, 2016 WL 3766121, at *38 (N.D. Tex. June 27, 2016). The FAC alleges an unreasonable assessment of burdens which is arbitrary and capricious to small businesses. FAC ¶¶ 12, 82-88.

62.     Under the RFA, DOL is required to provide a "statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(a)(6).

63.     Defendants did not challenge Plaintiffs' evidence that although a contractor might be later reimbursed for the cost of paying a prevailing wage, there are significant administrative costs in complying with the record keeping obligations under the DBA, including producing certified wage reports. These costs are compounded if a contractor has to attempt to recreate such reports after the fact. Defendants' failure to even acknowledge these unreimbursed costs in the Final Rule makes it invalid under the RFA.

64.     Similarly, Defendants did not consider the additional interest costs that contractors would have to pay on restitution wages. This is a cost that would be improperly borne by the contractors and not accounted for by Defendants in the Final Rule. Failure to consider this significant cost also violates the RFA.

65.     Significant issues raised by public comment, including those filed by the Chief Counsel for Advocacy of the SBA, commented that DOL's initial regulatory flexibility analysis did not properly inform the public about the impact of this rule on small entities. 88 Fed Reg.

57717.  SBA and the other commentators correctly asserted that DOL should have estimated the compliance costs of expanding DBRA coverage to new industries, and state that the proposed rule expands coverage to prefabrication companies, material suppliers, and truck drivers, professional surveyors, and additional small businesses.  *Id.*

66.   In response to these challenges under the RFA, Defendants falsely contended that "the final rule does not expand coverage to material suppliers or truck drivers but rather codifies existing policy with minor changes" 88 Fed Reg. 57717, and that therefore a compliance cost analysis was not required under the RFA.  Furthermore, Defendants admitted that "the Department cannot estimate the precise number of small entities that will be impacted by this change . . . ."  *Id.*  Plaintiffs noted that in the Preamble to the Final Rule, Defendants did not conduct an analysis of compliance costs for the materials supply and trucking provisions, claiming it was too small of a number for them to attempt the analysis.  Tr. (Christianson) at pg. 22, line 15 – pg. 23, line 10.  *See also* 88 Fed Reg. 57717.[2]  Plaintiffs adduced evidence that these changes in the Final Rule are in fact broad substantive changes to the DBA that will affect large numbers of contractors across the country.  Tr. (Christianson) pg. 22, line 15 – page 23, line 10, and (Ramage) pg. 78, line 18-pg. 79, line 6.

67.   Thus, Defendants summarily and incorrectly concluded that the Department does not anticipate that it will substantially broaden coverage to entities not previously covered.  Because Defendants (1) incorrectly assumed that the Final Rule did not expand coverage of

---

[2] "SBA Advocacy commented that DOL's Initial Regulatory Flexibility Analysis did not properly inform the public about the impact of this rule on small entities. They asserted that DOL should have estimated the compliance costs of expanding DBRA coverage to new industries and state that the proposed rule expands coverage to prefabrication companies, material suppliers, and truck drivers . . . ."  88 FR 57717 (Aug. 23, 2023).

DOL explains that it "does not anticipate that the [material supplier and truck driver changes] will substantially broaden coverage to entities not previously covered" as the reason why the Department did not conduct proper economic analysis under the RFA. *Id.*

workers under the DBA; (2) failed to perform the required compliance cost analysis pertaining to this expanded class of workers; and (3) failed to even attempt to estimate the number of small entities that will be impacted by these changes, the Final Rule violates the RFA.

### 2. Plaintiffs have shown a substantial threat of irreparable harm.

23.     Plaintiffs would suffer irreparable harm in the absence of injunctive relief.

24.     An irreparable injury is one which cannot be remedied by an award of economic damages. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). It is "a fundamental principle of preliminary injunctions" that "[a]n injunction is of no help if one must wait to suffer injury before the court grants it." *Texas v. U.S.*, 809 F.3d at 173 n.137. "Under our precedent, the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Restaurant Law Center v. United States Dep't of Lab.,* 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted). Indeed, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA,* 829 F.3d 405, 433 (5th Cir. 2016) (emphasis in original) (citation omitted). This is because sovereign immunity bars any future action to recover these costs from the Government. *Wages and White Lion Investments, L.L. C. v. United States Food and Drug Admin.,* 16 F.4th 1130, 1142 (5th Cir. 2021). The economic loss or harm must be "more than de minimis," but "it is not so much the magnitude but the irreparability that counts." *Louisiana v. Biden,* 55 F.4th 1017, 1035 (5th Cir. 2022).

25.     Here, Plaintiffs have shown there is a substantial threat that challenged Final Rule provisions will cause irreparable harms to them, their members, and other contractors.

26.     Plaintiffs have shown that the Final Rule's operation-of-law provision causes a substantial threat irreparable harm to contractors due to the uncertainty caused to the competitive

34

bidding and contracting process. Plaintiffs have shown that as a result of the proliferation of new federal funding programs, state and local government programs not accustomed to federal contracting practices are failing to include the DBA provisions in federally funded contracts. As a result, several Plaintiff members have been subjected to administrative expense and time to issue restitution to affected workers, complete and submit certified payroll records, and ensure compliance by subcontractors. In such circumstances where the bid specifications and contracts fail to include the DBA requirements, and contractors are required to otherwise comply with the DBA due to the operation-of-law provisions, prime contractors and contractors are subject to significant consequences where they are unable to demonstrate compliance by themselves and their subcontractors. As Plaintiffs have shown, it can be almost impossible to ensure full compliance with the DBA once the workers and subcontractors have completed their work on the project. Plaintiffs can also be subject to the imminent and irreparable harm of debarment from participating in federal contracting in the future if they err in meeting these newly heightened requirements under the Final Rule.

27. Plaintiffs have shown that the Final Rule's material supplier provisions cause a substantial threat of irreparable harm to Plaintiffs member contractors with material supply operations, because such contractors are at a competitive disadvantaged with other competing contractors that do not have their own material supply operations because they must pay and administer the DBA requirements where they use their own material supply operations on their projects.

28. Plaintiffs have shown that the Final Rule's on-site trucking provisions causes a substantial threat of irreparable harm to Plaintiff members because, due to the uncertainty of what constitutes *de minimis time*, they must pay the drivers the applicable DBA wage rates and complete

certified payrolls records for the entire time for the entire time the driver is on-site in order to assure compliance. Plaintiffs have shown that this increases bids, and with the thin margins in the construction industry, those costs can be the difference between winning a bid and not.

29.    For all these reasons, Plaintiffs have shown a substantial threat of irreparable harm.

### 3.    The balance of hardships weighs in Plaintiffs' favor.

30.    The threatened injury to Plaintiffs outweighs any threatened harm to DOL. The threatened injury to Plaintiffs as set forth above is substantial, including the burdening of constitutional rights.

31.    On the other hand, DOL has shown no harm from enjoining the challenged provisions.

### 4.    The issuance of the preliminary injunction will not disserve the public interest.

32.    For all the reasons set forth above, a preliminary injunction would serve the public interests.

### C.    A nationwide injunction is appropriate.

33.    This Court has jurisdiction to grant injunctive relief under Fed. R. Civ. P. 65. This Court has jurisdiction to enter an injunction against Defendants on a nationwide basis. *See Texas*, 809 F.3d at 188 ("[T]he Constitution vests the District Court with 'the judicial power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction")

34.    The Fifth Circuit has noted that "determining the scope of injunctive relief is better suited to the district court in the first instance." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the

geographic extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). "[T]he Constitution vests the District Court with the 'judicial Power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas*, 809 F.3d at 188 (citations omitted). Such circumstances justifying nationwide injunctive relief include a constitutional uniformity principle or "concern that patchwork rulings would undermine an injunction limited to certain jurisdictions." *Louisiana v. Becerra*, 20 F.4d 260, 264 (5th Cir. 2021).

35.     The Fifth Circuit has affirmed nationwide injunctions against the Federal Government in similar proceedings. *See, e.g.*, *Texas*, 809 F.3d at 188. *See also Nevada v. United States Dep't of Lab.*, 218 F. Supp. 3d 520, 533-34 (E.D. Tex. 2016) (issuing a nationwide injunction to bar implementation of the Department's new overtime salary threshold final rule). Thus, in order to truly afford injunctive relief to Plaintiffs, the Court should issue an injunction with nationwide applicability.

36.     Plaintiffs have shown that a nationwide injunction is appropriate.

37.     First, a nationwide injunction is proper because this case presents a facial challenge that maintains DOL's challenged Final Rule provisions are invalid because, among other reasons, they are inconsistent with the DBA and exceed the DOL's authority. Where a party brings a facial challenge alleging that agency action violated APA procedures, a nationwide injunction is appropriate. *See, e.g., Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407-08, 1409 (D.C. Cir. 1998) (invalidating rule and enjoining Army Corps from nationwide application); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed.").

38.     In addition, Plaintiff AGC of America has shown that it is a nationwide organization which has members in all 50 states and Washington D.C. and Puerto Rico. Tr. (Christianson) at p. 10, lines 6-9. AGC of America's members would be subject to DOL's challenged Final Rule provisions in every jurisdiction.  Given the breadth of AGC's membership and the fact that the Final Rule applies to impacted members located all over the country, limiting the relief to only those before the Court would prove unwieldly and would only cause more confusion.

39.     Because the scope of the irreparable injury is national, and because the DOL's challenged Final Rule provisions are facially invalid, the injunction should be nationwide in scope.

40.     To the extent any of the foregoing Conclusions of Law should more properly be denominated as Findings of Fact, they are hereby deemed to be such.

### PRELIMINARY INJUNCTIVE RELIEF

Based upon the foregoing Findings of Fact and Conclusions of Law, and the Court having found that Plaintiffs have satisfied all the necessary elements to maintain a lawsuit and to obtain a Preliminary Injunction, the Court hereby grants Plaintiffs' Motion for Preliminary Injunction. The United States Department of Labor, its agencies, officers, agents and employees, including Julie Su, Acting Secretary of the United States Department of Labor, are hereby enjoined on a national basis from implementing and enforcing:

- § 5.2 (specifically the definition of "*Construction, prosecution, completion, or repair*" set forth at subsection (iv)(D) and which provides ["Covered Transportation," defined as any of the following activities:] "Onsite activities essential or incidental to offsite transportation,'' defined as activities conducted by a truck driver or truck driver's assistant on the site of the work that are essential or incidental to the transportation of materials or supplies to or from the site of the work, such as loading, unloading, or

38

waiting for materials to be loaded or unloaded, but only where the driver or driver's assistant's time spent on the site of the work is not de minimis."[3])

- § 5.2 (specifically the definition of "Material supplier" set forth at subsection (2) which provides "If an entity, in addition to being engaged in the activities specified in paragraph (1)(i) of this definition, also engages in other construction, prosecution, completion, or repair work at the site of the work, it is not a material supplier."[4]); and

- § 5.5(e), (which provides "*Incorporation by operation of law.* The contract clauses set forth in this section (or their equivalent under the Federal Acquisition Regulation), along with the correct wage determinations, will be considered to be a part of every prime contract required by the applicable statutes referenced by § 5.1 to include such clauses, and will be effective by operation of law, whether or not they are included or incorporated by reference into such contract, unless the Administrator grants a variance, tolerance, or exemption from the application of this paragraph. Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, the prime contractor must be compensated for any resulting increase in wages in accordance with applicable law.")

of its "Updating the Davis-Bacon and Related Acts Regulations" published August 23, 2023, 88 Fed. Reg. 57526 *et seq.*, pending a final resolution of the merits of this case or until a further order of this Court, the United States Court of Appeals for the Fifth Circuit or the United States Supreme Court. The scope of this injunction is nationwide.

The Court has considered the issue of security per Rule 65(c) of the Federal Civil Rules of Procedure. It finds that the Defendants will not suffer any financial loss that warrants the need for

---

[3] 88 Fed. Reg. 57732.
[4] 88 Fed. Reg. 57733.

the Plaintiffs to post security. The Fifth Circuit has held that a district court has the discretion to "require no security at all" and the Court hereby exercises that authority based upon the facts and circumstances of the case, the issues being decided and the parties involved. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996); *see also Corrigan Dispatch Co. v. Casa Guzman, SA.*, 569 F.2d 300 (5th Cir. 1978); Wright & Miller, *Federal Practice and Procedure, § 2954*. Because there is no realistic likelihood of harm to Defendants from granting a preliminary injunction in this case, a security bond is not required.

**SO ORDERED.**

Dated this 24th day of June, 2024.

SAM R. CUMMINGS
SENIOR UNITED STATES DISTRICT JUDGE