**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| ASSOCIATED GENERAL CONTRACTORS OF AMERICA, *et al.*, | Case No. 5:23-cv-00272-H |
| Plaintiffs, | Judge James Wesley Hendrix |
| v. | |
| U.S. DEPARTMENT OF LABOR, *et al.*, | |
| Defendants. | |

**DEFENDANTS' BRIEF IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND**
**IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

I.     Statutory Background ..............................................................................................2

II.    Regulatory Background ...........................................................................................3

III.   The 2022 Proposed Rule and 2023 Final Rule .......................................................4

IV.    This Lawsuit .............................................................................................................5

LEGAL STANDARD ..........................................................................................................5

ARGUMENT .......................................................................................................................7

I.     The truck driver regulation falls within DOL's statutory authority to issue reasonable regulations and is not arbitrary or capricious. .........................................7

       A.     The truck driver regulation implements the plain language of the statute. ..................7

       B.     The truck driver regulation does not conflict with case law. ........................................10

II.    The material supplier regulation is reasonable and within DOL's authority and not arbitrary or capricious. ...............................................................................................11

III.   Summary judgment should be granted to Defendants on Plaintiffs' challenge to the secondary construction sites regulation. ...........................................................16

IV.    DOL has statutory authority to promulgate the operation-of-law regulation ............18

V.     DOL complied with the Regulatory Flexibility Act. ...............................................23

VI.    Plaintiffs' constitutional claim is duplicative of their exceeds-statutory authority claim. .......................................................................................................................27

VII.   Plaintiffs did not bring any Appointments Clause challenge. ...................................28

VIII.  Any relief should be appropriately limited. ...............................................................28

       A.     The Rule's various regulations are severable ...............................................................28

       B.     Plaintiffs have not demonstrated entitlement to injunctive relief or vacatur ..............29

       C.     Any relief should be limited to the parties. ..................................................................30

CONCLUSION ...................................................................................................................31

i

# TABLE OF AUTHORITIES

## CASES

*Aetna Cas. & Sur. Co. v. United States,*
  382 F.2d 615 (5th Cir. 1967) ................................................................................................13

*Alenco Commc'ns, Inc. v. FCC,*
  201 F.3d 608 (5th Cir. 2000) ...............................................................................................23

*Allen v. Hous. Indep. Sch. Dist.,*
  689 F. App'x 238 (5th Cir. 2017) .........................................................................................20

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ..............................................................................................6

*Architectural Granite & Marble, LLC v. Pental,*
  2023 WL 121996 (N.D. Tex. Jan. 6, 2023) ....................................................................20, 28

*Associated Gen. Contractors of Am. (AGC) v. DOL,*
  No. 5:23-CV-0272-C, 2024 WL 3635540 (N.D. Tex. June 24, 2024),
  *appeal filed*, No. 24-10790 (5th Cir. Aug. 28, 2024) ................................................*passim*

*Ball, Ball & Brosamer, Inc. v. Reich,*
  24 F.3d 1447 (D.C. Cir. 1994) ..............................................................................................10

*BUI Constr. Co. & Bldg. Supply,*
  ASBCA No. 28707, 84–1 B.C.A. ¶ 17,183, 1984 WL 13235 ...............................................22

*Building & Construction Trades Department, AFL-CIO v. DOL Wage Appeals Board (Midway),*
  932 F.2d 985 (D.C. Cir. 1991) ..............................................................................................10

*Call Henry, Inc. v. United States,*
  855 F.3d 1348 (Fed. Cir. 2017) .............................................................................................19

*Camp v. Pitts,*
  411 U.S. 138 (1973) .................................................................................................................6

*Caradelis v. Refineria Pan., S.A.,*
  384 F.2d 589 (5th Cir. 1967) ................................................................................................20

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) ....................................................30

*Cent. & S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) ................................................................................................30

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ............................................................................................6

*Clifford F. MacEvoy Co. v. United States*,
322 U.S. 102 (1944) ..........................................................................................11

*Data Mkg. P'ship, LP v. DOL*,
45 F.4th 846 (5th Cir. 2022) .............................................................................30

*eBay Inc. v. MercExchange*,
547 U.S. 388 (2006) ..........................................................................................29

*F.D. Rich Co. v. United States*,
417 U.S. 116 (1974) ..........................................................................................13

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .....................................................................................6, 25

*Franciscan All., Inc. v. Azar*,
414 F. Supp. 3d 928 (N.D. Tex. 2019) ..............................................................29

*Frank Bros., Inc. v. Wisconsin Department of Transportation*,
409 F.3d 880 (7th Cir. 2005) .............................................................................10

*G.L. Christian & Assocs. v. United States*,
312 F.2d 418 (Ct. Cl. 1963) ..............................................................................19

*Garcia for Cong. v. Fed. Election Comm'n*,
22 F. Supp. 3d 655 (N.D. Tex. 2014) ..................................................................7

*Gill v. Whitford*,
585 U.S. 48 (2018) ......................................................................................28, 30

*Grocery Servs., Inc. v. USDA Food & Nutrition Serv.*,
Civ. Action No. H-06-2354, 2007 WL 2872876 (S.D. Tex. Sept. 27, 2007)......24

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ..........................................................................................30

*H.B. Zachry Co. v. United States*,
344 F.2d 352 (Ct. Cl. 1965) ..............................................................................12

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) ..........................................................................................31

*Holy Trinity Church v. United States*,
143 U.S. 457 (1892) ............................................................................................9

*In re E.T. Simonds Constr. Co.*, No.,
   2021-54, 2022 WL 1997485 n.35 (DOL Admin. Review Bd. May 13, 2022)......................................8

*Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*,
   750 F.3d 486 (5th Cir. 2014) ..............................................................................................20

*K-Con, Inc. v. Sec'y of Army*,
   908 F.3d 719 (Fed. Cir. 2018) ...........................................................................................19

*Kentucky v. Fed. Highway Admin.*,
   No. 5:23-CV-162-BJB, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024),
   *appeal filed*, No. 24-5532 (6th Cir. June 3, 2024) ...........................................................30

*L.P. Cavett Co. v. DOL*,
   101 F.3d 1111 (6th Cir. 1996)............................................................................................10

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ..............................................................................................6, 13, 16

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..........................................................................................................16

*Nken v. Holder*,
   556 U.S. 418 (2009) ..........................................................................................................29

*Nuziard v. Minority Bus. Dev. Agency*,
   721 F. Supp. 3d 431 (N.D. Tex. 2024),
   *appeal dismissed*, No. 24-10603, 2024 WL 5279784 (5th Cir. July 22, 2024) ...........30

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*,
   115 F. App'x 806 (6th Cir. 2004) ......................................................................................20

*PCA Health Plans of Tex., Inc. v. LaChance*,
   191 F.3d 1353 (Fed. Cir. 1999)..........................................................................................23

*Redeemed Christian Church of God v. U.S. Citizenship & Immigr. Servs.*,
   331 F. Supp. 3d 684 (S.D. Tex. 2018) ...............................................................................6

*S.J. Amoroso Constr. Co. v. United States*,
   12 F.3d 1072 (Fed. Cir. 1993) ...........................................................................................19

*Tex. Tech Physicians Assocs. v. U.S. Dep't of Health & Hum. Servs.*,
   917 F.3d 837 (5th Cir. 2019) ........................................................................................5, 18

*Texas v. U.S. Dep't of Health & Hum. Servs.*,
   No. 23-CV-00022-DC, 2024 WL 1493809 (W.D. Tex. Apr. 5, 2024)................................7

*Timilsina v. Bryson,*
No. 3:22-CV-1327-D, 2023 WL 5517218 (N.D. Tex. Aug. 25, 2023) ...................................6

*Tincher v. Piasecki,*
520 F.2d 851 (7th Cir. 1975) ...................................20

*Trump v. Hawaii,*
585 U.S. 667 (2018) ...................................31

*Turkiye Halk Bankasi A.S. v. United States,*
598 U.S. 264 (2023) ...................................10

*U.S. ex rel. D.L.I. Inc. v. Allegheny Jefferson Millwork, LLC,*
540 F. Supp. 2d 165 (D.D.C. 2008) ................................... 19, 22

*U.S. ex rel. DeKort v. Integrated Coast Guard Sys.,*
475 F. App'x 521 (5th Cir. 2012) ...................................28

*United States v. Binghamton Constr. Co.,*
347 U.S. 171 (1954) ...................................3

*United States v. Miss. Power & Light Co.,*
638 F.2d 899 (5th Cir. Unit A 1981) ...................................21

*United States v. Texas,*
599 U.S. 670 (2023) ...................................30

*Univ. of Tex. v. Camenisch,*
451 U.S. 390 (1981) ................................... 7, 20

*Univs. Rsch. Ass'n v. Coutu,*
450 U.S. 754 (1981) ................................... 3, 21, 22

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982) ...................................31

## STATUTES

5 U.S.C. § 551 ...................................29

5 U.S.C. § 601 *et. seq.* ...................................5

5 U.S.C. § 603 ...................................25

5 U.S.C. § 604 ...................................23, 24, 25

5 U.S.C. § 607 ...................................26

5 U.S.C. § 611 ...................................................................................................................... 7, 26

5 U.S.C. § 701 ........................................................................................................................... 7

5 U.S.C. § 702 ........................................................................................................................... 7

5 U.S.C. § 703 ..................................................................................................................... 7, 30

5 U.S.C. § 704 ........................................................................................................................... 7

5 U.S.C. § 705 ........................................................................................................................... 7

5 U.S.C. § 706 ................................................................................................... 6, 26, 29, 30

23 U.S.C. § 113 ......................................................................................................................... 1

28 U.S.C. § 2201 .................................................................................................................... 30

28 U.S.C. § 2401 .................................................................................................................... 18

40 U.S.C. § 3131 .................................................................................................................... 11

40 U.S.C. § 3141 *et seq.*........................................................................................................ 2

40 U.S.C. § 3142 ............................................................................................................. *passim*

40 U.S.C. § 3145 ............................................................................................................. *passim*

## LEGISLATIVE HISTORIES

75 Cong. Rec. at 12,366 (1932) ........................................................................................ 11

## RULES

LR 56.3(c) ............................................................................................................................... 16

## REGULATIONS

29 C.F.R. parts 1 ..................................................................................................................... 3

29 C.F.R. § 1.6(b)(2) ............................................................................................................ 23

29 C.F.R. § 1.6(f) (2022) ......................................................................................... 4, 18, 27

29 C.F.R. § 5.2 ................................................................................................................ *passim*

29 C.F.R. § 5.5 ................................................................................................................ *passim*

29 C.F.R. § 5.13 ................................................................................................23

29 C.F.R. § 5.14 ................................................................................................23

15 Fed. Reg. 3176, effective May 24, 1950,
    *reprinted as amended in* 5 U.S.C. app. 1 *and in* 64 Stat. 1267 ..................2

46 Fed. Reg. 41,444 (Aug. 14, 1981) ..................................................................4

47 Fed. Reg. 23,644 (May 28, 1982) ............................................................4, 9

65 Fed. Reg. 80,268 (Dec. 20, 2000) ....................................................8, 16, 17

87 Fed. Reg. 15,698 (Mar. 18, 2022) ..................................................................4

88 Fed. Reg. 57,526 (Aug. 23, 2023) .........................................................*passim*

## OTHER AUTHORITIES

11 Williston on Contracts § 30:19 (4th ed. 2021) ............................................19

71 A.L.R. 1136 (1931) ........................................................................................9

Field Operations Handbook ch. 15 ..............................................................8, 12

*Laborer*, Webster's Collegiate Dictionary (5th ed. 1948) ..................................9

*Laborer*, Dictionary.com, https://perma.cc/F6AW-M9Y8 ................................9

*Laborer*, Merriam-Webster Dictionary Online, https://perma.cc/3BXY-WKXW ................9

*Mechanic*, Webster's Collegiate Dictionary (5th ed. 1948) ..............................9

Prevailing Wage Resource Book ........................................................................8

SAM.gov, https://sam.gov/wage-determinations ..............................................3

WHD All Agency Mem. 5 (Dec. 26, 1957) ......................................................12

WHD All Agency Mem. 10 (Sept. 26, 1958) ......................................................9

WHD Opinion Letter DB-22 (Mar. 12, 1962) ..................................................12

## INTRODUCTION

Congress enacted the Davis-Bacon Act (DBA or Act) to protect construction workers from substandard wages. The Act requires federal construction contractors to pay their workers, at minimum, the wages and fringe benefits that the U.S. Secretary of Labor determines to be "prevailing" in the local area. Congress has incorporated DBA requirements into numerous statutes under which federal agencies provide grants, loans, loan guarantees, insurance, or other assistance to construction projects (Related Acts).[1]

In 2023, the U.S. Department of Labor (DOL or Department) updated various aspects of the DBA's and the Related Acts' (together, DBRA) implementing regulations. *See* 88 Fed. Reg. 57,526 (Aug. 23, 2023) (Final Rule or Rule). In this lawsuit, Plaintiffs challenged only four regulations affected by the Rule: the provisions concerning (1) coverage of certain truck drivers; (2) the scope of the material supplier exception to coverage; (3) the operation of law when DBRA requirements are incorrectly omitted from a contract, and (4) coverage of secondary construction sites. Plaintiffs alleged that these regulations violated the Administrative Procedure Act (APA) and the Regulatory Flexibility Act (RFA).

In their motion, Plaintiffs seek summary judgment only as to the (1) truck driver, (2) material supplier, and (3) operation-of-law regulations, arguing that these regulations violate the APA. Defendants are cross-moving for summary judgment on those claims, as well as the remaining claims in the complaint: the APA claims as to (4) secondary construction sites, and the RFA claim as to all four regulations.

While Judge Cummings preliminarily enjoined DOL from enforcing the (1) truck driver, (2) material supplier, and (3) operation-of-law regulations, preliminary findings and conclusions made at the preliminary injunction stage are not binding later in the case, and the Court now has the opportunity to consider these issues anew in a non-emergency posture. The Court should hold that all four regulations, including the (4) secondary construction sites regulation, are reasonable and

---

[1] *See, e.g.*, 23 U.S.C. § 113(a) (requiring payment of DBA prevailing wages on highway projects).

appropriate and fall within DOL's statutory authority. Congress has expressly given DOL discretion to promulgate "reasonable" and "appropriate" regulations to implement the DBRA. 40 U.S.C. § 3145(a); Reorganization Plan No. 14 of 1950, 15 Fed. Reg. 3176, effective May 24, 1950, *reprinted as amended in* 5 U.S.C. app. 1 *and in* 64 Stat. 1267 ("Reorganization Plan"). Similarly, under the deferential standard of review for APA arbitrary-and-capricious claims, an agency need only act reasonably and with reasonable explanation. Each of the challenged regulations satisfies these generous standards. Each regulation is reasonable and appropriate and reflects the best interpretation of the Act based on DOL's years of experience applying and enforcing the DBRA regulations and thorough consideration of public comments. DOL also extensively explained its reasoning for adopting each regulation.

As to Plaintiffs' RFA claim, the Rule does not violate the RFA, because review under that statute is limited to purely procedural, not substantive, errors, and Plaintiffs have identified no procedural error in DOL's analysis. DOL thoroughly considered the Rule's impact on small entities, made changes between the proposed rule and final rule accordingly, and explained the need for the Rule, as required.

Finally, as Plaintiffs have expressly conceded, the challenged regulations are severable for they operate independently of each other and the unchallenged portions of the Rule. Thus, if the Court concludes that any challenged regulation is unlawful, it should grant relief only as to the unlawful provision(s), and even then, only as to Plaintiffs' members, in accordance with Article III and equitable principles.

## BACKGROUND

### I.    Statutory Background

The DBA, as amended, requires the payment of locally prevailing wages and fringe benefits to workers on federal construction contracts. 40 U.S.C. §§ 3141 *et seq.* The DBA applies to "every contract in excess of $2,000, to which the Federal Government . . . is a party, for construction, alteration, or repair, including painting and decorating, of public buildings and public works of the Government . . . which requires or involves the employment of mechanics or laborers[.]" *Id.* § 3142(a).

The "contractor or subcontractor" working on every such contract must pay prevailing wages to "all mechanics and laborers employed directly on the site of the work." *Id.* § 3142(c)(1). The Supreme Court has described the DBA as "a minimum wage law designed for the benefit of construction workers." *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 178 (1954). The Act "protect[s] local wage standards by preventing contractors from basing their bids on wages lower than those prevailing in the area." *Univs. Rsch. Ass'n v. Coutu*, 450 U.S. 754, 773 (1981) (discussing the Act's legislative history).

Congress has delegated to the Secretary the authority to "prescribe reasonable regulations for contractors and subcontractors engaged" in DBRA contracts. 40 U.S.C. § 3145(a); *see also* Reorganization Plan. The Department's regulations implementing the DBRA are codified at 29 C.F.R. parts 1 (methodology for determining prevailing wages), 3 (anti-kickback regulations), and 5 (scope of coverage and enforcement). Many of these regulatory provisions were updated in DOL's 2023 rulemaking. Only four specific regulations in part 5 are at issue here—those concerning (1) truck drivers; (2) material suppliers; (3) operation of law; and (4) secondary construction sites. *See* First Amended Compl., ECF No. 5 (FAC); 29 C.F.R. § 5.2 (definitions of "Onsite activities essential or incidental to offsite transportation," "material supplier," and "secondary construction site(s)"); *id.* § 5.5(e) (operation of law).

## II.    Regulatory Background

The Wage and Hour Division (WHD), an agency within DOL, administers the DBRA in partnership with the federal agencies that enter into DBA-covered construction contracts or administer DBRA-covered federal assistance to state and local governments. 88 Fed. Reg. at 57,530. WHD determines the prevailing wage rates for different types of construction jobs in local areas around the country based on survey data collected from contractors and other interested parties. *Id.* Wage determinations that contain prevailing wages are available online at SAM.gov, https://sam.gov/wage-determinations, the federal government's website for federal contracting and

assistance. If a contract is covered by the DBRA, it must include the applicable wage determination and other DBRA-required labor standards clauses. 88 Fed. Reg. at 57,530–31.

WHD and contracting agencies conduct investigations of covered contracts. *Id.* If a contractor violates the DBRA, DOL or the contracting agency may recover underpayments or have payments to the contractor withheld to compensate workers for the underpayments. *Id.* Since 1982, if WHD determines that DBRA wage determinations and contract clauses were omitted from a contract that should have been covered by the DBRA, WHD has required contracting parties to modify the contract so that prevailing wages apply retroactively, and the contractor to be reimbursed if that causes an increase in wages. *Id.* at 57,531 (citing 29 C.F.R. § 1.6(f) (2022)).

## III.    The 2022 Proposed Rule and 2023 Final Rule

On March 18, 2022, the Department proposed various changes to its DBRA regulations "to provide greater clarity and enhance their usefulness in the modern economy." 87 Fed. Reg. 15,698 (Mar. 18, 2022) (Proposed Rule). Since its last major review of the DBRA regulations in 1981–1982,[2] the agency noted, "Congress has expanded the reach of the Davis-Bacon labor standards significantly"; they now apply to approximately $217 billion in construction spending per year and provide minimum wage rates for over 1.2 million workers. *Id.* at 15,699. DOL also explained that in the intervening 40 years, the federal contracting system had undergone significant changes and the agency had learned lessons from its enforcement experience. *Id.* Thus, DOL identified a need to review and modernize various DBRA regulations.

During a 60-day comment period, DOL received over 40,000 comments expressing a wide range of views regarding the proposed changes. 88 Fed. Reg. at 57,527. Most comments favored some or all of the proposed changes. *Id.* On August 23, 2023, having considered the comments, DOL promulgated the Final Rule, which adopted the changes in the Proposed Rule with some modifications. *Id.* at 57,528. The Final Rule took effect on October 23, 2023. *Id.* at 57,526.

---

[2] Procedures for Predetermination of Wage Rates, 46 Fed. Reg. 41,444 (Aug. 14, 1981) (1981 Proposed Rule); Procedures for Predetermination of Wage Rates, 47 Fed. Reg. 23,644 (May 28, 1982) (1982 Final Rule).

IV.     **This Lawsuit**

Plaintiffs filed this lawsuit on November 7, 2023, and amended their complaint on December 18, 2023. Compl., ECF No. 1; FAC. Plaintiffs allege that, in promulgating the (1) truck driver; (2) material supplier; (3) operation of law, and (4) secondary construction site regulations, DOL exceeded its constitutional and statutory authority (Counts I, II) and acted arbitrarily and capriciously (Count III), in violation of the APA. FAC ¶¶ 61–81; *see* 29 C.F.R. § 5.2 (definitions of "Onsite activities essential or incidental to offsite transportation," "material supplier," and "secondary construction site(s)"); *id.* § 5.5(e). Plaintiffs also allege that the Rule violated the RFA, 5 U.S.C. §§ 601 *et seq.*, which requires agencies to consider the impact of certain regulations on small entities. FAC ¶¶ 82–88 (Count IV).

Plaintiffs then moved for a preliminary injunction of three of the four regulations they challenged: the (1) truck driver, (2) material supplier, and (3) operation of law regulations. After holding an evidentiary hearing, Judge Cummings adopted Plaintiffs' proposed findings of fact and conclusions of law nearly verbatim and preliminarily enjoined those three regulations. *Compare* Pls.' Proposed Findings of Fact & Conclusions of Law, ECF No. 60, *with Associated Gen. Contractors of Am. (AGC) v. DOL*, No. 5:23-CV-0272-C, 2024 WL 3635540 (N.D. Tex. June 24, 2024). An appeal regarding the first two regulations is pending before the Fifth Circuit. *AGC*, No. 24-10790 (5th Cir. Aug. 28, 2024). Plaintiffs did not seek a preliminary injunction as to (4) the secondary construction sites regulation.

On December 16, 2024, Plaintiffs filed a motion for summary judgment. *See* Pls.' MSJ, ECF No. 67. On January 10, 2025, the parties jointly filed a stipulation clarifying that Plaintiffs' motion seeks relief only as to the truck driver, material supplier, and operation of law regulations. ECF No. 72. Defendants are now cross-moving for summary judgment on all claims in the case, including on the secondary construction sites regulation.

**LEGAL STANDARD**

Under the APA, an agency's action "is presumptively valid; the plaintiff bears the burden of showing otherwise." *Tex. Tech Physicians Assocs. v. U.S. Dep't of Health & Hum. Servs.*, 917 F.3d 837, 844

(5th Cir. 2019). An agency action is unlawful if it exceeds statutory authority. 5 U.S.C. § 706(2)(C). Where Congress "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term" or where it empowers an agency to regulate subject to the limits imposed by flexible terms such as "appropriate" or "reasonable," "the best reading" of a statute "may well be that the agency is authorized to exercise a degree of discretion." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024). The role of the reviewing court is simply to ensure the agency has acted "within [the] boundaries" "of [the] delegated authority." *Id.* at 395 (citation omitted). Here, Congress delegated to DOL the authority to issue "reasonable" and "appropriate" regulations under the Act. 40 U.S.C. § 3145(a); Reorganization Plan. Thus, DOL's regulations must be upheld so long as they fall within that boundary.

Agency action is also unlawful if it is arbitrary or capricious. 5 U.S.C. § 706(2)(A). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Loper Bright*, 603 U.S. at 392 ("Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential.").

In APA cases, "the district judge sits as an appellate tribunal" and "the entire case on review is a question of law." *Redeemed Christian Church of God v. U.S. Citizenship & Immigr. Servs.*, 331 F. Supp. 3d 684, 694 (S.D. Tex. 2018) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). The district court's review of the merits is based upon the "administrative record that was before the [agency] at the time [it] made [its] decision," not a new record created by the district court. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see* 5 U.S.C. § 706. Thus, the "general 'genuine dispute of material fact' standard for summary judgment does not apply to APA claims." *Timilsina v. Bryson*, No. 3:22-CV-1327-D, 2023 WL 5517218, at *3 (N.D. Tex. Aug. 25, 2023) (citation omitted)). Rather, "it is well established that when a district court reviews a summary judgment motion concerning an agency's action, the court determines not

whether the material facts are disputed, but whether the agency properly dealt with the facts." *Texas v. U.S. Dep't of Health & Hum. Servs.*, No. 23-CV-00022-DC, 2024 WL 1493809, at *3 (W.D. Tex. Apr. 5, 2024) (quoting *Garcia for Cong. v. Fed. Election Comm'n*, 22 F. Supp. 3d 655, 659 (N.D. Tex. 2014)).[3]

## ARGUMENT

"[G]iven the haste that is often necessary" in a preliminary injunction proceeding, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" at the merits stage. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Now that the Court has the opportunity to consider Plaintiffs' arguments in a less hurried context, the Court should hold that Plaintiffs have not met their burden of showing that each of the challenged regulations exceeded DOL's authority to issue reasonable and appropriate regulations. Similarly, Plaintiffs have not shown that the regulations were unreasonable or unreasonably explained, as required to prevail on an APA arbitrary-and-capricious claim. Nor have they demonstrated a violation of the RFA, which they do not discuss at all in their motion, and with which DOL complied. Even if Plaintiffs meet their burden as to one or more of the regulations, any remedy should be limited to the individual provision(s) found to be legally deficient and to the Plaintiffs before the Court.

## I.  The truck driver regulation falls within DOL's statutory authority to issue reasonable regulations and is not arbitrary or capricious.

### A.  The truck driver regulation implements the plain language of the statute.

Plaintiffs' claims regarding the truck driver regulation should be rejected. The DBA applies to "every contract . . . for construction, alteration, or repair . . . which requires or involves the employment of mechanics or laborers" and requires "the contractor or subcontractor" to pay DBA prevailing wages to "all mechanics and laborers employed directly on the site of the work." 40 U.S.C. § 3142(a), (c)(1). The specific part of the truck driver regulation challenged by Plaintiffs implements that statutory text as applied to one specific class of "mechanics" or "laborers" while they are employed by a contractor/subcontractor "directly on the site of the work": truck drivers and their

---

[3] RFA claims are reviewed "in accordance with" the judicial review provisions of the APA, 5 U.S.C. §§ 701-706. *See id.* § 611.

assistants who are doing "activities . . . on the site of the work that are essential or incidental to the transportation of materials or supplies to or from the site of the work," such as loading, unloading, and waiting. FAC ¶ 37; 88 Fed. Reg. at 57,732 (codified at 29 C.F.R. § 5.2 (definition of "Onsite activities essential or incidental to offsite transportation")). Recognizing that some drivers and assistants may spend "only a few minutes at a time" on-site, the regulation offers a safe harbor to employers: employers need not pay truck drivers and assistants DBRA wages for these on-site activities if the aggregate time spent doing them is *de minimis*. *Id.* at 57,624, 57,732. The regulation also makes clear that *offsite* transportation by these drivers and assistants is excluded from DBRA coverage. *See id.* at 57,732 (unless specifically covered by DOL regulations, "transportation of materials or supplies to or from the site of the work" is not covered).

These regulations codified DOL's longstanding guidance, which provided that "[d]rivers of a contractor or subcontractor" are covered for "time spent loading and/or unloading materials and supplies on the site of the work, if such time is not *de minimis*." App'x at 41 (AR00003698, Field Operations Handbook ch. 15e22(a)); App'x at 198 (AR00003953, Prevailing Wage Resource Book); *see also* 88 Fed. Reg. at 57,624; Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction, 65 Fed. Reg. 80,268, 80,276 (Dec. 20, 2000) (noting that DOL has long used "a rule of reason" and not applied the DBRA's "prevailing wage requirements with respect to the amount of time spent on-site, unless it is more than 'de minimis'" because, as a practical matter, "the great bulk of the time spent by material truck drivers is off-site beyond the scope of Davis-Bacon coverage, while the time spent on-site is relatively brief").

The truck driver regulation is consistent with the plain text of the statute. The DBA requires payment of prevailing wages to "all mechanics and laborers employed directly on the site of the work." 40 U.S.C. § 3142(c)(1). While truck drivers transporting materials between on- and off-site locations spend part of their work time off-site, they necessarily spend part of their work time on-site as well. *See, e.g.*, *In re E.T. Simonds Constr. Co.*, No. 2021-54, 2022 WL 1997485, at *5 n.35 (DOL Admin. Review Bd. May 13, 2022) (holding that DBA covered truck drivers for the 25% of their workday spent on-site). The Rule treats only on-site time as DBRA-covered.

8

Plaintiffs contend that truck drivers are not "mechanics and laborers." Pls.' MSJ at 11; 40 U.S.C. § 3142(c). But they are. Longstanding DOL regulations—which Plaintiffs have not challenged—recognize that "laborers and mechanics" are individuals whose "duties are manual or physical in nature . . . as distinguished from mental or managerial." Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction, 47 Fed. Reg. 23,658, 23,667 (May 28, 1982) (promulgating the definition now codified at 29 C.F.R. § 5.2); *see also* App'x at 451-52 (WHD All Agency Mem. 10 (Sept. 26, 1958)); *cf. Holy Trinity Church v. United States*, 143 U.S. 457, 463 (1892) (explaining that the "common understanding" of the term "laborer" is that it refers to "manual" work and not the work of "the professional man"). Dictionary definitions are in accord. *See* Webster's Collegiate Dictionary 559, 620 (5th ed. 1948) (defining "laborer" as "[o]ne who does physical labor; one who does work that requires strength rather than skill" and "mechanic" as "involving manual skill"); *Laborer*, Dictionary.com, https://perma.cc/F6AW-M9Y8 (similar); *Laborer*, Merriam-Webster Dictionary Online, https://perma.cc/3BXY-WKXW (similar). Truck drivers' and their assistants' duties plainly entail manual and physical labor, such as driving, loading, and unloading trucks. App'x at 452 (stating that there is "no doubt" that truck drivers fall within the meaning of "laborers or mechanics" and citing cases); 71 A.L.R. 1136 (1931) (citing cases holding driving is "labor" for the purpose of construction lien statutes).

Plaintiffs also argue that trucking is categorically not "construction, alteration, or repair," Pls.' MSJ at 9, 11. But DBA coverage is triggered when there is a "*contract* . . . for construction, alteration, or repair" between a prime contractor and a federal entity (or another entity covered by a Related Act). 40 U.S.C. § 3142(a) (emphasis added). If that prime contract exists, then "all mechanics and laborers employed directly on the site of the work" are paid DBRA wages if they are employed by a "contractor or subcontractor" carrying out that contract. *Id.* § 3142(c)(1). It is thus irrelevant whether "trucking" itself constitutes "construction, alteration, or repair," so long as the employee doing "trucking" activities is a mechanic or laborer (i.e., performing manual or physical labor, as a truck driver does, working on-site for a covered employer on a contract that triggers the statute.

**B. The truck driver regulation does not conflict with case law.**

The truck driver regulation is also consistent with case law. In *Building & Construction Trades Department, AFL-CIO v. DOL Wage Appeals Board* (*Midway*), the D.C. Circuit focused on whether the statutory phrase "*directly upon the site of the work*" could be interpreted to cover "all deliveries from off-site to on-site." 932 F.2d 985, 986, 989 (D.C. Cir. 1991). The court held that "the Act covers only mechanics and laborers who work *on the site* of the federally-funded public building or public work, not mechanics and laborers employed *off-site,* such as suppliers, materialmen, and material delivery truckdrivers, regardless of their employer." *Id.* at 992.[4] The *Midway* court explicitly noted, however, that no one had raised whether the truck drivers could be considered covered based on the time they spent on-site. *Id.* at 989 n.5. The truck driver regulation challenged here addresses the issue not addressed in *Midway*. Under the regulation, truck drivers employed by contractors and subcontractors are covered for the time they spend on-site, but not off-site, if such time is more than *de minimis*. 88 Fed. Reg. at 57,625 & n.200.

The truck driver regulation does not conflict with the other cases cited in Judge Cummings's preliminary injunction order either. *See AGC*, 2024 WL 3635540, at *14. *L.P. Cavett Co. v. DOL*, 101 F.3d 1111, 1113–16 (6th Cir. 1996), and *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1451–53 (D.C. Cir. 1994), concerned whether batch plants and borrow pits two or three miles from a construction site were part of the "site of the work." They did not concern whether the time that workers spent on the undisputedly covered construction site itself (a highway in *Cavett* and an aqueduct in *Ball*) was covered. *Frank Bros., Inc. v. Wisconsin Department of Transportation*, 409 F.3d 880, 883 (7th Cir. 2005), similarly did not address work actually done on-site. As the Supreme Court has "often admonished," "general language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023).

\* \* \*

---

[4] *Midway* here notably described "material delivery truckdrivers" as "mechanics and laborers," although it held that such workers were not covered if they were off-site. 932 F.2d at 992.

Plaintiffs have not met their burden of showing that the truck driver regulation exceeded DOL's authority to promulgate reasonable regulations. Nor have they shown that it was arbitrary or capricious. Plaintiffs' arbitrary-and-capricious argument is essentially the same as their exceeds-authority argument, *compare* Pls.' MSJ at 9, *with id.* at 11, and fails for the same reasons discussed above. Accordingly, summary judgment should be granted to Defendants as to the truck driver regulation.

## II.    The material supplier regulation is reasonable and within DOL's authority and not arbitrary or capricious.

Plaintiffs' challenge to the material supplier regulation should also be rejected. As discussed, the DBA applies to "every contract . . . for construction, alteration, or repair" and requires "the contractor or subcontractor" to pay covered workers. 40 U.S.C. § 3142(a), (c)(1). Because companies that supply materials for a construction project are in some senses "contractors" or "subcontractors," they might well be covered by the plain text of the Davis-Bacon Act. Nevertheless, DOL has long interpreted the term "contractor or subcontractor" to exclude material suppliers. 88 Fed. Reg. at 57,615. That position is consistent with Miller Act case law, which distinguishes between contractors and subcontractors on the one hand, and material suppliers on the other.[5] *See Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 108-09 (1944) (explaining that, although "[i]n a broad, generic sense," anyone with a contractual relationship to the prime contractor is a subcontractor, "in the building trades, a subcontractor is one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract, *thus excluding . . . materialmen*" (emphasis added)). DOL's view is also based in part on legislative history suggesting that Congress did not intend for the DBA to reach so broadly as to include workers of manufacturers such as the U.S. Steel Corporation and thereby to "regulat[e] the wages of private industry." *See* 75 Cong. Rec. at 12,366 (1932) (statement of Rep. Connery).

DOL's material supplier regulation codified this longstanding distinction between "contractors and subcontractors" and "material suppliers." The Rule defines "contract," "contractor,"

---

[5] The Miller Act, like the DBA, applies to government contracts for "construction, alteration, or repair," 40 U.S.C. § 3131(b).

and "subcontractor" to exclude "material suppliers." 88 Fed. Reg. at 57,732 (codified at 29 C.F.R.
§ 5.2). An entity is a "material supplier" if, among other things, "[i]ts only obligations for work on the
contract or project are the delivery of materials, articles, supplies, or equipment[.]" *Id.* at 57,733. "If
an entity, in addition to being engaged in [delivery] activities . . . also engages in other construction,
prosecution, completion, or repair work at the site of the work, it is not a material supplier." *Id.* Thus,
under the Rule, "material supplier" status is assessed at an entity level. If an entity meets the "material
supplier" definition for a contract or project, then its workers

> [are] not employed by a contractor or subcontractor, and . . . [are] not entitled to
> prevailing wages and fringe benefits under the Davis-Bacon labor standards at all even
> for time spent on the site of the work. In contrast, workers employed by contractors
> or subcontractors are entitled to Davis-Bacon wages, . . . for time spent on the site of
> the work.

*Id.* at 57,624.

Determining who is a material supplier versus a contractor or subcontractor at the entity level,
based on the entity's contractual responsibilities on the project, is consistent with guidance and case
law in the federal construction context. DOL has long relied on *MacEvoy* and distinguished between
independent entities that only provide materials for a project (material suppliers) and entities that are
more involved with the prime contract or contractor (subcontractors) for DBRA coverage purposes.
For instance, DOL has opined that a trucking firm was a material supplier where the firm was "an
independent business organization and operation" and its drivers "perform[ed] no additional
function" beyond transporting stone from a quarry to a dam construction site. "In these
circumstances," the firm was not "a subcontractor who has undertaken to perform a specific portion
of the work called for by the prime contract." App'x at 4-5 (AR00003415-16, WHD Opinion Letter
DB-22 (Mar. 12, 1962)).[6] *H.B. Zachry Co. v. United States*, 344 F.2d 352, 361 (Ct. Cl. 1965), relied on

---

[6] *See also, e.g.*, App'x at 39 (AR00003696, Field Operations Handbook ch. 15e16(c): "If a material
supplier, manufacturer, or carrier undertakes to perform a part of a construction contract as a
subcontractor, its laborers and mechanics employed at the site of the work would be subject to DBRA
in the same manner as those employed by any other contractor or subcontractor."); App'x at 11
(AR00003434, WHD All Agency Mem. 5 (Dec. 26, 1957), finding an entity was a subcontractor where

DOL opinion letters and *MacEvoy* to similarly opine that the "the employee of an independent trucking firm whose work is limited to the delivery of commercial building material to the site" was not covered by the DBA.

Analogous Miller Act caselaw, starting with *MacEvoy*, also supports the material supplier regulation's entity-level approach. "[T]he substantiality and importance of [an entity's] *relationship with the prime contractor*" is precisely the test the Supreme Court and the Fifth Circuit use to distinguish subcontractors from material suppliers in the federal construction context. *F.D. Rich Co. v. United States*, 417 U.S. 116, 123 (1974) (emphasis added); *Aetna Cas. & Sur. Co. v. United States*, 382 F.2d 615, 618 (5th Cir. 1967) (same). The mere fact that some of an entity's employees engage in supplying materials does not automatically make an entity a "material supplier" rather than a subcontractor. Courts examine whether the entity also engages in activities beyond supplying materials and the nature of the entity's relationship with the prime contractor. *See Rich*, 417 U.S. at 124 (Cerpac Co. "was clearly a subcontractor" because it "not only agreed to supply standard plywood but also had a separate contract to select, modify, detail, and install all custom millwork for the Beale project"); *Aetna*, 382 F.2d at 618 (Rogers Fabricating Co. was not a subcontractor in part because it did not install or supervise installation of the products it supplied; it only fabricated and delivered relatively simple items such as stairs, ladders, trench covers, and rails.).

The material supplier regulation is also a "reasonable" and "appropriate" "regulation[]." 40 U.S.C. § 3145(a); Reorganization Plan. The regulation was informed by challenges that DOL, contracting agencies, and employers had faced under DOL's prior policy. *Loper Bright*, 603 U.S. at 402 ("an agency's interpretation of a statute . . . may be especially informative to the extent it rests on factual premises within the agency's expertise" (cleaned up)). Under prior DOL enforcement policy regarding employees of material suppliers, if a worker came on-site and did non-delivery construction work, such as warranty or repair work, that work was always DBRA-covered. 88 Fed. Reg. at 57,623.

---

the original contract called for the provision of quarry-run stone with fines to be used in grading and excavation work, for the entity "took from the prime contractor a specific part of the original contract").

In contrast, the worker's on-site *delivery* work might or might not be covered: if non-delivery work took up 20% or more of the worker's workweek, then yes; if less, then no. The 20% threshold enforcement policy generated considerable confusion about which entities counted as material suppliers rather than contractors or subcontractors and which workers were covered and when. *Id.*

As DOL explained, the new regulation is easier to apply. Focusing the "material supplier" inquiry on "a company's obligations under a contract, rather than the amount of time its workers spend onsite engaged in particular activities in a given workweek" will "reduce uncertainty about coverage and assist both bidders and agencies in predicting labor costs before bidding." *Id.* It will also "facilitate compliance and [be] more consistent with both the language and purpose of the Davis-Bacon labor standards, as it ensures that all laborers and mechanics performing any non-delivery construction work on the site of the work will receive prevailing wages for such work." *Id.* at 57,623-24.

At the preliminary injunction stage, Judge Cummings preliminarily adopted Plaintiffs' position that the material supplier rule exceeds DOL's statutory authority because it "ignores the statutory language of the DBA, essentially determining that a bona fide material supplier will be considered covered by the DBA based simply upon its connection to a contractor or subcontractor." *AGC*, 2024 WL 3635540, at *14 (quoted in Pls.' MSJ at 9). Respectfully, Plaintiffs' position is incorrect. The language of the DBA is precisely the reason why whether the entity has a contract for construction, alteration, or repair (i.e., is a "contractor" or "subcontractor") is key to determining whether their workers are covered. The text of the DBA speaks only of "contractor[s]," and "subcontractor[s]"; it does not mention material suppliers at all. As explained above, in the building trades, companies engaged purely in material supply for a project have long been understood to be excluded from those terms. But a company that contracts to do actual construction in addition to material supply necessarily has a "contract . . . for construction, alteration, or repair" and therefore falls within the scope of "contractor" or "subcontractor." Plaintiffs identify no textual basis for excluding companies that do both material supply and construction from these terms; to the contrary, the plain text extends coverage to "*every* contract . . . for construction, alteration, or repair . . . which requires or involves the

14

employment of mechanics or laborers" and requires "the contractor or subcontractor" to "pay *all* mechanics and laborers employed directly on the site of the work." 40 U.S.C. § 3142(a), (c)(1) (emphases added). Given this expansive language, the best reading of the statute is that the terms "contractor" and "subcontractor" encompass "every" entity that has a contract or subcontract for construction, alteration, or repair and employs mechanics or laborers directly on the site of the work, and that they must pay DBA wages to "all" of their on-site mechanics or laborers.

Plaintiffs are concerned that the material supplier regulation transforms employees of material suppliers into "mechanics and laborers," Pls.' MSJ at 9 (quoting *AGC*, 2024 WL 3635540, at *14), but it does not. Whether an employee is a "mechanic" or "laborer" is simply a question of whether the worker engages in "manual or physical" labor. 29 C.F.R. § 5.2 ("The term 'laborer or mechanic' includes at least those workers whose duties are manual or physical in nature (including those workers who use tools or who are performing the work of a trade), as distinguished from mental or managerial."). If a worker's duties are not manual or physical in nature, then that worker was not covered before and is not covered now under the challenged Rule. If the worker does engage in manual or physical labor, then coverage depends on whether the other coverage criteria are met (e.g., whether the worker works on-site, whether the employer has a contract for construction, alteration, or repair).

At the preliminary injunction stage, Judge Cummings also preliminarily took Plaintiffs' view that the material supplier rule "arbitrarily punishes those contractors that also maintain commercial material supplier operations" and puts them at a "competitive disadvantage" since those not already paying their workers at or above the prevailing wage might have to raise wages to meet DBA requirements while a pure material supplier would not. *AGC*, 2024 WL 3635540, at *10; *see also* Pls.' MSJ at 10-11. Respectfully, that distinction is not arbitrary, but rather is based on the statute, which distinguishes between entities that qualify as a "contractor or subcontractor" and those that do not. 40 U.S.C. § 3142(c)(1). The material supplier regulation simply recognizes, as the statute does, that when an employer has a contract to do construction work for a given project, then the entity is a "contractor or subcontractor" for that project. It is not arbitrary or capricious for an agency to follow Congress's statute.

15

DOL's regulatory articulation of the material supplier exception thus reflects the best interpretation of the statute. At a minimum, DOL's reading is reasonable and appropriate and thus falls within the statutory zone of discretion given by Congress to DOL. 40 U.S.C. § 3145(a); *Loper Bright*, 603 U.S. at 395. Thus, summary judgment should be granted for Defendants.

## III.    Summary judgment should be granted to Defendants on Plaintiffs' challenge to the secondary construction sites regulation.

Plaintiffs' challenge to the secondary construction sites provision also fails for multiple reasons. First, Plaintiffs have abandoned their challenge to this particular regulation. Under this district's local rules, if "a moving party seeks summary judgment on fewer than all claims or defenses, the motion must be styled as a motion for partial summary judgment." LR 56.3(c). Plaintiffs' motion is not labeled "partial" and thus seems meant to address all of their claims. Yet, "Plaintiffs' motion seeks relief only as to the three preliminarily enjoined regulations: (1) truck drivers; (2) material suppliers; and (3) operation of law." Joint Stip. Regarding Pls.' MSJ ¶ 5, ECF No. 72. "Plaintiffs do not seek relief as to the regulation concerning (4) secondary construction sites, as described in Paragraphs 40-43 in Plaintiffs' First Amended Complaint." *Id.* ¶ 6.

Second, Plaintiffs lack standing to challenge the secondary construction sites regulation. Although Judge Cummings determined that Plaintiff J. Lee Milligan, Inc. (JLM) had standing at the motion to dismiss stage, Order at 1 (June 6, 2024), ECF No. 43, Plaintiffs must satisfy a higher standard now. Standing is not a "mere pleading requirement[] but rather an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the merits stage, a plaintiff must "submit affidavits or other evidence showing, through specific facts," their standing to sue. *Id.* at 563. Plaintiffs have not met this burden, as Plaintiffs have not identified any evidence as to JLM or any other Plaintiffs' standing to challenge the secondary construction sites regulation.

Third, in any event, Plaintiffs have not met their burden on the merits. Since 2000, DOL has interpreted "site of the work" to include secondary sites "where a significant portion of the building or work is constructed, provided that such site is established specifically for the performance of the contract or project." 65 Fed. Reg. at 80,278 (codified at 29 C.F.R. § 5.2 (2001)). The 2000 regulation

was meant to address "new construction technologies" that had created "certain rare situations that warrant [DBA] coverage." *Id.* at 80,274. For example, in one case, workers performed 40% of a construction contract by building modular units, the largest of which was a three-story structure, that were later transported by barge and assembled into a 300-foot mobile service tower. *Id.* at 80,273-74. In another, workers constructed "two massive floating structures, each about the length of a football field," which were floated downriver to where they "would comprise the vast bulk of [a] new gated dam." *Id.* at 80,273. As DOL explained, in each case, given the "large amount of construction" that was taking place at the remote location, it was "fair and reasonable to view such location as a site where the public building or work is being constructed." *Id.* at 80,274.

The 2023 Rule makes only incremental changes, which DOL carefully explained. While the 2000 Rule covered only secondary sites established specifically for a DBRA project, the 2023 Rule also includes any sites that were dedicated exclusively or nearly so to the performance of a single DBRA contract for a specific period of time, even if not established specifically for a DBRA project. *Id.* at 57,618. "A 'specific period of time' means a period of weeks, months, or more." *Id.* at 57,733 (codified at 29 C.F.R. § 5.2). The 2023 Rule also clarifies that a "significant portion" of a building or work is "one or more entire portion(s) or module(s) of the building or work, such as a completed room or structure, with minimal construction work remaining other than the installation and/or final assembly of the portions or modules at the place where the building or work will remain." *Id.* The term "significant portion" is specifically defined to exclude "materials or prefabricated component parts such as prefabricated housing components." *Id.* The 2023 amendments to the secondary construction site provision are "narrow" and are expected to have "limited" impact on the vast majority of construction projects. *Id.* at 57,617-18. In particular, "based on the comments received," DOL "believes that most modular construction facilities are engaged in more than one project at a time and therefore will not be considered 'sites of the work' under this rule," as they would not be "dedicated exclusively or nearly so to the performance of a single DBRA contract." *Id.* at 57,708.

Plaintiffs do not challenge the 2000 Rule[7]; they contend only that the 2023 Rule "impermissibly extends coverage beyond the 2000 rule." FAC ¶ 43. But Plaintiffs have not explained how the 2023 Rule is "impermissible." Under the APA, an agency's action "is presumptively valid; the plaintiff bears the burden of showing otherwise." *Tex. Tech Physicians Assocs.*, 917 F.3d at 844. A conclusory assertion that a regulation is "impermissible" cannot overcome this presumption of validity.

## IV.    DOL has statutory authority to promulgate the operation-of-law regulation.

The operation-of-law regulation changes the administrative procedure for enforcing the DBRA when its labor standards or wage determinations are "wrongly omitted from a covered contract." 88 Fed. Reg. at 57,661. Previously, if the wage determination or other relevant DBRA contract clauses were omitted from a contract, the regulations provided a process by which the contract would be amended or superseded to retroactively include the correct wage, and the contractor would be compensated for any increases in wages resulting from that modification. 29 C.F.R. § 1.6(f) (2022). Over the years, DOL learned that this regulatory framework created enforcement challenges, including: (1) confusion when a contracting agency has mistakenly omitted a wage determination, (2) "significant delays" in resolving omissions that harmed workers, and (3) unique situations when modifying an existing contract could run afoul of non-DBRA statutes. 88 Fed. Reg. at 57,661. To address those problems, and in line with longstanding federal contracting doctrines, the Rule maintains the procedure at 29 C.F.R. § 1.6(f) and reinforces it by making DBRA labor standards clauses and wage determinations "effective 'by operation of law' . . . where they [were] wrongly omitted from a covered contract." *Id.* at 57,662.

The operation-of-law regulation also includes an important provision to protect contractors. Contracting agencies must "compensate prime contractors for any increases in wages resulting from a post-award incorporation of a contract clause or wage determination by operation of law." *Id.* That is, an agency must make the prime contractor whole if the agency includes the incorrect wage (or no

---

[7] Nor could they; any challenge by these Plaintiffs to decades-old regulations would likely be barred by the APA's statute of limitations, 28 U.S.C. § 2401(a).

minimum wage at all) in a DBRA-covered contract and the covered workers are, as a result, owed more than initially paid. *Id.* These changes are reflected in 29 C.F.R. § 5.5(e).

The operation-of-law regulation is consistent with the Act's text under longstanding federal contracting doctrine, is supported by Fifth Circuit caselaw, and gives full effect to the statute. In federal procurement settings, contract clauses that are required by law are routinely deemed to be a part of the contract even where they are omitted. That principle flows from the foundational precept that "parties to a contract . . . are presumed or deemed to have contracted with reference to existing principles of law." 11 Williston on Contracts § 30:19 (4th ed. 2021). That is why, under the *Christian* doctrine, "a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal" law, even where there is no explicit operation-of-law provision in statute or regulation. *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018) (discussing *G.L. Christian & Assocs. v. United States*, 312 F.2d 418 (Ct. Cl. 1963)); *see S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) (applying the *Christian* doctrine to the 1933 Buy America Act, which used parallel language to the DBA in requiring the inclusion of certain contract provisions); *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1351 n.1 (Fed. Cir. 2017) (same for "mandatory" Service Contract Act clauses).[8] In fact, at least one court has found that DBRA clauses are effective by operation-of-law in the prime contract even in the absence of an explicit regulatory provision such as 29 C.F.R. § 5.5(e). *U.S. ex rel. D.L.I. Inc. v. Allegheny Jefferson Millwork, LLC*, 540 F. Supp. 2d 165, 176 (D.D.C. 2008) ("When [DBRA] provisions are omitted from a *prime* contract, they do become part of the contract by operation of law, and the prime contractor is charged with constructive knowledge of Davis-Bacon's requirements."). Based on these longstanding interpretive principles in the federal

---

[8] The *Christian* doctrine applies where (1) a contract clause is "mandatory," (2) and the required clause "expresses a significant or deeply ingrained strand of public procurement policy." *K-Con*, 908 F.3d at 724. DBRA clauses meet both of those requirements: (1) the statute uses the word "shall" indicating that the clauses are mandatory, and (2) the DBA has set federal procurement policy for nearly 100 years. *See also id.* at 724–25 (applying the *Christian* doctrine to the Miller Act, which also has mandatory contract clause requirements with coverage terms exceedingly similar to those in the DBRA and was also enacted in the 1930s).

procurement context, the Rule's operation-of-law provision is entirely consistent with the DBA's statutory text requiring the inclusion of DBRA clauses in covered prime contracts.

Plaintiffs' sole argument in opposing the operation-of-law provision at the summary judgment stage is that the government did not appeal the district court's holding at the preliminary injunction stage on that provision, and therefore, summary judgment is "compelled." Pls.' MSJ at 12. They cite no case law in support of that proposition. To the contrary, "conclusions of law made by a court granting a preliminary injunction are not binding" at the merits stage. *Univ. of Tex.*, 451 U.S. at 395; *see Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*, 750 F.3d 486, 491 (5th Cir. 2014). For that reason, it is Plaintiffs who have waived any substantive argument in opposition to the operation-of-law regulation at the summary judgment stage, because they have advanced none in their opening brief. *Allen v. Hous. Indep. Sch. Dist.*, 689 F. App'x 238, 243 n.4 (5th Cir. 2017) ("arguments . . . not raised in [an] opening brief . . . are waived"); *Architectural Granite & Marble, LLC v. Pental*, 2023 WL 121996, at *4 (N.D. Tex. Jan. 6, 2023) (litigant failed to adequately brief and therefore waived an issue by merely arguing in a conclusory fashion and citing a single case).

Moreover, and besides, "[a] decision not to appeal certain issues . . . at the preliminary injunction stage in no way diminishes an individual's right to pursue those issues in the district court." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 115 F. App'x 806, 810 (6th Cir. 2004). In other words, the government had no obligation to pursue an appeal at the preliminary injunction stage on every issue that the district court considered in order to preserve any merits arguments in either the district court at summary judgment or on appeal from any final judgment. *Caradelis v. Refineria Pan., S.A.*, 384 F.2d 589, 591 n.1 (5th Cir. 1967) ("An interlocutory appeal is permissive rather than mandatory, and an aggrieved party may, at his election, decline to appeal an interlocutory order but appeal from the final determination of the case and at that point raise all questions involved in the case."); *cf. Tincher v. Piasecki*, 520 F.2d 851, 854 n.3 (7th Cir. 1975) (calling "frivolous" the notion that parties "waived their right to appeal by failing to appeal the order granting the preliminary injunction").

In any event, Judge Cummings's holding at the preliminary injunction stage that this regulation likely violates DOL's statutory authority was, respectfully, incorrect. *See AGC*, 2024 WL 3635540, at

*12–13. The preliminary injunction opinion primarily quoted the text of the DBA and stated that the regulation violated that text. *Id.* at *12. But as explained, the regulation is consistent with the text and federal contracting doctrine, and gives full effect to the statute's purpose. *See* Defs.' Opp'n. to Pls.' Mot. for Prelim. Inj. at 16–18, ECF No. 27; *see also United States v. Miss. Power & Light Co.*, 638 F.2d 899 (5th Cir. Unit A 1981) (upholding a DOL operation-of-law regulation analogous to the provision at issue here).

Judge Cummings held that the *Christian* doctrine should not apply here, citing *Universities Research Association, Inc. v. Coutu*, 450 U.S. 754 (1981). *See AGC*, 2024 WL 3635540, at *12. However, the operation-of-law provision is consistent with *Coutu*. There, the Supreme Court held that there was no private right of action for workers to sue for back wages under the Davis-Bacon Act, when covered clauses were omitted from the contract. The Court's holding stemmed from the foundational principle that "Congress intend[s] to create a cause of action where the language of the statute explicitly confers a right directly on a class of persons that includes the plaintiff in the case." *Coutu,* 450 U.S. at 771–72 (citation omitted). Because the Davis-Bacon Act is "a command to a federal agency," rather than one which "confer[s] rights directly on … individuals," the Court declined to find a private right of action. *Id.* at 772. The operation-of-law regulation is consistent with that holding because it creates no implied "private remedy." *See id.* at 772–73; Final Rule, 88 Fed. Reg. at 57,688. The regulation simply gives full force to the Act's "command to [] federal agenc[ies]" to include DBA clauses in covered contracts, *Coutu*, 450 U.S. at 772–73, and operates to make contractors whole in the event that a required clause is omitted.

The Rule's operation-of-law regulation also alleviates the two concerns animating the Court in *Coutu*. First, the Court worried that finding an implied private right of action for back wages would undermine contractors' reliance on bid specifications. *Id.* at 776–77. But, as explained, the Rule provides for contractors to be compensated for any resulting increase in wages where a covered clause is omitted. *See* 29 C.F.R. § 5.5(e). By contrast, no such mechanism existed in 1981, so finding an implied right of action for back wages without a corresponding provision for compensation could have exposed contractors to unexpected liability, giving rise to notice and reliance concerns that do

not obtain here. And such compensation is required by the regulation: "Where the clauses and applicable wage determinations are effective by operation of law under this paragraph, *the prime contractor must be compensated for any resulting increase in wages* in accordance with applicable law." 29 C.F.R. § 5.5(e) (emphasis added).

Second, the Court worried that finding an implied private right of action would "undercut" the Act's administrative enforcement scheme by allowing parties to go directly to federal court, leaving "courts … free to make postcontract coverage rulings." *Coutu*, 450 U.S. at 783. But the operation-of-law regulation does not cause the Act's enforcement scheme to be "disrupted by judicial intervention," *id.*, for two reasons: First, because the regulation does not create a private cause of action, as explained; and second, because the regulation operates within the Act's administrative enforcement scheme. In particular, the regulation specifies that the DOL Wage and Hour Division Administrator may grant a variance, tolerance, or exemption from the operation-of-law provision, which reflects that any exercise of the provision may be subject to administrative review and the Administrator's determination regarding the appropriate scope and coverage of the Act as well as additional equitable factors. *See* 29 C.F.R. § 5.5(e); 88 Fed. Reg. at 57,662 & n.249.

The Court stated in dicta that the respondent, in arguing for a private right of action, could not rely on the *Christian* doctrine to read the missing Davis-Bacon contract clause into the contract. *See Coutu*, 450 U.S. at 784 n.38; 88 Fed. Reg. at 57,667. However, as the Rule explains, the operation-of-law regulation differs in relevant part from the standalone *Christian* doctrine for the above reasons: (1) the *Christian* doctrine does not include compensation for contractors, whereas the operation-of-law provision does; and (2) while the *Christian* doctrine "is effectively self-executing," the operation-of-law provision allows DOL to grant variances, tolerances, or exemptions to help avoid "unexpected or unjust results." 88 Fed. Reg. at 57,663, 57,667–68. And subsequent decisions finding that operation-of-law principles are consistent with the DBA confirm that the cited dicta in *Coutu* does not say otherwise. *E.g.*, *Allegheny Jefferson Millwork*, 540 F. Supp. 2d at 176 ("When [Davis-Bacon] provisions are omitted from a *prime* contract, they do become part of the contract by operation of law."); *BUI Constr. Co. & Bldg. Supply*, ASBCA No. 28707, 84–1 B.C.A. ¶ 17,183, 1984 WL 13235 ("It is well settled

that if a statute requires inclusion of a contract provision, such provision will be read into the contract by operation of law, and is binding on the parties even if omitted from the contract terms.").

Judge Cummings preliminarily held that the operation-of-law regulation poses a "notice" issue and that it may be arbitrary and capricious because of uncertainty about whether Davis-Bacon will apply and compliance costs when the clauses are applied retroactively. *AGC*, 2024 WL 3635540, at *10, 13. But entities contracting with the federal government are required to have "knowledge of published regulations," *PCA Health Plans of Tex., Inc. v. LaChance,* 191 F.3d 1353, 1356 (Fed. Cir. 1999); *see also* 29 C.F.R. § 1.6(b)(2) (contractors have "an affirmative obligation to ensure . . . compliance with the Davis-Bacon Act labor standards"). If a contractor is unsure of DBA applicability for any particular contract, it "can seek guidance from the Department prior to contract award regarding whether the DBA provisions should apply" under 29 C.F.R. § 5.13. 88 Fed. Reg. at 57,666. Moreover, DOL maintains ultimate authority to settle questions regarding coverage and enforcement—and thereby avoid inequitable outcomes—through granting exemptions from the operation-of-law provisions. *See id.* at 57,669; 29 C.F.R. §§ 5.5(e), 5.14. And even where the operation-of-law provision must be invoked, it is paired with an assurance that contractors will be compensated for any increase in their wages. 29 C.F.R. § 5.5(e). Concerns regarding lack of notice and compliance costs are therefore unfounded.

## V.    DOL complied with the Regulatory Flexibility Act.

Similar to the secondary construction sites regulation and any substantive argument regarding the operation-of-law regulation, Plaintiffs have abandoned their RFA claim by not briefing it in their motion for summary judgment. *See supra* Argument III, IV.

In any event, Plaintiffs' RFA claim fails on the merits. The RFA requires agencies to "prepare a final regulatory flexibility analysis" for certain final rules addressing six elements pertaining to a rule's impact on small entities. 5 U.S.C. § 604(a). "The RFA is a procedural rather than substantive agency mandate." *Alenco Commc'ns, Inc. v. FCC,* 201 F.3d 608, 625 (5th Cir. 2000). Thus, courts review a final regulatory flexibility analysis "only to determine whether an agency has made a 'reasonable, good-faith

effort' to carry out the mandate of the RFA." *Id.* (citation omitted). "The proper question for [the reviewing] Court is not whether the [agency] reached the 'correct' determination, but whether the agency followed the [required] procedural steps." *Grocery Servs., Inc. v. USDA Food & Nutrition Serv.*, Civ. Action No. H-06-2354, 2007 WL 2872876, at *10 (S.D. Tex. Sept. 27, 2007).

Plaintiffs' RFA claim fails as a matter of law. It is clear from the face of the Rule that DOL made a good faith effort to comply with the RFA: the Rule had an entire section devoted to RFA compliance, *see* 88 Fed. Reg. at 57,716–21, and both there and throughout the rulemaking DOL discussed all six of the required factors. *Compare* 5 U.S.C. § 604(a) *with* 88 Fed. Reg. at 57,716–17 (need for rulemaking), *id.* at 57,526–721 (responding to significant issues in public comments), *id.* at 57,557, 57,616–18, 57,622–23, 57,639–40, 57,664–70, 57,717– 18 (addressing Small Business Administration comment and making changes in response), *id.* at 57,700–01, 57717–18 (estimating number of affected entities); *id.* at 57,719–21 (noting compliance and recordkeeping requirements and costs, and justifying regulations in light of them).

At the preliminary injunction stage, Judge Cummings preliminarily adopted Plaintiffs' view that DOL violated the RFA because it:

> (1) incorrectly assumed that the Final Rule did not expand coverage of workers under the DBA; (2) failed to perform the required compliance cost analysis pertaining to this expanded class of workers; and (3) failed to even attempt to estimate the number of small entities that will be impacted by these changes . . . .

*AGC*, 2024 WL 3635540, at *16. But close examination of the statute and the administrative record demonstrates that each of those contentions is incorrect.

First, while DOL believed that the material supplier and truck driver regulations "codifie[d] existing policy with minor changes," 88 Fed. Reg. at 57,717, it acknowledged that some employers would have to change their practices to comply. As discussed, under DOL's previous enforcement guidance, coverage of workers employed by material suppliers was assessed at the hour-by-hour, worker-by-worker level. Such workers' on-site non-delivery construction work, such as warranty or repair work, was always DBRA-covered, but such a worker's on-site *delivery* work might or might not be covered: if the worker's non-delivery work was 20% or more of the workweek, then yes; if less,

then no. *Id.* at 57,623. There was "considerable confusion" about this enforcement policy within the industry, however. As DOL explained:

> Some employers, for example, believe that 20 percent is the *de minimis* threshold for coverage of onsite delivery work by truck drivers employed by contractors or subcontractors; however, the 20-percent threshold in the Department's current guidance actually applies to material suppliers. Similarly, others incorrectly read the existing guidance as only requiring compensation for onsite non-delivery construction time if such time exceeds 20 percent of a workweek; however, the existing guidance actually requires compensation for all such time regardless of the amount, and additionally requires that if such time exceeds 20 percent of a workweek, all of a worker's onsite time is covered.

*Id.* DOL recognized that some employers might have reliance interests in whatever they believed the policy to be. *Id.* at 57,624. DOL also acknowledged that contracting agencies may not have been following DOL's previous policy. *Id.* at 57,719. As a result, DOL noted that the new regulations clarifying the material supplier exception and truck driver coverage "could lead to expanded application of the Davis-Bacon labor standards, which could lead to more small firms being required to comply with Davis-Bacon labor standards." *Id.*

Second, DOL reasonably explained that it did not have data with which to estimate the number of small firms specifically affected by the material supplier or truck driver regulations. Not having "perfect empirical or statistical data . . . is not unusual in day-to-day agency decisionmaking within the Executive Branch." *Prometheus Radio Project*, 592 U.S. at 427. "The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Id.* And neither does the RFA. Rather, the RFA sensibly requires an agency to estimate "the number of small entities to which the proposed rule will apply" only "where feasible." 5 U.S.C. § 603(b)(3). Similarly, in a final rule, the agency can either estimate "the number of small entities to which the rule will apply" or provide "an explanation of why no such estimate is available." *Id.* § 604(a)(4). Here, DOL explained that it did "not have data to determine how many" small firms would be affected by the material supplier or truck driver regulations. 88 Fed. Reg. at 57,719. Contracting agencies and employers interpreted DOL's previous guidance in many different ways and adopted many different practices. It was not feasible to determine how many small businesses would actually need to change their practices

in response to the Rule. To demonstrate an RFA violation, Plaintiffs would need to show, for example, that DOL had some relevant data about the number of small firms affected before it at the time of the rulemaking and unreasonably failed to address it. But Plaintiffs have not pointed to such data.

Moreover, although a more granular estimate of the number of small businesses specifically affected by the truck driver and material supplier regulations was not feasible, DOL in good faith estimated that between 101,700 and 127,800 small businesses would potentially be affected by its entire rulemaking. DOL did so by identifying small businesses that were "actively holding" DBRA contracts; were "bidding on" DBRA contracts but without active contracts; or were "considering bidding in the future." *See* 88 Fed. Reg. at 57,717. As DOL explained, most of the small businesses that might be newly covered by the material supplier or truck driver regulations were "included in the estimate because the methodology covers all firms bidding, or considering bidding," not just those currently holding DBRA contracts. *Id.* at 57,718. Further, the number of small businesses affected by the entire rulemaking is necessarily equal to or higher than the number affected by any individual provision. It is hard to see how small entities could complain that DOL was insufficiently solicitous of their interests if the agency *over*estimated the number of small entities who would be affected. And that is especially true in light of the fact that judicial review under the RFA can only be done in accord with APA standards, *see* 5 U.S.C. § 611(a), (c), which incorporates the APA's prejudicial error rule, *see id.* § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").

Third, as for compliance costs, under the RFA, an agency "may provide either a quantifiable or numerical description of the [rule's] effects . . . or more general descriptive statements if quantification is not practicable or reliable." 5 U.S.C. § 607. DOL explained that it was not quantifying the costs of the regulations clarifying DBRA coverage because, again, it did not have data on how many firms would be affected. 88 Fed. Reg. at 57,721. But it nevertheless addressed potential effects on small businesses. DOL considered some commenters' concerns that "compliance costs for newly covered small firms" would be so high that they would deter small businesses from participating on DBRA contracts, but determined that they would not, based on several considerations: (1) two-thirds (67%) of all Davis-Bacon contracts were held by 101,700 small firms; (2) a study of the highway

construction industry found contractors did not bid any differently when bidding on DBRA projects versus less-regulated state projects, indicating a change in labor costs does not necessarily affect bids; and (3) to the extent any firms would have to significantly increase their wages to satisfy DBRA requirements under the Rule, those increased costs could be incorporated into their bids with the contracting agency. *Id.* at 57,720-21; *see also* AR00007270-71 (highway construction study). These suggested that the Rule would not pose a substantial barrier to entry. *See* 88 Fed. Reg. at 57,721.

And as to the operation-of-law regulation in particular, Judge Cummings adopted Plaintiffs' statement that the Rule violated the RFA by failing to acknowledge compliance costs beyond the wage differentials. *AGC*, 2024 WL 3635540, at *15. That is not accurate. The rule extensively addressed comments about compliance costs with respect to the operation-of-law regulation. 88 Fed. Reg. 57,663-70, 55,708. The Department concluded that the provision requiring compensation to contractors "significantly reduces" the costs on contractors, *id.* at 57,666, and acknowledged a request for compensation beyond the specific wage-differential itself, noting that the rule provides for compensation "in accordance with applicable law" including the Federal Acquisition Regulatory Council and its price-adjustment clauses. *Id.* at 57,669. Taking all of this into consideration, the Department concluded that any new costs from the provision would be minimal because the pre-existing procedure at 29 C.F.R. § 1.6(f) already required retroactive application of missing contract clauses and thus the associated compliance costs, *id.* at 57,665–66, 57,708, and that "any increased compliance burdens due to this change will be minimal and are outweighed by the Department's goal of streamlining coverage determinations, ensuring effective enforcement, and reducing economic hardship to workers caused by delays in receiving backpay," *id.* at 57,666. Plaintiffs have not identified any comment that was not addressed so as to plausibly support a violation of the APA or RFA on this score.

## VI.    Plaintiffs' constitutional claim is duplicative of their exceeds-statutory authority claim.

Plaintiffs' Count I, which alleges that the challenged regulations are "contrary to constitutional right," is based on the same legal theory as Count II: that Defendants exceeded their authority under

the statute. *See* FAC ¶ 63 (alleging Defendants violated the Constitution when "they created substantive requirements wholly untethered to the statutory text"). Plaintiffs do not make any unique constitutional arguments in their motion. Pls.' MSJ at 11-12. Because each of the challenged regulations falls within DOL's statutory authority to promulgate reasonable regulations, Plaintiffs' Count I fails.

## VII. Plaintiffs did not bring any Appointments Clause challenge.

Plaintiffs' motion contains a stray remark that "Plaintiffs' challenges to DOL's Final Rule raise legal questions under . . . the Appointments Clause." *Id.* at 7. But Plaintiffs never raised an Appointments Clause claim in their complaint. *See* FAC. Nor have Plaintiffs adequately briefed the issue. Thus, that issue is not properly before this Court. *U.S. ex rel. DeKort v. Integrated Coast Guard Sys.*, 475 F. App'x 521, 522 (5th Cir. 2012) (affirming district court's denial of "DeKort's motion for partial summary judgment because he attempted to raise a new claim, not asserted in his fifth amended complaint"); *Architectural Granite*, 2023 WL 121996, at *4.

## VIII. Any relief should be appropriately limited.

If the Court disagrees with Defendants' arguments, any relief should be no broader than necessary to remedy the demonstrated harms to Plaintiffs before this Court. *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Any relief should be limited in several ways.

### A.   The Rule's various regulations are severable.

First, the parties agree that the Rule's numerous regulatory changes are severable and, in their motion, Plaintiffs seek relief only as to the truck driver, material supplier, and operation of law regulations. Joint Stip. ¶¶ 5-7; *see* Pls.' Reply Br. in Supp. of Prelim. Inj. Mot. at 10, ECF No. 34 ("Plaintiffs agree, as they must, that each of the challenged provisions operate independently from one another and are severable."). The Rule contains an express severability clause, "explain[ing] that each provision is capable of operating independently from one another, and that if any provision of part 1 is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the Department intended that the remaining provisions

remain in effect." 88 Fed. Reg. at 57,591. Thus, any relief should be limited to the three specific regulations that Plaintiffs challenge here. (As discussed, Plaintiffs have abandoned their claims as to the secondary construction sites regulation. *Supra* Argument III.). And that is true even if this Court determines that it should "set aside" the relevant agency action here under 5 U.S.C. § 706(2), because an "agency action" includes "the whole or part of an agency rule." 5 U.S.C. § 551(13). *See Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 n.7 (N.D. Tex. 2019) (a court may set aside "only the part of a rule found to be invalid").

### B. Plaintiffs have not demonstrated entitlement to injunctive relief or vacatur.

Second, Plaintiffs have not demonstrated entitlement to an injunction, let alone a universal injunction. Plaintiffs' motion makes no mention of the requisite permanent injunction factors, *see generally* Pls.' MSJ, under which they must prove, with evidence, that they suffer irreparable harm absent an injunction, and that harm to them outweighs the harm to the public caused by enjoining the truck driver, material supplier, and operation of law regulations. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (listing criteria for permanent injunction); *Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance of the equities and public interest factors "merge when the Government is the opposing party"). In fact, the public interest would be disserved by an injunction. DOL promulgated the Final Rule to ensure workers receive the DBA's protections and to provide regulatory certainty for businesses by codifying existing agency practices. *See, e.g.*, 88 Fed. Reg. at 57,715. Reinforcing that conclusion, the majority of public comments favored some or all of the Rule's changes. *Id.* at 57,527.

Thus, even if this Court holds that some of the challenged regulations are unlawful, rather than enjoin the regulations,[9] the Court should simply issue a declaratory judgment that those particular regulations cannot be lawfully applied to Plaintiff JLM and to the members of the three voluntary-association Plaintiffs. Such a declaratory judgment would fully remedy any harm to Plaintiffs while

---

[9] By "universal" vacatur, Defendants refer to a remedial order that is understood to operate against the rule itself and render the rule void and without legal effect for everyone, as opposed to an order that is limited to declaring the rule inapplicable to the plaintiffs before the Court. Similarly, by "universal" injunction, Defendants refer to an injunction that prevents Defendants from applying the rule to anyone, as opposed to simply enjoining application of the rule to Plaintiffs.

not affecting the rights of parties not before the Court, such as workers who have not chosen to work for JLM or the other Plaintiffs' members. *See* 28 U.S.C. § 2201(a) ("[A]ny court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . . . [and] such declaration shall have the force and effect of a final judgment or decree."); *Kentucky v. Fed. Highway Admin.*, No. 5:23-CV-162-BJB, 2024 WL 1402443, at *18 (W.D. Ky. Apr. 1, 2024) (a declaratory judgment under 28 U.S.C. § 2201 "binds the parties alone—unlike vacatur or a nationwide injunction"), *appeal filed*, No. 24-5532 (6th Cir. June 3, 2024).

While Defendants recognize that the Fifth Circuit has described vacatur as the "default" remedy under the APA, *Data Mkg. P'ship, LP v. DOL*, 45 F.4th 846, 859-60 (5th Cir. 2022), even if the APA authorizes vacatur, the Fifth Circuit has recognized that it is not always required or appropriate. *See Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality op.) (district court could consider "a more limited remedy" than universal vacatur), *aff'd*, 602 U.S. 406 (2024); *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand); *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 499-502 (N.D. Tex. 2024) (declining to vacate regulations), *appeal dismissed*, No. 24-10603, 2024 WL 5279784 (5th Cir. July 22, 2024).[10] The Court should enter the more limited remedy of declaratory relief here.

### C.    Any relief should be limited to the parties.

Finally, if the Court were to enjoin DOL from enforcing parts of the Rule or set aside parts of the Rule, that relief should be limited to the parties here in accordance with constitutional and equitable principles. Article III of the Constitution limits a federal court's power to granting relief to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill*, 138 S. Ct. at 1930. And a court's equitable authority is generally limited to relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Historically,

---

[10] Defendants preserve for appeal the argument that the APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize vacatur, as § 706(2) should not be read as authorizing remedies. Remedies are governed by § 703, which, in the absence of a "special statutory review proceeding," provides only declaratory or injunctive relief. *See United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment).

"American courts of equity did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)). And the inclusion of APA claims does not alter these principles. Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). While Congress "may intervene and guide or control the exercise of the courts' discretion," courts should "not lightly assume that Congress has intended to depart from established [equity] principles." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Thus, any relief—whether declaratory, injunctive, or under the APA—should be limited to only Plaintiff JLM and the other Plaintiffs' members to the extent they have proven injury from particular provisions of this rulemaking, in accordance with these principles.

## CONCLUSION

The Court should grant summary judgment for Defendants and deny Plaintiffs' motion for summary judgment.

Dated: January 16, 2025                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Principal Deputy Assistant Attorney General

                                           JULIE STRAUS HARRIS
                                           Assistant Branch Director

                                           */s/ Cynthia Liao*
                                           CYNTHIA LIAO (CA Bar No. 301818)
                                           ARJUN MODY (DC Bar No. 90013383)
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L St. N.W.
                                           Washington, DC 20005
                                           Tel: (202) 531-1325 (Liao)
                                           Tel: (202) 451-7723 (Mody)
                                           Fax: (202) 616-8470
                                           cynthia.f.liao@usdoj.gov
                                           arjun.a.mody@usdoj.gov

                                           *Counsel for Defendants*